**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (JLP) |
| | ) | |
| Debtor. | ) | Hearing Date: 01/26/05 @ 9:30 a.m. |
| | ) | Related Document No.: 2432 |

**MAGTEN ASSET MANAGEMENT CORPORATION'S
OBJECTION TO FINAL FEE APPLICATION OF
<u>PAUL HASTINGS JANOFSKY & WALKER LLP</u>**

Magten Asset Management Corporation ("Magten") objects to the Paul Hastings Janofsky & Walker LLP ("Paul Hastings") final fee application (the "Final Fee Application") in connection with the NorthWestern Corporation ("NorthWestern" or the "Debtor") Bankruptcy, and respectfully alleges as follows:

**INTRODUCTION**

1. By Memorandum Decision dated July 23, 2004, this Court (Case, J.) held that Paul Hastings' initial disclosures under Bankruptcy Code Section 327 and Bankruptcy Rule 2014 had been "inadequate." (Memorandum Decision, at 5, attached hereto as Exhibit A)  The Court noted that Paul Hastings had an obligation to disclose "*all connections*" but it "fail[ed] to do" so. *Id.* (emphasis in original).  Paul Hastings omitted from its declarations that it represented both the Debtor and one of its subsidiaries in a fraudulent transfer of substantial assets to the Debtor from the subsidiary, assets that were the centerpiece of the Debtor's plan of reorganization. Nevertheless, on the basis of the United States Trustee's 11th hour oral representation that Paul Hastings had disclosed its conflict secretly to the Trustee, and whom the Court also found "mistakenly" did not require disclosure, and even in the face of overwhelming

evidence of Paul Hastings' failure to disclose the earlier representation on multiple occasions, despite opportunity and requests to do so, the Court found Paul Hastings had a "lack of intent to conceal", and exercised discretion not to disqualify Paul Hastings. *Id*. The Court necessarily rejected Magten's contention that Paul Hastings' pre-petition representation of both parties to the fraudulent transfer of the principal reorganization assets of the Debtor's estate prevented it from acting with disinterest as to all classes of creditors in contravention of Bankruptcy Code Section 327. That ruling is on appeal to the District Court where it has yet to be decided.

2. Paul Hastings now seeks, as part of its Final Fee Application, an order approving the sum of $13,620,661.75 for payment of professional services rendered to the Debtor and the sum of $916,531.68 for payment of expenses incurred in connection with its representation over a thirteen month interlude.[1] Magten objects to the Final Fee Application because until the disqualification appeal is decided, the Court should not undertake to determine what standards will govern the award of fees or, for that matter, whether Paul Hastings is even entitled to fees. While Paul Hastings has received approximately $11 million of the $13 million, on an interim basis, the Court should await the outcome of the appeal before making a final fee determination.

3. In the event the Court determines to proceed to hear the Final Fee Application in any event, Magten objects because (1) the final application includes time (and, inexplicably, no expenses) on matters that Paul Hastings represented to the Court

---

[1] These amounts do not include approximately $1,912,263.58 incurred by Paul Hastings in connection with the same representation in the two months preceding the filing, no explanation or details of which have ever been disclosed. (See Deposition of Jesse H. Austin III, Paul Hastings' principal billing partner on the NorthWestern reorganization, at 85, attached hereto as Exhibit B (hereinafter, "Austin Deposition")); (see also Affidavit of Jesse H. Austin III at 12, attached hereto as Exhibit C.)

from which it had withdrawn as counsel and (2) a substantial portion of the fees and expenses incurred were not necessary and did not benefit the Debtor's estate.

## BACKGROUND

4.     On November 15, 2002, less than ten months before filing its bankruptcy petition, NorthWestern transferred substantially all of the assets of its wholly owned subsidiary, Clark Fork and Blackfoot, LLC ("Clark Fork"), to itself for little or no consideration (the "Transaction"). Paul Hastings represented both NorthWestern and Clark Fork in the Transaction, an undertaking Paul Hastings failed to disclose to this Court and the creditors pursuant to its disclosure obligations under Bankruptcy Code Section 327 and Rule 2014. The Transaction netted NorthWestern hundreds of millions of dollars of assets at the expense of Clark Fork's creditors, who were left without recourse. These creditors, including Magten, sought and obtained orders to lift the automatic stay so as to pursue fraudulent conveyance claims against NorthWestern.

5.     Following this Court's grant of a motion to lift the automatic stay, on April 16, 2004, Magten filed an adversary proceeding (the "Adversary Proceeding") against NorthWestern seeking to avoid the November 2002 transaction as a fraudulent transfer. The Adversary Proceeding is still pending.

6.     In March, 2004, Magten pressed Paul Hastings to disclose its role in the Transaction, and if, as Magten surmised, Paul Hastings had represented both parties to the Transaction, that it withdraw from its representation of the Debtor. When Paul Hastings refused both demands and failed to even respond, on May 11, 2004, Magten first filed a statement pursuant to Bankruptcy Code Section 328(c) alerting the Court and

parties to the potential conflict. Magten also commenced an action in state court in Montana against Paul Hastings for its role in aiding and abetting the fraudulent transfer.

7. By motion dated June 18, 2004, Magten moved to disqualify Paul Hastings from representing the Debtor on the grounds that Paul Hastings' pre-petition representation of both parties to the fraudulent transfer of assets which were the centerpiece of the Debtor's reorganization prevented it from acting with disinterest as to all classes of creditors (the "Motion to Disqualify").

8. In response to Magten's request, the Court ordered that Paul Hastings file a supplemental disclosure, which it did on June 16, 2004. (Second Supplemental Affidavit dated June 16, 2004 ("Second Supplemental Affidavit") at 5, docket no. 1488, attached hereto as Exhibit D.) In the Second Supplemental Affidavit, Paul Hastings represented to the Court that it had withdrawn as counsel to the Debtor in all matters related to the Adversary Proceeding. *Id*.

9. In its July 23, 2004 Memorandum Decision, the Court found that Paul Hastings had failed to disclose all of its connections, as it was obligated to do. Despite that finding, the Court denied the Motion to Disqualify Paul Hastings as counsel to the Debtor. Magten has appealed the Court's decision not to disqualify Paul Hastings from its representation of the Debtor to the District Court (the "Disqualification Appeal"), and that appeal is pending.

## LAW AND ARGUMENT

### A. Any Allowance of Fees Should Be Stayed and Subject To Disgorgement Until The Disqualification Appeal Is Decided

10. Paul Hastings' Final Fee Application should not be decided or paid until resolution of the Disqualification Appeal. The District Court's decision on that appeal

4

necessarily impacts any final fee award to which Paul Hastings may be entitled. If the District Court were to reverse the decision not to disqualify Paul Hastings as Debtor's counsel, then the propriety of all its approximately $14 million in fees and expenses would be called into question.

11.   Magten asserted multiple, substantial grounds upon which to disqualify Paul Hastings. As the Court found, Paul Hastings failed to disclose its prior involvement with the Transaction. (Exhibit A at 5). In fact, however, Magten also demonstrated that Paul Hastings deliberately misrepresented its involvement in the Transaction in its initial Section 327 and Rule 2014 disclosures, which constitutes clear grounds for disqualification. In re BH&P, 949 F.2d 1300, 1317-18 (3d Cir. 1991). Additionally, Paul Hastings should have been disqualified for having represented both parties to the Transaction in the face of Clark Fork's creditors' objections to it. See, e.g., In re Envirodyne Industries, Inc., 150 B.R. 1008 (Bankr. N.D. Ill. 1993); Grynberg v. Burke, 1976 Del. Ch. Lexis 153 (Del. Ch. 1981); Gieder v. Waxman, 1983 WL 21397 *3 (Del. Ch. 1983). Finally, as a defendant for having aided and abetted the Transaction, Paul Hastings clearly held an interest materially adverse to a class of creditors. See, e.g., In re First Jersey Securities, Inc., 180 F.3d 504 (3d Cir. 1999); In re Matter of 22 Acquisition Corp., 2004 WL 870813 at *2 (E.D. Pa. 2004); In the Matter of Gelsinger, 2000 WL 136812 at *2 (E.D. Pa. 2000); In re Star Broadcasting, Inc., 81 B.R. 835, 838 (Bankr. D. N.J. 1988). Any one of the above grounds is more than sufficient to disqualify Paul Hastings. Magten intends to vigorously prosecute the Disqualification Appeal.

12.   In the event the Disqualification Appeal is successful, Paul Hastings' Final Fee Application would be subject to outright denial, and much, if not all, of the fees paid

5

to date, subject to disgorgement. Indeed, at least one Circuit Court has held that the courts lack discretion to award compensation to any professional found to be an "interested person" and thereby disqualified under Section 327, even if the finding is made at the conclusion of the case. In re Federated Department Stores, Inc., 44 F.3d 1310, 1319 (6th Cir. 1995); see also In re Prince, 40 F.3d 356, 358-60 (11th Cir. 1994) (denying fees to counsel for the debtor and ordering disgorgement because the attorney was counsel on both sides of a pre-petition transaction that shifted assets of the bankruptcy estate, and the attorney did not fully disclose his involvement in that transaction until well into the bankruptcy case).

        13.    The better approach to the Final Fee Application is to deny the same without prejudice to renew upon the determination of the Disqualification Appeal. See In re Keravision, Inc., 273 B.R. 614, 615 (N.D. Ca. 2002)(bankruptcy court denied attorney fee application without prejudice pending appeal of retention order even though attorneys had continued representation of the debtor during the pendency of the appeal); In re Domino Investments, Ltd., 82 B.R. 608, 609 (Bankr. S.D. Fla. 1998) (Court would exercise discretion to defer fee applications until conclusion of case, including appeals).

        14.    Moreover, withholding the final fee award until resolution of the Disqualification Appeal will not prejudice Paul Hastings. Paul Hastings has already received 80% of its fees for professional services and 100% of its expenses, or more than $11,000,000 (not including $2 million plus received pre-petition in connection with the reorganization). The determination of whether to award the interim fees on a final basis and any additional fees should be held in abeyance, until the Disqualification Appeal is decided.

## B. Paul Hastings Should Not be Compensated for Matters Which It Represented to the Court It Had Withdrawn From

15.     Under Section 330 of the Bankruptcy Code, the Court "may award reasonable compensation for actual, necessary services rendered" by an attorney and "reimbursement for actual, necessary expenses." 11 U.S.C. §§ 330(a)(1)(A)-(B). The Court has the power to "award compensation that is less than the amount of compensation that is requested." 11 U.S.C. § 330(a)(2). In determining the appropriate compensation for an attorney, the Court should take into account all relevant factors, including the time spent for such services, the rates charged by the attorney, the complexity of the case and the fees of comparably skilled attorneys. 11 U.S.C. § 330(a)(3)(A). However, "the Court shall not allow compensation for…services that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A); see also In re Engel, 124 F.3d 567, 573 (3d. Cir. 1997) ("the attorney must show that the services were necessary and benefited the estate.").

16.     In the event the Court does determine to proceed with the Final Fee Application prior to the determination of the Disqualification Appeal, it should deny at least those fees that are related to matters from which Paul Hastings represented it withdrew. In response to the Motion to Disqualify, Paul Hastings asserted that any conflict of interest it had with respect to the fraudulent transfer was cured by its withdrawal from representation of the Debtor in connection with "all matters relating to" the Adversary Proceeding. Paul Hastings stated:

> As a result of the filing of the Magten Paul Hastings Litigation and in order to avoid any potential or appearance of any conflict of interest, *all matters relating to the*

7

> *Magten Adversary Proceeding* have been transferred to Greenberg Traurig LLP, Paul Hastings is no longer handling matters *related to* the Magten Adversary Proceeding.

(Second Supplemental Affidavit, at 5, Exhibit D). (Emphasis supplied.)

17. Ruling on the Motion to Disqualify, the Court found Paul Hastings had failed to properly disclose its role in the fraudulent transfer. Nevertheless, it did not disqualify Paul Hastings from acting as counsel to the Debtor in the reorganization proceedings. (Memorandum Decision, Exhibit A). But the Court also did not address Paul Hastings' role in the Adversary Proceeding or matters related to it, as their withdrawal did not require it to do so.

18. Now, in its Final Fee Application, Paul Hastings is seeking fees and expenses on the very matters from which, it represented to the Court that it had withdrawn. Paul Hastings may claim that the amount is *de minimus*, only $9,719.00 of which is identifiable. (See Seventh Monthly Interim Application at 2, n.1, attached hereto as Exhibit E.) As set forth below, the amount is much more than that, or over $300,000. Even that number does not account for other, unidentified time entries related to the Adversary Proceeding.

19. Set forth below is a list of other matters that are not only "related to" the Adversary Proceeding, but are in fact the very same issue—the fraudulent transfer of Clark Fork's assets to NorthWestern. Paul Hastings represented it had withdrawn from these matters. At no time did it seek to amend that representation. It should not be permitted to represent that it had withdrawn, then charge for the work.

8

a.     <u>The Lift Stay Motion</u>

20.    Paul Hastings' opposition to Magten's motion to lift the automatic stay (the "Lift Stay Motion") is clearly related to the Adversary Proceeding. Magten filed the motion on March 17, 2004. (<u>See</u> Magten's Motion to Lift the Automatic Stay, docket no. 959, attached hereto as Exhibit F.)  The Court granted the motion on April 8, 2004. (<u>See</u> Transcript of April 22, 2004 hearing, docket no. 1292, attached hereto as Exhibit G.)  The Lift Stay Motion involved the same legal issues, the same allegations of fraud and the same asset transfer as the Adversary Proceeding. It was the Lift Stay Motion that permitted the filing of the Adversary Proceeding.

21.    Paul Hastings' explanation of why it could bill for the Lift Stay Motion, but not the Adversary Proceeding, is that "it's a matter of judgment in great part as a bankruptcy petitioner." (<u>See</u> Austin Deposition at 36, Exhibit B.)  In other words, no explanation at all. From Paul Hastings' monthly billing statements, one can glean at least $17,378.50 billed to the estate in connection with the Lift Stay Motion, all of which should be disallowed. (<u>See</u> Paul Hastings' Billing on Magten's Lift Stay Motion, attached as Exhibit H.)  As set forth below, that amount may not account for other time charged in such a manner as to conceal whether it was charged in connection with the Lift Stay Motion or Adversary Proceeding.

b.     <u>The McGreevey Class and Comanche Park Lift Stay Motions</u>

22.    The same conflict that prohibited Paul Hastings from acting as counsel in Magten's Adversary Proceeding was prevalent in the McGreevey Class and Comanche Park adversary proceedings. Consequently, Paul Hastings had no justification for participating in those proceedings and should not be awarded fees for its improper action.

9

23. On April 2, 2004, a group of former Clark Fork creditors referred to generally as the McGreevey Class Action Claimants (the "McGreevey Class") filed a joinder to the Lift Stay Motion in order to continue litigating their own action that asserted, among other things, "that the upstreaming of assets constituted a wrongful acquisition and a fraudulent transfer which transfer rendered [Clark Fork] insolvent and was done with the design and effect to impair [Clark Fork's] creditors." (See Joinder of McGreevey Class Action Claimants in Magten's Motion For Relief From Automatic Stay, at 2, docket no. 1163, attached as Exhibit I.) Despite denying that motion, the Court granted the McGreevey Class' separate motion to lift stay to pursue its action. (See Orders dated May 10, 2004 and June 16, 2004, attached as Exhibits J and K.)

24. Another former Clark Fork creditor, Comanche Park, LLC ("Comanche Park") also filed a motion to lift the stay to pursue its own fraudulent conveyance action. That motion was denied, but only because Comanche Park did not assert its fraudulent conveyance claim prior to the expiration of the bar date for proofs of claims. (See Memorandum Decision Denying Comanche Park's Motion to Lift the Automatic Stay, docket no. 1482, attached hereto as Exhibit L.)

25. The McGreevey Class and Comanche Park lift stay motions were identical to Magten's Lift Stay Motion. As admitted by Mr. Austin: "We had lift stay motions or a lift stay file, of which there were others that were filing similar motions to Magten, to seek the right to bring similar claims." (See Austin Deposition at 36, Exhibit B.)

26. The work performed on the McGreevey Class and Comanche Park lift stay motions was so intertwined, and performed in unison, with the work performed on Magten's Lift Stay Motion, that Mr. Austin could not distinguish whether specific line-

10

item billing descriptions referred to the Magten's, the McGreevey Class' or Comanche Park's lift stay motions. (See Austin Deposition at 69-72, Exhibit B)(referring to whether a particular line-item billing description referred to Magten's Lift Stay Motion, Mr. Austin answered, "I can't say yes or no to that…Comanche Park had also been asserting similar arguments about a fraudulent conveyance of the transfer of the assets and the going flat transaction. And the McGreevey plaintiffs had been making the same type of allegations."). The very fact that Paul Hastings billed the estate for work performed in connection with these motions without differentiating between the particular motion being worked on only reaffirms the relatedness of all three parties' claims.

27.     Paul Hastings has offered no persuasive rationale as to why its potential conflicts with the fraudulent conveyance claims filed by Magten warranted withdrawing from the Adversary Proceeding but not from the McGreevey Class and Comanche Park matters, particularly in light of the representation that they were withdrawing from all matters "related to" the Adversary Proceeding. (See Austin Deposition at 72, Exhibit B) (offering only that, "They did not sue Paul Hastings like your client [Magten] did."). Paul Hastings bears the burden of demonstrating the necessity and reasonableness of its fees, In re Fleming Companies, Inc., 304 B.R. 85, 89 (Bankr. D. Del. 2003) citing Zolfo, Cooper & Co. v. Sunbeam-Oster Company, Inc., 50 F.3d 253, 261 (3d Cir. 1995), which it cannot do.

28.     Paul Hastings billed at least $53,293.50 to the estate in connection with the McGreevey Class and Comanche Park Lift Stay Motions. (See Paul Hastings' Billing on McGreevey Class and Comanche Park Lift Stay Motions, attached as Exhibit M.) As noted, those bills are organized in such a manner as to make it impossible to determine

11

the full extent of Paul Hastings' billings to these matters, a point addressed in section f, infra.

c.  Objections to the Confirmation of the Plan

29. According to both this Court and Paul Hastings, Magten's objections to the Debtor's plan of reorganization were identical to the issues raised in the Adversary Proceeding. As stated by Paul Hastings, "Magten's Appeal from the Confirmation Order involves issues that go to the heart of the Adversary Proceeding, including key elements of Magten's claim against Paul Hastings…" (See Reply Memorandum in Support of Motion to Stay Action at 6, docket no. 37, attached as Exhibit N.) Similarly, this Court commented, "I went back to look at the issues on appeal, and the same issues on appeal directly parrot the issues of confirmation." (See Transcript of Proceedings on December 6, 2004, docket no. 2490, attached as Exhibit O.) On that basis and at Paul Hastings' urging, the Court stayed the Adversary Proceeding pending the outcome of an appeal of the confirmation order.

30. Paul Hastings should not be permitted to bill the estate for a matter that it claims is related to the Adversary Proceeding, and used as the basis for staying the Adversary Proceeding. Yet Paul Hastings has done just that.

31. In connection with the plan's confirmation, Paul Hastings billed the estate for, among other things, researching fraudulent conveyance law, examining the various trust agreements issued in connection with Clark Fork's debt, defending depositions on the Clark Fork fraudulent transfer, and even preparing an analysis of the Order denying the motion to dismiss the Adversary Proceeding. (See Paul Hastings' Billing on Objections to the Confirmation Plan, attached hereto as Exhibit P.)

32. Paul Hastings represented to this Court that it would withdraw as NorthWestern's counsel in the Adversary Proceeding and all matters "related to" that proceeding. By its own admission, and this Court's finding, that should have included objections to the plan based on the fraudulent transfer.

33. According to Paul Hastings' monthly billing statements, they billed at least $230,867.50 to the estate in connection with Magten's objections to the confirmation of the reorganization plan. (See Exhibit P.) Again, this number fails to account for related billings charged to other time entry categories.

d. The 11 U.S.C. § 328(c) Statement

34. On May 11, 2004, following Paul Hastings' refusal to respond to repeated requests for disclosure of their role in the fraudulent transfer and withdrawal from matters related to it, Magten filed a statement pursuant to Code Section 328(c) requesting that the Court examine whether Paul Hasting was disinterested before considering allowance of compensation for services and reimbursement of expenses of Paul Hastings. Subsequently, Paul Hastings filed a response, styled as a motion, to Magten's 328(c) statement. (See Response of Paul Hastings to 328(c) Statement, docket no. 1395, attached hereto as Exhibit Q.)

35. On matters related to the 328(c) statement, even Paul Hastings has admitted it has no basis for billing the estate. Asked whether Paul Hastings' Final Fee Applications included work performed in connection with the 328(c) Statement, Jesse Austin replied, "As I said, I think some of the early stuff may have slipped through in the case administration or fee application or something maybe, but as a general rule, the answer is no." (See Austin Deposition at 43, 45, Exhibit B) (Asked if Paul Hastings

intended to withdraw billing entries related to the 328(c) Statement, Mr. Austin replied, "We would withdraw those.").

36. However, Paul Hastings' Final Fee Application reveals it is in fact seeking reimbursement for at least $2,999.50 of fees for work performed in connection with the 328(c) statement. (See Paul Hastings' Billing on Magten's 328(c) Statement, attached as Exhibit R.) Those fees should also be disallowed.

e. Magten's suit against Paul Hastings

37. On May 20, 2004, Magten sued Paul Hastings in state court in Montana for its role in aiding and abetting the fraudulent transfer. Paul Hastings subsequently removed the matter to the United States District Court for the District of Montana. The Montana District Court then transferred the matter to the District Court in this District, where it is pending. Paul Hastings wrongfully charged the estate for work performed in connection with that suit.

38. Although self-evident, Paul Hastings cannot bill the estate for time and expenses defending Magten's suit against it. Yet, according to their monthly billing statements, Paul Hastings billed at least $1,691.00 to the estate in connection with Magten's suit against Paul Hastings. (See Paul Hastings' Billing of Magten's Suit Against Paul Hastings, attached hereto as Exhibit S.) That time should be disallowed.

39. Similarly, Paul Hastings should not be permitted to bill the estate for preparation of the Second Supplemental Affidavit informing the court of its role as counsel to both parties in the fraudulent transaction and withdrawal from matters related to the Adversary Proceeding. As the Court found, Paul Hastings failed to disclose their role as required by the Bankruptcy Code and Rules. (See Exhibit D.) Moreover, Paul

Hastings should not be reimbursed for advising the Court it was withdrawing as counsel in the Adversary Proceeding and all matters related to it so as, among other things, to "avoid any potential or appearance of any conflict of interest." (See Exhibit D.)

40.    According to Paul Hastings' monthly billing statements, it billed at least $1,805.00 to the estate in connection with the Second Supplemental Affidavit. (See Paul Hastings' Billing, attached as Exhibit T.) That amount, and the $1,691.00 expended in connection with defending the action filed against them, should be disallowed.

f.    It Should Be Paul Hastings' Burden to Identify What Matters it Continues to Bill That Are Related to the Adversary Procceding

41.    It is elementary that the burden of demonstrating the reasonableness and necessity of fees rest with the applicant. In re Fleming Companies, Inc., supra, 304 B.R. at 89 (citing Zolfo, Cooper & Co. v. Sunbeam-Oster Company, Inc., 50 F.3d 253, 261 (3d Cir. 1995)). In that connection, it is incumbent upon counsel to maintain accurate, contemporaneous records of time expended, and in such a manner so as to enable the Court and interested parties to determine the matters to which such time is related. See In re Yankton College, 101 B.R. 151, 158 (Bankr. D. S.D. 1989).

42.    Under the United States Trustee Guidelines, "Professionals should make their best effort to be consistent in their use of categories…" U.S. Trustee Program, Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses filed under 11 U.S.C. § 330, Exhibit A (May 17, 1996), http://www.usdoj.gov/ust/fee0202.htm (last visited Jan. 3, 2005). In violation of this guideline, a critical problem encountered while examining Paul Hastings' Final Fee Application is that particular line-item entries explaining the work performed by attorneys or paralegals do not match-up with the billing categories under which they are

listed. By billing work under categories that are unrelated to the actual work performed and by not billing pursuant to a consistent methodology, Paul Hastings has made it extremely difficult for entities examining its fee applications to find line-item entries that are objectionable. This difficulty is compounded all the more so by the enormity of Paul Hastings' fees and expenses—more than $14 million in total.

43.     An illustration is appropriate. On August 24, 2004, Jesse H. Austin, who should fully understand his firm's billing practices because he was the lead partner in charge of NorthWestern's reorganization and edited many of the fee applications, billed $8,850.00 under the "Plan and Disclosure Statement" category for the following work description:

> Final witness preparation of A. Yearley, B. Bird, B. Austin and M. Hanson for confirmation hearing (7.0); conference with NorthWestern senior management and A. Kornberg to address issues regarding ruling on Magten action (1.0); analyze research to address issues arising from Magten ruling (2.3); attend settlement conference with counsel for Law Debenture, Magten, Committee (1.5); conference with A. Kornberg to discuss Magten and Law Debenture issues (1.0); final preparation for confirmation hearing (2.2)

(See August 24, 2004 Line-Item Entry, attached hereto as Exhibit U.) Although Mr. Austin listed all of this work under the "Plan and Disclosure Statement" category, a review of the line-item entries demonstrates that this work actually falls under several different categories. Thus, the two entries referencing the Magten ruling, which granted in part and denied in part NorthWestern's Motion to Dismiss Magten's fraudulent conveyance action, properly belongs under the category "Magten Potential Litigation." To be sure, Mr. Austin himself explained that "Magten Potential Litigation" refers to "…the issues relative to the litigation that Magten was asserting, based on what it

16

believed was a fraudulent conveyance of assets from a subsidiary to NorthWestern Corporation." (See Austin Deposition at 28, Exhibit B.) Similarly, the entry referencing a settlement conference concerned "the overall claims of the QUIPS in connection with the bankruptcy case." (See Austin Deposition at 80, Exhibit B.) But if that is the case, why wasn't the entry listed under any of the three categories Paul Hastings set-up related to the QUIPS? The answer is unknown, but one thing is certain, if a party desired to challenge the line-item entries listed under "Magten Potential Litigation" or the three categories concerning the QUIPS, that party would have to laboriously search every line-item entry in each of Paul Hastings fee applications because of the inconsistencies in Paul Hastings' categorization of its work.

44.   Another illustration is appropriate. On April 12, 2004, Jesse Austin billed $2,950.00 for the following work listed under "Case Administration:"

> Revise draft orders regarding motion by Magten, joinders by Comanche Park, McGreevy and Andre motion (1.5); analyze cases regarding standing on fraudulent conveyance issues (1.5); conference with B. Bird and B. Austin regarding open issues and prepare for Tuesday's meeting (2.0)

(See April 12, 2004 Line-Item Entry, attached hereto as Exhibit V.) Although listed under one billing category, this work description also encompasses work from several different billing categories. To be sure, the motion by Magten that was joined by Comanche Park and McGreevey was the Motion to Lift the Automatic Stay. Thus, the entry concerning work on that motion properly belongs in Paul Hastings' category "Relief from Stay Proceedings." (See Austin Deposition at 66, Exhibit B.) When asked about this discrepancy, Mr. Austin explained:

17

> I just put it there and it probably didn't get moved. We moved things from time to time, when we were doing the final monthly fee applications, to the right file. This may be an example that sometimes it didn't get moved, but didn't mean it did not get done.

(See Austin Deposition at 67, Exhibit B.) Similarly, the entry concerning work on the fraudulent conveyance issues properly belongs in Paul Hastings' category "Magten Potential Litigation."

45. Jesse Austin dismisses many of these inconsistencies by saying, "You have to set up these various sub-files and there's no manual for that and it's based on your experience and judgment in what matter happens in a particular case." (See Austin Deposition at 36, Exhibit B.) Fortunately, Mr. Austin is incorrect—there is a basic manual for the preparation of fee applications, contained in Exhibit A of Exhibit A of the U.S. Trustee Guidelines, which states "Here is a list of suggested project categories for use in most bankruptcy cases. Only one category should be used for a given activity…" U.S. Trustee Program, Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses filed under 11 U.S.C. § 330, Exhibit A (May 17, 1996), http://www.usdoj.gov/ust/fee0202.htm (last visited Jan. 3, 2005).

46. Finally, and inexplicably, Paul Hastings has allotted none of its almost $1 million in expenses to the Adversary Proceeding or matters related to it. Indeed, there is no way from the applications submitted to delineate expenses among the different matters.

47. The task of properly recording and segregating time and expense entries should fall on the applicant, Paul Hastings, and not objectors. In re Thorn, 192 B.R. 52, 55 (Bankr. N.D.N.Y. 1995) (citing Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)

("[F]ee applicant bears the burden of establishing entitlement to an award and documenting the appropriate expended and hourly rates.")). The Court should direct Paul Hastings to review its billings, and submit a supplemental statement that clearly identifies time and expenses on the Adversary Proceeding and all matters related to it.

## CONCLUSION

For the reasons advanced above, this Court should deny Paul Hastings' Final Fee Application until the Disqualification Appeal is decided. Alternatively, should the Court determine to proceed with the application, it should deny at least $308,035 or the amount sought, and require Paul Hastings to specify what other fees and expenses are attributable to matters related to the Adversary Proceeding before any final determination is made. The Court should also stay payment of, and make subject to disgorgement, any allowed fees pending the outcome of the Disqualification Appeal.

Dated: January 3, 2004                    SMITH, KATZENSTEIN & FURLOW LLP


/s/ Kathleen M. Miller
David A. Jenkins (I.D. No. 932)
Kathleen M. Miller (ID No. 2898)
The Corporate Plaza
800 Delaware Avenue
P.O. Box 410
Wilmington, DE 19899
(302) 652-8400

*Of Counsel*

STORCH AMINI & MUNVES PC
Bijan Amini (admitted *pro hac vice*)
Avery Samet
2 Grand Central Tower
New York, New York 10017
(212) 490-4100

19