UNITED STATES BANKRUPTCY COURT FILED
DISTRICT OF DELAWARE

2005 MAY -9  AM 8: 32

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| | . |
| NORTHWESTERN CORPORATION, | . Case No. 03-12872(JLP) |
| | . |
| Debtor. | . May 3, 2005 (9:32 a.m.) |
| | . (Wilmington) |
| | |
| IN RE: | Chapter 11 |
| | . |
| NETEXIT, INC., f/k/a | . Case No. 04-11321(JLP) |
| EXPANETS, INC., et al., | . |
| | . May 3, 2005 (9:32 a.m.) |
| Debtor. | . (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN L. PETERSON
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



2

INDEX TO TESTIMONY

GRAVES LAW OFFICE'S
EVIDENCE

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Lee Graves | 97 | | | |
| Michael Young | 107 | | | |

INDEX TO EXHIBITS

LESTER AMMONDSON'S
EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE |
|-------------|-------------|------|
| 1 | Letter Dated 3/31/05 to Northwestern Energy in Beaut, Montana | 49 |
| 2 | Summary Dated August 18th, 2004 | 49 |

3

1    THE CLERK: Please rise. The United States

2 Bankruptcy Court for the District of Delaware is now in

3 session. The Honorable John L. Peterson presiding.

4    THE COURT: Please be seated. Let's take up

5 Netexit first. There's a mike there.

6    MS. DENNISTON: Good morning, Your Honor. Karol

7 Denniston on behalf of Netexit. On the agenda this morning

8 -- all of the matters, I will advise the Court, are being

9 continued. The first matter, the motion for order regarding

10 a disclosure statement has been continued pending the

11 mediation which is scheduled in June. Matter number 2 is the

12 motion to allow the Chicago Regional Counsel of Carpenter's

13 Pension Fund and to file a late filed claim. This matter has

14 been resolved by stipulation. I'd like --

15    THE COURT: I think I signed an order this morning.

16    MS. DENNISTON: Again, I have not seen the order,

17 Your Honor, but thank you. Matter number 3, the Court has

18 entered the order on the motion to compel reimbursement of

19 amounts paid by the Netexit debtors. And then matter number

20 4 is the debtor's motion for a TRO and preliminary injunction

21 staying petition before the Office of Administrative Trials

22 and Hearings, and this matter is under advisement with the

23 Court, and those are the only matters pending on the Netexit

24 docket.

25    THE COURT: We'll have an order out on the

1    comptroller's case probably by Wednesday.

2            MS. DENNISTON:  Thank you, Your Honor.

3            THE COURT:  Now, we'll pick up the agenda on

4    Northwestern Corporation.

5            MR. AUSTIN:  Your Honor, for the record, I'm Jesse

6    Austin on behalf of Paul Hastings Janofsky & Walker as lead

7    bankruptcy counsel for Northwestern.  We have a number of

8    matters on the agenda today subject to the Court's

9    predisposition.  I'd ask Ms. Denniston to go through this

10   agenda to advise the Court as to the matters which at least

11   from the debtor's perspective still appears to be active and

12   will require some direction from the Court and also those

13   matters which may otherwise either be resolved or to carry

14   over to the next hearing date.

15           THE COURT:  All right.

16           MS. DENNISTON:  Your Honor, we'd like to run

17   through the agenda and then we'd come back to those matters

18   that are contested or will require a hearing.  The fee

19   applications of Graves, Law Debenture, and Paul Hastings will

20   be going forward today.  We would note for the Court that as

21   to Law Debenture, we think it would be efficient to tie it to

22   matter number 14 which is the administrative claim filed by

23   Law Debenture when the Court hears that matter so both can be

24   addressed at the same time.

25           THE COURT:  They just filed another reply of

1 | thirty-some pages, and I signed the order this morning

2 | authorizing that reply to be filed by Law Debenture.

3 | MS. DENNISTON: We received those papers, Your

4 | Honor, and have reviewed that reply.

5 | THE COURT: All right, we'll just hold all of these

6 | fee matters until the end.

7 | MS. DENNISTON: Thank you, Your Honor. Matter

8 | number 2 is the motion to is the motion to approve the

9 | memorandum of understanding. We'd ask that that be continued

10 | to the next omnibus hearing date, but we would note for the

11 | Court that we do not have a calendar for the next hearing

12 | date. Matter number 3 --

13 | THE COURT: I don't know if you're going to have a

14 | judge either. We're getting that decided this week.

15 | MS. DENNISTON: All right, Your Honor. Thank you.

16 | Matter number 3 is the omnibus motion for Court approval to

17 | assume certain executory contracts pursuant to § 365, and

18 | we'd ask that that be continued to the next omnibus hearing

19 | date. Matter number 4 is the motion pursuant to 105(a) and

20 | 363 of the Bankruptcy Code authorizing the debtor to

21 | terminate certain non-qualified retirement plans. We'd ask

22 | that that be continued to the next hearing date. Matter

23 | number 5, Your Honor, is the debtor's tenth omnibus objection

24 | to claims pursuant to 11 U.S.C. 502(b) and 510(b). We note

25 | for the record that these are equity claims that no responses

1  have been filed, and we would ask that the Court enter an

2  order at this time.

3       THE COURT:  Well, I read the omnibus objections

4  over and there are no responses.  I think they're all taken

5  care of by the terms of the plan or by further action by

6  payment.  Go on to number 6.

7       MS. DENNISTON:  Okay.  Number 6 is the same thing,

8  Your Honor.  This is the debtor's eleventh omnibus objection

9  pursuant to 502(b) and Bankruptcy Rule 3007.  There were no

10 supporting documentation provided with the claims.  No

11 responses were filed to the debtor's claim objection.  We'd

12 ask for an order at this time.

13      THE COURT:  All right.

14      MS. DENNISTON:  And I have forms of order which we

15 can hand up, Your Honor.  Number 7 is the debtor's objection

16 of claims of Barry Stefan and Donna Stefan pursuant to 11

17 U.S.C. 502(b) and Federal Bankruptcy Rule of Procedure 3007.

18 Again, these are equity claims, Your Honor.  No responses

19 have been filed, and we'd ask that they -- an order be

20 entered.  Same thing for number 8, Your Honor.  That's the

21 debtor's objection to administrative claim of House of Glass.

22 This is an administrative claim that there were -- is

23 inconsistent with the debtor's books and records.  The debtor

24 did file an objection and no response was received.  Matter

25 number 9 is the debtor's objection to the administrative

claim of Don Oberlander.  This is an administrative claim.
We filed an objection, Your Honor.  There was no response
received, and we'd ask that the order be entered.  And matter
number 10 is the debtor's fourteenth omnibus objection
pursuant to 11 U.S.C. 502(b) and Federal Bankruptcy Rule of
Procedure 3007.  This was a late-filed claim.  We filed an
objection.  No response was received, and we'd ask that the
order be entered at this time.

THE COURT:  Very well.

MS. DENNISTON:  If I could approach with the
orders, Your Honor.  Matter number 11, Your Honor, is the
motion for order declaring the automatic stay to be
inapplicable.  This is in connection with the Worker's
Compensation claim.  That matter has been continued as has
matter number 12 and matter 13.  All three of those matters
are related.  Those matters are subject to a settlement
stipulation that's being finalized.  We'd ask that these be
continued to the next omnibus hearing.  Matter 14 is the
matter I referred to earlier.  This is the request for
administrative expenses filed by Law Debenture.  It is going
forward today.  Matter number 15 is the COBRA motion where
the Court has entered the order so that can be vacated.
Matter number 16 is Richard Hylland's cross-motion for order
confirming that the supplemental income security plan is an
obligation of the reorganized Northwestern.  At the last

1    hearing, Your Honor, the Court advised that it would be

2    entering an order as to what it was going to be hearing

3    today, unless we may have misunderstood, but we're prepared

4    to proceed on the cross-motion but not the substantive claim

5    objection if the Court wishes to have that hearing today.

6              THE COURT:  Well, let me ask this:  How does this

7    objection relate to Judge Barron's decision that all these

8    matters be sent to arbitration.

9              MS. DENNISTON:  The arbitration, Your Honor,

10   addresses the employment contract and the claims that were

11   pled by Mr. Hylland in connection with the employment

12   contract.  The debtor in the plan in the confirmation order

13   reserved the jurisdiction of the Court as to those claims

14   that were filed, and there were separate claims filed by Mr.

15   Hylland on the -- what we call the non-qualified plans that

16   were not part of the arbitration claim when he submitted the

17   arbitration claim to the arbitrator.  And because those plans

18   are group plans, the debtor has taken the position that this

19   Court is the proper forum for those plans to be addressed.

20             MR. DEMMY:  Your Honor --

21             THE COURT:  Yes.

22             MR. DEMMY:  May I be heard on that point?

23             THE COURT:  Please take the --

24             MR. DEMMY:  Thank you, Your Honor, good morning.

25   John Demmy on behalf of Mr. Hylland.  I take exception to the

1   position that the debtor is taking with respect to whether or

2   not Mr. Hylland's underlying claim relating to the SISP plan

3   not being part of the arbitration.  We believe that it is

4   because the SISP plan is one of the benefit plans to which

5   Mr. Hylland is entitled under his employment agreement with

6   Northwestern.  It is Mr. Hylland's claims under the

7   employment agreement which were demanded in the arbitration

8   that are going forward in the arbitration.  It's our position

9   that all of those claims, including the extent to which Mr.

10  Hylland has an SISP claim, i.e., the amount of that claim, is

11  included in the arbitration demand, is going forward in

12  arbitration.  Your Honor, the cross-motion that we filed to

13  the debtor's motion raises a legal issue for the Court, and

14  it relates to the debtor's attempt to have this Court rule on

15  the debtor's request to terminate that plan.  We believe that

16  that is not something for this Court because that plan passed

17  through the bankruptcy for the reasons set forth in or

18  papers.  I'm not going to argue the merits, I just wanted to

19  outline that for the Court.  We believe it's an obligation of

20  the reorganized debtor which we believe is a legal issue

21  perhaps apart from the underlying claim relating to the SISP

22  if the debtor wishes to terminate that plan under applicable

23  non-bankruptcy law, which we do believe is part of the

24  arbitration demand which demanded that the arbitrator deal

25  with all of Mr. Hylland's employment agreement claims, the

1    employment agreement includes the SISP claim.  That's our

2    position, Your Honor.

3              THE COURT:  Counsel.

4              MS. DENNISTON:  Your Honor, the debtor set out its

5    position to Mr. Hylland's cross-motion in a written

6    objection.  Basically, the argument's very simple, is that we

7    believe that Mr. Hylland and his counsel are incorrectly

8    reading the language of the plan of reorganization, that the

9    plan of reorganization had expressed provisions in it that

10   permitted the termination -- the post-effective date

11   termination of the specific plan, and that, as such, that the

12   motion should be denied.  If the Court wants us to walk the

13   Court through the objection, I'm happy to do that, but we --

14             THE COURT:  I read it over and it weeds through all

15   of the problems that are going arrive with regard to

16   termination of these non-qualified plans relative to the plan

17   provisions and I think the Court's jurisdiction.  So, and I'm

18   going to rule on it, but I do want all the rest of the

19   matters to go to arbitration.  I don't see how you want to

20   fracture these away and not get the whole thing done in

21   arbitration.

22             MS. DENNISTON:  But for the fact, Your Honor, that

23   these non-qualified plans involved other participants in

24   addition to Mr. Hylland, I'm not sure that the debtor would

25   not be in agreement with the Court on that, but because they

1  are group plans and because of the Bankruptcy Code's need to

2  treat those claimants the same, we do believe that this is

3  subject to this Court's jurisdiction and because of the

4  issues that require the interpretation of the confirmation

5  order believe that this is the proper court for the

6  adjudication of Mr. Hylland's rights under the SISP.

7            THE COURT:  Do you want to reply?

8            MR. DEMMY:  Are we into the merits of the motion,

9  Your Honor?

10            THE COURT:  Yes.

11            MR. DEMMY:  Okay.  Your Honor, we did not get a

12  chance to respond to the objection.  I suppose we could have

13  filed a reply, but I didn't think it was necessary.  I think

14  we can handle that in the argument here.  Your Honor,

15  Northwestern filed its motion to terminate the SISP plan on

16  January 13 of 2005, this year.  The second amended plan was

17  confirmed by order dated October 19.  On November 1, the plan

18  went effective.  On December 29, there was a notice filed

19  regarding the substantial consummation of the plan.  In the

20  debtor's motion, the authority they cite for their ability to

21  terminate the plan is § 9.2 of the plan itself, not anything

22  in the plan of reorganization, and also § 105 of the

23  Bankruptcy Code.  Your Honor, we don't believe that the SISP

24  plan is governed by § 8.6 of the plan.  8.6 deals with

25  retiree benefits.  Your Honor, retiree benefits is something

that's dealt with in the Bankruptcy Code at § 1114.  The definition of retiree benefits as included in the plan of reorganization, which is what 8.6 deals with, tracks almost word for word, with some immaterial changes, the definition of retiree benefits included in § 1114 of the Bankruptcy Code.  Your Honor, I have a one-page chart which just makes that comparison which I'd like to hand up for Your Honor's convenience.

THE COURT:  That would be fine.  Thank you.

MR. DEMMY:  The first thing I would like to do, Your Honor, is point the Court's attention to § 8.6 of the plan, and I do have a copy of the plan if the Court would like it, but basically, 8.6 says, and I'm quoting from the plan, "Payment of any Retiree Benefits" -- and that's in capital letters -- "as such benefits may have been modified during the Chapter 11 case shall be continued solely to the extent and for the duration of the period the debtor is contractually or legally obligated to provide such benefits, subject to any and all rights of the debtor under applicable law including without limitation the debtor's right to amend or terminate such benefits prior to or after the effective date."  And that's the language that the debtors are seizing upon, Your Honor.  I would suggest, first of all, that there can't be a provision like this which allows the debtor at any time after the effective date to take this kind of an action.

1  What in effect the debtor is saying, Your Honor, is, Well, we
2  haven't terminated this plan as of the effective date.  We
3  haven't terminated it as of substantial consummation of the
4  plan, but a year from now, five years from now, twenty years
5  from now, a hundred years from now to take it to its
6  ludicrous logical end result, we could come back, terminate
7  this plan, do it under the authority they believe of the
8  Bankruptcy Court in this case and turn the claims, a hundred
9  years from now into Class 9 claims under the plan of
10  reorganization.  Clearly, that's an absurd result, Your
11  Honor, and there has to be a limitation on that provision in
12  8.6.  I suggest to the Court that that limitation is set
13  forth in the Bankruptcy Code, specifically the provision that
14  says that you cannot modify the plan after substantial
15  consummation of the plan which occurred well prior to the
16  time that the debtor filed its motion.  But beyond that, Your
17  Honor, we don't believe that 8.6 applies here because, as I
18  said, I think that 8.6 really deals with retiree benefits,
19  which is a special animal under the Bankruptcy Code.  There's
20  a definition in the plan of retiree benefits which is
21  § 1.161.  You can read it there, Your Honor.  I'm not going
22  to read verbatim, but you compare it with the definition of
23  retiree benefits that's included in § 1114 of the Bankruptcy
24  Code, and you'll see that the import of those two definitions
25  are almost identical.  There are some non-material changes.

1  They talked about the petition date, capital, initial caps on
2  those words as opposed to the date that a petition is filed
3  commencing a case, but otherwise, Your Honor, the definitions
4  are the same.  And that's what they were getting at in the
5  plan, in 8.6 with regard to their right to do something with
6  regard to retiree benefits plans.  And that's what they said
7  in their motion, Your Honor.  In their motion that was filed
8  on January 13, starting on page 13, paragraph (34) and
9  continuing, they say, "Section 1114 of the Bankruptcy Code
10 which deals with retiree benefits, which is basically the
11 same definition of retiree benefits, is included in the plan
12 and adopted in 8.6 of the plan."  They say that 1114 does not
13 apply to the SISP.  In paragraph (37) they say, "The SISP
14 plan provides supplemental pension payments during retirement
15 which is not the form of payment included within the
16 definition of, quote, 'retiree benefits', which is dealt with
17 in 1114."  That's what the debtor says, Your Honor, and
18 that's one of the reasons why § 8.6 doesn't apply.  Another
19 reason is, 8.6 talks about, again, retiree benefits and a
20 retiree benefit plan, and it talks about payments to retired
21 employees of the debtor.  Well, as a fundamental or practical
22 matter, Mr Hylland is not a retired employee of the debtor.
23 Your Honor, in the debtor's disclosure statement filed in
24 connection with their second amended plan, they talked about,
25 and this is set forth again in our objection, they talked

about the plans that they intended to terminate prior to the

effective date of confirmation of the plan or the effective

date of the plan, that is, and on page 58 of the disclosure

statement, footnote 51, which is set forth on page 2 of Mr.

Hylland's objection, it says, "The debtor intends to

terminate and/or reject the non-qualified plans as discussed

above and will be filing a motion seeking an order

implementing the proposed termination and/or rejection.  The

debtor intends to reject the following non-qualified plans."

And then they list three plans in the disclosure statement,

none of which were the SISP plan and all of which were

included in the debtor's first motion to terminate non-

qualified plans, which is filed on August 31, which I think

was item 4 on the docket for today which has been continued

several times, but that motion filed August 31 does not

involve the SISP plan.  The SISP plan is not stated as being

one of the plans the debtor intended to reject.  The last

sentence of that footnote 51 in the disclosure statement,

Your Honor, says the debtor intends to assume the remaining

non-qualified plans.  So, we get to the effective date of the

plan.  There's been no motion to either assume or reject the

SISP plan, and the plan of reorganization in § 8.1 provides

-- well, I'll call it an assumption default if an executory

contract has not been assumed -- or, I'm sorry, has not been

rejected as of that time or it is not a motion pending for

1   the rejection of the contract then it's assumed.  There was

2   no such motion pending as of the effective date.  None

3   pending as of the substantial consummation of the plan.  We

4   thought, well, maybe it was assumed.  They say in their

5   objection, well, you're misreading the plan.  We didn't

6   assume and it's not an executory contract.  We're just going

7   by what the debtor said in their disclosure statement.  They

8   talked about rejecting these non-qualified plans, and then

9   they also said, We intend to assume all the rest.  All the

10  rest would include the SISP.

11          THE COURT:  Right.

12          MR. DEMMY:  That's one point, Your Honor.  The next

13  point, Your Honor, is that we believe that rather than § 8.6

14  of the plan, this SISP plan and the debtor's right to take

15  action with respect to it is, it rests in 8.5 of the plan

16  which talks about the debtor retaining the right to terminate

17  up to the effective date of the plan.  So, Your Honor, we

18  don't believe that 8.6 applies.  We believe that this is

19  either an 8.1 -- the debtor says that's not the case, but if

20  it's not 8.1 it's 8.5 which specifically cuts off the

21  debtor's right to do anything, terminate or take any action

22  to modify the SISP plan after the effective date of the plan

23  which occurred on November 1 of 2004.  Even after that time,

24  Your Honor, we had substantial consummation of the plan in

25  late December, after which time the debtor cannot modify the

1   plan.  We believe that what has happened here, Your Honor,

2   with respect to the SISP plan is that once we got to the --

3   certainly once we got to the substantial consummation of the

4   plan in late December that SISP plan -- and consistent with

5   what the debtor said in their disclosure statement about

6   assuming all other non-qualified plans, that that plan is now

7   an obligation of the reorganized debtor, and it's the

8   reorganized debtor's ability to terminate or not under non-

9   bankruptcy law, which if they have that right, they have that

10  right.  We're not here contesting their right to terminate

11  per se.  What we're saying is that this debtor, as opposed to

12  the reorganized debtor, cannot seek this Court's authority to

13  terminate the plan and convert these claims into Class 9

14  claims under the Bankruptcy Code.  That is simply not what

15  they can do at this time.  These are reorganized debtor

16  obligations.

17          MS. DENNISTON:  It's a compelling argument, Your

18  Honor, but there's one fallacy.  And the fallacy is simply

19  this:  The plan says what the plan says as to the definition

20  of retiree benefits.  The SISP is a retirement plan.  At the

21  confirmation hearing, the debtor made a record.  I made it,

22  advised the Court that those plans were still being analyzed

23  and as soon as the debtor made a determination, including the

24  SISP, then a motion would be filed.  What Mr. Demmy is

25  ignoring, Your Honor, is the fact that in the plan there's

1  also a provision that said that the debtor had to file all
2  claim objections within 90 days of the effective date, and
3  this motion was filed as a form of claim objection knowing
4  that a number of people had filed SISP claims including Mr.
5  Hylland.  On February 1, in connection with those claims, the
6  debtor filed the motion objecting to those claims moving to
7  terminate both those plans as § 8.6 permits.  One can't
8  simply take the language from the Code, the language of the
9  plan and say, The plan doesn't say what it says; it says
10 something close to what it says in the Code.  Unfortunately,
11 this confirmed plan expressly provided the debtor to amend or
12 terminate benefits on these non-qualified plans.  The
13 debtor's claim objection to the SISP claims was filed on or
14 before February 1st in the motion, which seeks to terminate
15 those plans.  All of the claimants were addressed, their
16 claims were addressed.  That was timely under the confirmed
17 plan, consistent with the confirmation order, and as such,
18 the debtor is merely enforcing the rights that it reserved
19 both in the confirmation hearing pursuant to the confirmation
20 order and in connection with the its claim objection.  It was
21 timely.  The debtor believes these are obligations of the
22 debtor not the reorganized debtor, and that this Court must
23 look to the confirmation order and the plan reading in terms
24 of the claim objections and the expressly reserved rights in
25 determining this motion.  We submit that Mr. Hylland is

1    misreading the plan.  The debtor has performed consistently

2    with the provisions of the plan.  Its claim objections were

3    timely filed prior to the cutoff established in the plan, and

4    through those claim objections, the debtor sought to

5    terminate the plan.  And with that, we'd ask the Court for a

6    ruling denying the motion.

7              MR. DEMMY:  Your Honor, just one sentence in

8    response.  I would suggest that a debtor has no ability to

9    object to a claim against a reorganized debtor, and the

10   cutoff date here was the effective date or substantial

11   consummation not February 1.

12             THE COURT:  Well, I don't think there's any

13   question that there's a jurisdictional issue, and whether or

14   not I have jurisdiction under any of these objections

15   relative to a non-qualified plan.  The issue comes up this

16   way that there was substantial consummation of the plan, and

17   that was filed on December the 29th, 2004, when the order of

18   confirmation was issued all of the property vested in the

19   debtor.  The debtor's relieved of any further obligation and

20   the Court's relieved of obligations unless they're

21   specifically mentioned in the plan, and there's a different

22   test as to the jurisdiction relative to what happens post-

23   confirmation or what happens during the administration of

24   this plan.  The Third Circuit has led the way on it with the

25   Resort International case, and it specifically pointed out,

1 and this case was just followed by the Ninth Circuit in the

2 Pegasus case vs. the State of Montana that Packard

3 (phonetical) doesn't apply. The related to jurisdiction is

4 restricted only if there is a close nexus to the

5 instrumentation of a consummation of the plan. Now, it can't

6 be consummated again. It only can be consummated once. And

7 what I'm basically saying is I believe that these matters

8 have to be resolved under applicable law in another

9 jurisdiction. I'll take the matter under advisement.

10 MS. DENNISTON: Thank you, Your Honor. Matter

11 number 17 is the debtor's motion for order compelling the

12 Depository Trust Company to distribute shares to holders of

13 allowed claims in Class 7 pursuant to the second amended and

14 restated plan of reorganization. This matter is going

15 forward but I would note for the record that DTC has advised

16 the debtor that it made the distributions on April 14th and

17 April 27th, and that the motion is now moot.

18 THE COURT: Did Magten agree with that? And how

19 about Law Debenture? Did they agree that the motion is moot?

20 MR. SNELLINGS: Your Honor, John Snellings for Law

21 Debenture. This is the first that we've heard that DTC has

22 made that distribution. We had filed a response to this

23 motion suggesting that due to the fact that there was an

24 appeal of the settlement agreement, that in context with that

25 settlement agreement, we had an interest in that particular

1  shares and warrants.  We are concerned about that.  The

2  appeal's going forward but if --

3          THE COURT:  What relief am I going to be able to

4  give?

5          MR. SNELLINGS:  I'm sorry?

6          THE COURT:  What relief is the Court going to be

7  able to give if the distribution's been made of the warrants

8  and the stock?

9          MR. SNELLINGS:  Right.  That was going to be my

10 conclusion.  It sounds like the tree has been cut down, and

11 we'll just have to take that up with DTC.

12         THE COURT:  Already been hauled away to the logging

13 company.

14         MS. DENNISTON:  Your Honor, just for the record, we

15 did put the status of this motion on the agenda which was

16 timely filed with the Court on the 22nd.  Matter number 18 is

17 the in re adversary proceeding.  This is the motion of Magten

18 and Talton Embry pursuant to Rule 7041 of the Federal Rules

19 for payment of fees and expenses, and that matter is going

20 forward.  Matter number 19, Your Honor, is the Northwestern

21 vs. Ominson (phonetical).  This is the order to show cause

22 why defendant should not be enjoined from continued

23 prosecution of the state court action.

24         THE COURT:  All right.  Let's go with the Magten

25 request for fees.

1    MS. STEINGART:  Good morning, Your Honor.  Bonnie

2    Steingart from Fried, Frank on behalf of Magten.

3    THE COURT:  I read all of the documentation and all

4    of the words and all of the allegations and all of the

5    charges back and forth, and if you've got anything more that

6    you want to add relative to this request go right ahead, but

7    let's not have a repetition of which you've already stated in

8    your motion relative to this fee award.

9    MS. STEINGART:  Right.

10    THE COURT:  And I think it comes down to whether or

11    not that the commencement of this action was filed on that

12    page or whether it was vexatious and whether or not Magten

13    and the dismissal, subsequent dismissal, warrants the award

14    of the nine hundred and some thousand dollars in fees.

15    MS. STEINGART:  I'm sorry, Your Honor, I thought

16    that the question on the floor was DTC.  I just need to get

17    my notes to respond to your question about the motion that we

18    have on.  May I just get my notes?

19    THE COURT:  Oh, you're back to the one with --

20    MS. STEINGART:  Yes, right, and that's done.

21    Because it is moot at this point though, you know, one would

22    think that once the objections were filed that DTC would have

23    refrained from making that distribution until the Court heard

24    it, but what's done is done, and we think that the debtor is

25    solvent enough to be responsible for that distribution if it

1    was wrongful.  So, from DTC's perspective, I agree that it's

2    moot.  From the debtor's perspective, if we think that, you

3    know, the debtor's urging DTC to distribute those shares when

4    there was still some dispute about the allocations in that

5    class, we'll seek the remedy against the debtor, but with

6    respect to DTC's motion, I agree, Your Honor, that that's

7    moot.

8              THE COURT:  All right.

9              MS. STEINGART:  If I could just get my notes.

10             THE COURT:  Now, who's going to handle the Magten

11   motion for fees?

12             MS. STEINGART:  Thank you, Your Honor.  With

13   respect to the fees, I certainly will not repeat what we have

14   in the motion.  I understand the Court has read it.  I would

15   like to review though what there is no dispute about, Your

16   Honor.  There's no dispute here that under 7041 when a case

17   is dismissed, it's dismissed on such terms and conditions as

18   the Court deems just and proper.  There is no dispute that

19   the voluntary dismissal with prejudice by the debtor here of

20   all claims against Magten and Embry amount to a judgment on

21   the merits in favor of both Magten and Embry.  There's also

22   no dispute that this Court, as all other federal courts, has

23   discretion to award attorneys fees where litigation is

24   commenced in a manner that is false, unjust, vexatious,

25   unnecessary, and groundless, and I think that the evidence is

1    substantial that this was.

2        THE COURT:  What is the evidence that this

3    litigation was in bad faith and vexatious?

4        MS. STEINGART:  Well, Your Honor, if we start with

5    the complaint in this action, okay, which is Exhibit B to Mr.

6    --

7        THE COURT:  Well, the background of the case, as I

8    read it and as I understand it is that when Magten and Embry

9    were on the Unsecured Creditors Committee they came into some

10   confidential information relative to non-public disclosure

11   matters, and notwithstanding that, that during this period of

12   time and shortly thereafter when Magten and Embry were thrown

13   off the Committee by the U.S. Trustee's Office, this company

14   went ahead and purchased a lot of these Quips bonds.

15       MS. STEINGART:  That's correct, Your Honor.

16       THE COURT:  And the question then arose as to, well

17   where did he get the information?  What was he relying on?

18   Now, as I understand it, he was not an owner of any of these

19   Quip bonds pre-petition.

20       MS. STEINGART:  No, Your Honor, that is precisely

21   not the fact.

22       THE COURT:  What is the fact?

23       MS. STEINGART:  The fact is -- and the debtor knew

24   this as we start with paragraph (1) in the complaint where

25   the allegation is that Mr. Embry somehow acquired 40 percent

of the Quips while he was in possession of material non-
public information.  Incorrect.  In the letter that Mr. Embry
wrote to the Trustee prior to being appointed to the
Committee in which the debtor was copied, Mr. Embry indicated
that he owned in excess of 35 percent of the Quips and on
that basis thought it appropriate to appoint him in addition
to Law Debenture to the Committee.  So, if we look at
paragraph (1) of the complaint, in paragraph (1) of the
complaint, the allegation is patently false and the debtor
had documents in its files that it was patently false.
Indeed, when I questioned Mr. Hanson about this allegation in
his deposition, Mr. Hanson was the 30(b)(6) witness
designated by Northwest to answer about the allegations
Northwest made in the complaint.  I said, Mr. Hanson, did you
see the letter that the Trustee provided to -- you know, that
we wrote to the Trustee that was copied to your counsel?  Did
you think about it when you made this allegation in the
complaint?  His lawyers would not let him answer.  As we
pointed out in our motion, Your Honor, when I asked Mr.
Hanson, Well, what investigation did you do?  Who did you ask
about what information was conveyed?  He asked no one one
question about any allegations in the complaint.  And that
portion of his deposition is Exhibit A to Mr. Kaplan's
affidavit.  Let's look on in the complaint, Your Honor,
because --

1    THE COURT:   I thought you just read the complaint

2  because I thought that the whole situation was that once the

3  Court signed the ethical law order and prohibited any of

4  these members of the Committee from using any of this non-

5  public information for their own benefit --

6    MS. STEINGART:   Right.

7    THE COURT:   -- that Embry then got on the

8  Committee, he knew about the confidentiality agreement, and

9  it was after it was relieved that he purchased additional

10  Quips.

11    MS. STEINGART:   Right, but, Your Honor, that's not

12  in fact what happened, and the debtor knew that because of

13  the discovery it had pre-complaint.   What happened is, Mr.

14  Embry purchased securities during the period of time after --

15  at the end of November, Mr. Embry or actually Magten was

16  appointed to the Committee and on December 17th, attended the

17  first Committee meeting.   Prior to that time, no confidential

18  information about the debtor was provided to Mr. Embry.   What

19  Mr. Embry did receive was a copy of the by-laws and some

20  other technical information concerning the Committee.

21  Indeed, the testimony showed that on December 17th the first

22  Committee meeting attended by the debtor in conjunction with

23  Committee members, the debtor was concerned because the

24  debtor was going to be giving confidential information that

25  had prior to that point not been shared with the Committee.

1    And, at that time, the debtor said, We can't give anything

2    written to the Committee because we need the Committee to

3    sign confidentiality agreements.  So, indeed, thereafter

4    confidentiality agreements were signed.  It's not our

5    position that at that meeting Mr. Embry could receive

6    confidential information and trade.  What the debtors knew

7    because of the trading records they had before they filed the

8    complaint was that Mr. Embry did not purchase any securities

9    after that first meeting, and that in the period of time that

10   from when he was appointed until the first meeting there was

11   no confidential information that he received.  We told them

12   that before they filed a complaint.  They had an affidavit.

13   They had his trading records, and yet they filed the

14   complaint.  All right, so, they knew, they knew that there

15   was no confidential information in his possession at that

16   time.  Let's talk about the untrue statement, Your Honor, in

17   the complaint about the trading order, okay, and let's look

18   at the trading order, if you would like.  They say in

19   paragraph (12) of the complaint that the trading order

20   prohibits members of the Committee from trading in

21   securities.  Not true.  Patently untrue.  Knowingly untrue,

22   Your Honor.  What the trading order did was to establish a

23   safe harbor so that members of the Committee who had a large

24   enough organization to do so, could create what we have

25   called an ethical wall, and if we look at the trading order,

1   Your Honor, and I will hand one up if you would like, on page
2   2 it makes clear that a Committee member can elect to be
3   subject to the order and once it elects to be subject to the
4   order, then it is bound by its provisions.  And that is made
5   even more clear, Your Honor, in the confidentiality agreement
6   which post dates the trading order.  But the confidentiality
7   agreement, and I'll hand that up to the Court as well, Your
8   Honor, says on page 2, okay, now the confidentiality
9   agreement that was drafted by Northwest was drafted more than
10  a month after the trading order was entered.  And it says --
11  I'm sorry, Your Honor, on page 3, and I'm quoting, "It is
12  understood that nothing herein shall prevent receiving
13  parties who have established an ethical wall pursuant to the
14  trading order entered on November 6 from trading in Northwest
15  securities in accordance with the provisions set forth in
16  such order or from otherwise trading such securities in
17  accordance with applicable law."  So when Northwest put
18  together and drafted the confidentiality agreement, they
19  recognized that the trading order provided a safe harbor and
20  nothing more.  It was not a prohibition by its terms and
21  certainly not a prohibition in practice.  Now, the fact that
22  the trading order was not a prohibition is made even more
23  clear, Your Honor, by the Committee's by-laws, and the
24  Committee's by-laws are in the exhibits provided, Your Honor,
25  attached to the correspondence in Exhibit S behind Mr.

1   Kaplan's affidavit.  And what the by-laws say, if I can read

2   from them, Your Honor, paragraph (1.7):  "Each member shall

3   have the ability to trade, purchase, sell, or otherwise

4   dispose of its claims or interest in the debtors in

5   accordance with applicable law including any orders entered

6   or to be entered by the Bankruptcy Court."  So, these are

7   things that the debtor knew and is charged with knowing at

8   the time they filed this complaint.  The allegations in the

9   complaint are patently false, and they were knowingly false

10  at the time they were made.  Later in the complaint, Your

11  Honor, in paragraph (21) the debtor talks about how the

12  defendants admitted their understanding that they were

13  prohibited from trading when we sought to have an amendment

14  to the trading order and didn't get it.  Untrue.  What we

15  understood at that time was that as long as we were in

16  possession of confidential information we should not trade

17  and certainly they did not prove that we did trade.  Let's go

18  onto the allegations beginning at 25 and thereafter.

19  Thereafter it's shown that the trading occurred either before

20  the information was gotten or after Mr. Embry was on the

21  Committee.  And let's talk about the events after Mr. Embry

22  was on the Committee since now we talk about how he had none

23  before the first meeting, had no confidential information and

24  they knew he had no confidential information or could easily

25  ascertain that.  Let's talk about the events after he was

1   removed from the Committee which is May 14th onward. What
2   happened by that time, Your Honor? What happened by that
3   time is that the debtor filed a plan, the debtor filed a plan
4   amendment. In the first week of May, the debtor filed a
5   10(k), the debtor filed a 10(q), and I think that we can
6   charge the debtor with knowledge of its own filings when it
7   makes allegations that after May we still had some
8   confidential information that was material to the value of
9   these Quips. Given all those disclosures and all the duties
10  that the debtors had in each of those documents to disclose
11  all material non-public information, how could the debtors
12  possibly have a good faith belief that we had material
13  information to the value of the Quips after May 14th? They
14  knew what they disclosed. They knew what the state of play
15  was. They knew we were off the Committee, and they knew that
16  for a long period of time before we were off the Committee.
17  We were certainly isolated from things that were going on, on
18  the Committee. They never even asked the Committee what they
19  gave us. So, Your Honor, I think it is fairly clear from the
20  allegations in this complaint that are on their face false,
21  that this litigation was commenced in bad faith. And then if
22  we look at the conduct of the debtor after this litigation
23  was commenced, in all the other pleadings filed with this
24  Court in which they made disparaging remarks about both
25  Magten and Embry on the basis of this false filing, we can

1  see the intention of the debtors when they filed this
2  complaint.  The intention of this debtor to try to undercut
3  the fraudulent conveyance motion, to try to harass and
4  oppress Mr. Embry in pursuing that along with Law Debenture.
5  Then let's look at their activities as Your Honor is well
6  aware from the papers we filed during discovery.  The only
7  discovery that Northwest sought was discovery it had trading
8  records.  And indeed, as Your Honor knows from the numerous
9  phone calls that we were forced to make to chambers prior to
10  the trial in this action and during discovery, Northwest
11  often joined the Committee in trying to quash the subpoenas
12  we had to sort of say, Hey, what's the information?  They
13  tried to quash the subpoena on Paul Hastings.  They tried to
14  quash the subpoenas on Northwest.  They joined the company in
15  trying to quash -- I'm sorry, Northwest joined the Committee
16  in trying to quash the subpoenas we had on Committee members
17  just so that we could establish a record that there was
18  nothing that the Committee gave us that was material, non-
19  public.  So even though Northwest said we need discovery
20  because we don't know what the Committee gave them, when we
21  tried to do discovery, they joined the Committee in trying to
22  shut that discovery down.  Your Honor, in doing so, they
23  created expense, embarrassment, delay.  They abused not only
24  Mr. Embry and Magten but also the Court and the Code and the
25  powers that the debtor has in settings such as these.  I

think that we have more than sufficient evidence, Your Honor, so that Northwest should have to pay not only the expenses but also the fees of Magten in this enterprise. And to the extent that this Court has any doubt that this is the case, I think that we should return here, have Mr. Hanson take the stand, and Mr. Hanson can tell you just how little investigation he did. He can confirm that he just brought the complaint because he thought this was a good way of shutting Magten down, and once he shut Magten down, then taking whatever steps as you will see when Law Debenture speaks were available to them to shut Law Debenture down from protecting the Quips. Thank you, Your Honor.

THE COURT:  Thank you.

MS. DENNISTON:  Obviously, Your Honor, there's another side to this equation. I think that it's important to take a look at the complaint in the context of the factual record that was before Northwestern at the time the complaint was filed, and I want to go back to the period where the issue arose for the first time, and that was in connection with the discovery on confirmation, and I believe at that point we did receive certain trading records from Magten. Prior to that, in terms of actually knowing what specific amounts that Magten held when it purchased and how much it purchased and on what information it purchased, the debtor didn't have those records, and the complaint doesn't say that

1  the debtor did. I want to look at the fact that at no time
2  did the debtor ever obtain a complete set of trading records
3  that weren't otherwise redacted that show who bought what and
4  when. In fact it later became known that the trading records
5  that had been submitted had been redacted to hide the holder.
6  That they were in fact held by Mr. Talley. There are any
7  number of disputes that we could go through in chapter and
8  verse about the set of the trading records, but even more
9  importantly, Your Honor, this was a litigant that had been an
10  active litigator throughout this case objecting to any number
11  of material motions, and yet was sitting on the Committee
12  until the May 14 date with full access to the information
13  that Northwestern was providing to the Committee or to the
14  Committee's advisors. Let's look at a couple of key points.
15  First of all, with regard to the trading order, there is an
16  expectation that if a member of the Committee was not going
17  to be bound by that trading order that it would have filed
18  and given notice. That it did not have, had not established
19  an ethical wall. When the debtor learned in fact that there
20  wasn't an applicable wall, then the debtor became concerned.
21  The debtor's expectation throughout this that there was no
22  trading because there was no ethical wall, there was a minor
23  trade in December which was explained away during discovery,
24  but there were a number of trades after Magten came off the
25  Committee, and I think the second thing that we need to focus

1  on is that from the period of January to May, while the

2  Magten still sat on the Committee, the Committee's advisors

3  were receiving any number of confidential information that

4  was not disclosed in the (k), the (q), the plan and the

5  disclosure statement.  All of those things involved the

6  drafts of pleadings with regard to certain projections and

7  the debtor's preparation for confirmation, and any number of

8  9019 motions that are still pending.  So when Magten left the

9  Committee, Your Honor, it had in its possession or at least

10  had had access to a significant amount of material non-public

11  information.  A lot of that information is still not publicly

12  available because those motions are still pending.  But that

13  being said, when the debtor filed the complaint, the purpose

14  of the complaint was to, (1) get to the bottom of what was

15  purchased and when, and what Magten relied upon.  The

16  complaint is accurate in the sense that it was the debtor's

17  belief that if the member of the Committee did have an

18  ethical wall it would not be trading, and that the member of

19  the Committee when it exited the Committee would continue to

20  be bound by the confidentiality agreement.  There's no

21  evidence that that in fact -- the confidentiality agreement

22  was supported once Magten left the Committee.  But even worse

23  than that is that we ended up with a situation where the

24  state of the record today, the bottom line is that why didn't

25  this action continue is simply this, Your Honor.  When we

1  looked to the Plan Committee -- or excuse me, looked to the
2  Committee and looked to the information that the debtor could
3  document, the confidential material, non-public information
4  that was provided to the Committee's professional advisors,
5  it was significant.  It was detailed, and it was ongoing from
6  the period of -- throughout the Committee's existence but
7  certainly from the period of January through May while the
8  debtor was preparing for confirmation.  What we couldn't
9  find, Your Honor, and there were problems with discovery, we
10  could not find any evidence or sufficient evidence to proceed
11  on the face of the complaint that showed where the
12  professional advisors or the Committee communicated the
13  material non-public information that the debtor had
14  consistently provided to them.  In other words, to put this
15  in context for the Court, I handled the discovery and the
16  response to the subpoena served by Magten on behalf of
17  Northwestern, and there were over thirty boxes of material
18  non-public information which included projections,
19  confirmation scenarios, analysis evaluation for the plan that
20  were provided to the advisors for the Plan Committee, but
21  yet, when we got to discovery we couldn't get that very
22  critical link to show that in fact that that information had
23  been given to Talley Embry.  Did he have access to it?  We
24  believe he did.  Would it have been imputed to him?  We
25  believe it might have, but by the time we got through the

1    discovery and began to prepare for trial it was clear to the

2    debtor that the better course was to dismiss with prejudice

3    because we couldn't link up the very pieces we needed to

4    establish that as to those trades that he made after he left

5    the Committee were made on the basis of material non-public

6    information that he was provided while sitting as a member of

7    the Committee.  We don't believe that there's any evidence of

8    bad faith or harassment here.  These are two grown-up

9    litigants slugging at each other.  They've been slugging at

10    each other throughout this case, Your Honor.  If you look at

11    the number of substantive motions that Magten has filed, the

12    very fact that we have seventeen pieces of active litigation,

13    I believe, I may be off one or two, between Northwestern and

14    Magten or the officers, so on and so forth, these are grown-

15    up litigants.  There's no bad faith.  There's no harassment.

16    This was not vexatious, wanton, or oppressive conduct as the

17    statute required.  In fact, three of the five cases that

18    Magten relies on even when you have the situation that we

19    have here with a clear admission that they are the prevailing

20    party, the Court refused to award fees.  We filed in good

21    faith based on the information that we as the debtor knew had

22    been given to the Committee's professional advisors.  When we

23    learned through discovery that we didn't have a clear

24    evidentiary trail of that information being delivered to

25    Magten and that we would be forced to argue imputation, we

decided the better course was to dismiss with prejudice. The courts have held that there is no showing here, and in light of this Court's denial of the motion to dismiss, in light of the factual record that there were trades after they left the Committee, while they still had or had had access to confidential information, there's nothing to conclude that this suit was unnecessary or groundless. And with that, we believe that Magten's request for attorneys fees and costs should be denied. We also note for the Court that Magten has not complied with the statute in terms of the bill of costs. That no bill of costs has been provided, that they have not complied with 28 U.S.C. 1920, that a number of the costs that they're seeking are not included in 28 U.S.C. 1920. And as for the attorneys fees, Your Honor, that's part and parcel of being in a bankruptcy case where the litigants have a major dispute, and I don't think that there's any denial that both sides here have incurred large amounts of attorneys' fees to try to deal with Mr. Embry's claims and Magten's claims. We believe that it would be totally ignoring existing precedent to award Magten fees in this case given that there's three facts that we think show the debtor's good faith. Fact number one is that they didn't put anybody on notice that they had no intention of signing up to and participating in the order, the trading order; that we did establish that there was a trade in December and that they explained that

1 | away in discovery; that they signed a confidentiality
2 | agreement which had provisions that should have continued to
3 | remain in place after they left the Committee; they were
4 | bounced off the Committee at a time that the debtor was
5 | getting ready for confirmation, and during that period, the
6 | critical time period between January and May, the debtor
7 | produced extensive amounts of material, non-public
8 | information, to the Committee's advisors.  So, the debtor
9 | brought the complaint in good faith understanding what had
10 | been communicated to the advisors.  When it was unable to
11 | make the link that that information was transmitted to Mr.
12 | Embry or Magten, it chose to do what it should do which was
13 | to dismiss with prejudice.  We believe our conduct has been
14 | appropriate.  We believe we were looking out for the best
15 | interest of the estate, and we believe that it's horrendous
16 | precedent that a committee member that's bounced off a
17 | committee should be permitted to continue to trade on
18 | material non-public information without any kind of
19 | supervision or at least the debtor being able to address it,
20 | and we would ask the Court deny the motion.

21 | THE COURT:  All right.  There's a brief response
22 | then from Magten's counsel.

23 | MS. STEINGART:  Thank you, Your Honor.  Your Honor,
24 | I am appalled.  I am appalled that Ms. Denniston should stand
25 | up here and imply that there was material non-public

1   information still out there, still available to Mr. Embry

2   after he was removed from the Committee when the debtor had

3   filed the plan amendment, the 10(q), the 10(k). Is that an

4   admission that those documents are --

5       THE COURT: Well, it might have been different

6   information. Some of the non-public disclosure information

7   does not go into a disclosure statement.

8       MS. STEINGART: Your Honor --

9       THE COURT: We don't know what that is.

10      MS. STEINGART: I have no argument that there may

11  be information that's confidential during every trading

12  period. I mean, certainly, there are directors and officers

13  of companies that trade during windows that are given to them

14  to trade, and, of course, companies always have confidential

15  information, but they have confidential information, Your

16  Honor, that's not material. Ms. Denniston cannot with a

17  straight face stand up here and tell this Court that after

18  May 14th there was a scintilla of material non-public

19  information, and the fact that she would suggest that Mr.

20  Embry engaged in wrongful conduct to this day when they have

21  withdrawn their complaint with prejudice is shameful. And I

22  am furious about it, and so should the Court be. This is my

23  client who's being accused of dishonesty and being accused of

24  wrongful conduct as both in his corporate form and

25  individually, and I think that is horrendous. They never

1    said before they stood up today that they didn't have the

2    trading records they show when they trade before they filed

3    the complaint and indeed, Your Honor, they had them.    And we

4    should put somebody on the stand, Mr. Austin or Ms.

5    Denniston, because they had all of them in connection with

6    the confirmation hearing and the deposition which was in

7    July.    By the beginning of August they had all those records.

8    They didn't file this complaint until August 20th.    So she's

9    wrong.    She had it.    She knew when the trades occurred, and

10   she knew that the trades occurred a substantial amount of

11   time after everything should have been public.    The issue

12   about the trading order, they knew that Magten wasn't going

13   to comply with the trading order because Magten asked for an

14   exemption.    The issue about the trading order is that in the

15   complaint, they were -- they made a false statement about it,

16   and they made misleading statements about it.    They knew that

17   the trading order was not a prohibition.    They knew it was a

18   safe harbor and they represented it otherwise to this Court.

19   They knew before the complaint was filed and everyone on the

20   Committee, he had 35 percent of stock, and they

21   misrepresented that in the complaint.    From January and May

22   there was confidential information, and they can't prove what

23   went to Mr. Embry.    Well, they never tried.    And the

24   Committee made it clear that the amount of information that

25   went to professionals and that was shared with members of the

1   Committee was extremely limited.  For them to just say they
2   can't now get him because they can't prove it is the worst
3   kind of tactic and the worst kind of cynical conduct I can
4   imagine.  They gave us tons of information.  Thirty boxes,
5   Your Honor.  Two litigants slugging it out.  So they can do
6   anything?  They're allowed to make false allegations in a
7   complaint?  They're allowed to have a client not review a
8   complaint because we're slugging it out?  I don't think
9   that's the way this Court conducts itself.  I don't think
10  that anyone, any litigant, no matter how hard they're
11  fighting, no matter how concerned they are gets to file false
12  documents with this Court and that is precisely what they
13  have done, and they have gained the system.  They gained the
14  system in filing the complaint, in doing the discovery, in
15  every action they've taken in connection with Mr. Embry and
16  the complaint and continue to do so now in the statements
17  made to this Court, and I would demand that those accusations
18  to the extent they were made again be withdrawn.  Thank you,
19  Your Honor.
20          THE COURT:  Wait a minute, I've got a couple of
21  questions about your fees and costs.  Your firm is asking for
22  an award of $698,602 for five months' work?
23          MS. STEINGART:  It was in the period from August --
24          THE COURT:  That's pretty high fees for even for
25  New York lawyers; isn't it?

1      MS. STEINGART:   I --

2      THE COURT:   Even if I go through here, look, the

3  first day, August the 20th, you've got one, two, three

4  lawyers who all reviewed the complaint, and they're charging

5  almost $4,000.   Is that complaint that tough?

6      MS. STEINGART:   Well, we had to review the

7  complaint and decide what we're going to do about it, Your

8  Honor.

9      THE COURT:   That's not what it says here.   It says

10 review Northwestern complaint.   Review complaint regarding

11 Talley.   Review NOR complaint.   Let's get on with something

12 else.   On this cost bill you've got here.

13     MS. STEINGART:   Yes, Your Honor.

14     THE COURT:   You haven't filed it in accordance with

15 1920, but do you know of any under 1920 where you're getting

16 -- can get duplicating costs of $43,124 or transportation for

17 late night and other fees of 4,154 or working meals for

18 $2,649 or a secretary and paralegal overtime for $1,546, or

19 temporary paralegals for $258 or computerized research for

20 $10,776?   Do any of those come within 1920?

21     MS. STEINGART:   Well, I think certainly that the

22 duplicating costs do, Your Honor, and Ms. Denniston did refer

23 to thirty boxes, and we had productions from the Committee.

24 We had productions from the company.   We had productions from

25 the investment bankers.   We had productions from the -- I'm

1  sorry, the broker dealers.  We had productions from committee

2  members.  We had lots and lots and lots of documents that

3  needed to be looked at, that needed to be assessed, and that

4  we needed to track down.  So, Your Honor, and given the time

5  frame where we were working on this, there was, you know,

6  certainly many motions made and during the time, from the

7  time that we were ordered to trial to trial there were

8  numerous depositions.  Four of us were working almost round

9  the clock on this.  So, I think that these fees and expenses,

10  and we certainly can deal with items to the extent that Court

11  believes that they may be inappropriate, we can explain them,

12  and the Court can --

13          THE COURT:  Just as a matter of curiosity --

14          MS. STEINGART:  Uh-huh.

15          THE COURT:  One looks as these fees as Magten paid

16  them.

17          MS. STEINGART:  Well, Magten generally pays the

18  fees as we bill them, Your Honor.

19          THE COURT:  I didn't ask that question.  I said how

20  much has he paid?

21          MS. STEINGART:  I believe that Magten, though I

22  have not looked at what's outstanding, but we do have a

23  fiscal year end that's in February, and that Magten had paid

24  almost a hundred percent of the fees that we had billed until

25  that time.

1        THE COURT: Thank you, that's all.

2        MS. STEINGART: Thank you, Your Honor.

3        THE COURT: I'll take this matter under advisement.

4   We'll go now to verified complaint for declaratory relief,

5   conjunctive relief under 105 by Northwestern against

6   Ammondson, et al, and motion for preliminary injunction is

7   the purpose of this hearing.

8        MS. DENNISTON: Yes, Your Honor, this is in

9   connection with the motion that Northwestern filed on January

10  31st seeking to terminate certain agreements. On March 31st,

11  the defendant filed an objection and a counterclaim. The

12  objection included the debtor's purported counterclaims which

13  the debtor believes are identical to those set forth in a

14  state law complaint that the defendants have also filed. The

15  causes of action include breach of contract, breach of

16  covenant of good faith and fair dealing, abuse of process,

17  and then in the state court litigation it included a

18  malicious prosecution cause of action. The debtor filed a

19  request for an order to show cause because the debtor's

20  believe that the state court action, if allowed to proceed,

21  would be in violation of the plan and the confirmation order,

22  that Northwestern would suffer irreparable harm because it

23  would be subject to dual proceedings in both this Court and

24  in Montana state court over the same contracts, and that the

25  State board action should be stayed to allow the debtor to

proceed with its motion to terminate.  Now, I will admit and be candid with the Court, this is a motion that was filed on the 31st in connection with the last day for the debtor to object to certain claims.  This was filed in an omnibus motion to terminate.  It's the debtor's belief that particularly in light of the notice of that motion and the defendant's response under Langencamp (phonetical) and Gardner, the cases that the debtor cited, that this Court has jurisdiction over this matter and should retain it.  We have been advised and have reviewed this morning the pleadings that were filed by the defendants.  The defendants raise an issue that they did not receive notice and, therefore, cannot be bound by the confirmation order.  I just want to note for the Court that if the debtors believe that, that is a red herring argument because this matter arises in connection with claim objections and the motion to terminate to eliminate these, that the service of that motion was proper on the defendants, that they did timely file an objection and counterclaim with the Court, and that in order to avoid duplicative litigation, the debtor believes that under Langencamp that the debtors have accepted jurisdiction of the Bankruptcy Court and that this Court is where that matter should be received -- should be continued.  We have asked that the Court stay the Montana litigation pending the resolution of the debtor's motion.

1     MR. SULLIVAN:  Good morning, Your Honor.  Bill

2  Sullivan from Buchanan Ingersoll on behalf of Lester

3  Ammondson and a group of retirees.  Your Honor, I'd like to

4  introduce to the Court Mr. Cliff Edwards from Montana.  We

5  filed a motion for admission pro hac vice last week.  Mr.

6  Edwards is here to respond to the allegations and request for

7  an injunction, and I ask that he be permitted pro hac vice.

8  I checked the docket.  I did not see an order.

9     THE COURT:  I signed the order for Mr. Edwards and

10  Mr. Doak Sunday morning and faxed them out that day.

11     MR. SULLIVAN:  Okay.  Your Honor --

12     THE COURT:  But it probably hasn't hit the docket

13  yet is all.

14     MR. SULLIVAN:  Okay.  Thank you, Your Honor.  We

15  also filed a pleading yesterday which was consistent with the

16  schedule that the debtors had requested.

17     THE COURT:  I have that.

18     MR. SULLIVAN:  Okay.  Your Honor, with that I'll

19  introduce Mr. --

20     THE COURT:  All right.

21     MR. SULLIVAN:  -- Edwards.

22     MR. EDWARDS:  Good morning, Your Honor.

23     THE COURT:  Good morning.

24     MR. EDWARDS:  Your Honor, first of all, this Court

25  has no jurisdiction over this matter that Northwestern has

1  brought, and before I begin, may I say for the record, my
2  name is Clifford Edwards, Billings, Montana.  With me, co-
3  counsel from my firm Creo Kulver (phonetical) also have John
4  Doak who is co-counsel with us, and I would like to introduce
5  three members of these retirees that have come to Delaware
6  with me:  George Thornton (phonetical).  We have Gary Meldal
7  (phonetical) and Sheward Christianson (phonetical), and in
8  the back of the room, as any good law student would find the
9  back, is my intern, my son, John.  He's learning quickly to
10  go right to the back of the classroom.  The fundamentals of
11  this case, Your Honor, are this -- and in the application for
12  all of this emergency and extraordinary relief, Northwestern
13  attached through their Atlanta counsel Exhibit B, a letter of
14  March 31, 2005 that I sent to W. Wayne Harper of Northwestern
15  Energy in Beaut, Montana.  Said hello to Mr. Harper this
16  morning.  He's here in the courtroom as well.  The critical
17  sentence which Northwestern didn't highlight in any of their
18  prayers for emergency relief and prayers for attorney fees
19  and prayers for sanctions and prayers for cost was this:  I
20  won't serve the complaint -- and I'm referring to the one in
21  Beaut State District Court until we know what the Bankruptcy
22  Court until we know what the Bankruptcy Court does.
23  Consistent throughout our complaint, that they also attached
24  in that exhibit, is our allegation that the Bankruptcy Court
25  has no jurisdiction.  We said that in our responsorial

1  pleadings here to the very last minute filing literally
2  January 31, 2005 of Northwestern that claims to bring these
3  retirees in.  We have consistently claimed there is no
4  jurisdiction for the very simple matter that these gentlemen
5  whose benefits were slashed, unilaterally, without notice and
6  without any ability, any notice to participate in these
7  bankruptcy proceedings here in the State of Delaware.  Now,
8  it is undisputed Northwestern cannot show you any notice at
9  all to these retirees that they unilaterally slashed, but it
10  is worse, and may I show the Court a filing from May of 2004?
11  There are two critical filings I wish to bring to the Court's
12  attention that absolutely show not only was there no notice,
13  but that these gentlemen were once named, once referred to
14  and then struck from the disclosure statement.  I'm referring
15  first of all to a filing in May of 2004, the docket number
16  begins 993177.48, and with permission of the Court, I would
17  like to present a summary of that to the Court.

18          THE COURT:  That would be fine.

19          MR. EDWARDS:  Significantly, Your Honor, we notice
20  that when the debtor begins to talk about the non-qualified
21  compensation and benefit plans they're going to reject, in
22  the May 1, we have the top-hat contracts which are an
23  aggregation of individual agreements with the Montana Power
24  Company entered into with various executives which grant the
25  executive retirement benefits in amounts specified in the

1   contract and certain individual contracts the debtor entered

2   into with five former employees to provide each with

3   additional retirement benefits of various forms and amounts,

4   and the family protector plan described in greater detail

5   below.  As of the filing of the petition, the debtor had

6   accrued and had unpaid liabilities.  Now, I want to contrast

7   that with the next summary.

8       THE COURT:  I'm going to mark this as Exhibit 1 so

9   we can keep it identified on the record.  Is there any

10  objection to the Court taking judicial notice of this

11  exhibit?

12      MS. DENNISTON:  Thank you, Your Honor, that's fine.

13      THE COURT:  All right, then it will be admitted.

14      MR. EDWARDS:  Your Honor, then I would mark this

15  next summary, which is an August 18th, 2004 filing here in

16  Wilmington, Delaware under Docket No. 1053554.9, and may we

17  refer to that as Exhibit 2, and I would move its admission as

18  well and would like permission to bring that forward to the

19  Court as well.

20      THE COURT:  Very well.  That exhibit will be

21  admitted.

22      MR. EDWARDS:  Significantly, Your Honor, in August

23  of 2004, that very language that I just read, these top-hat

24  contracts that would include these retirees to include the

25  three gentlemen in the courtroom here in Delaware, that was

50

1    stricken.  That was crossed out.  The very contracts that

2    they sought within minutes of the last minute, January 31st

3    of this year, were stricken in August.  Further, we have no

4    jurisdiction of this Court on the very base of their own plan

5    of reorganization which was granted November 1 of 2004.  We

6    noted on page 7 of that plan, which was approved by this

7    Court, and that is Docket No. 1060234.9, they indicate that a

8    bar date was January 15th, 2004, almost a year before they

9    attempted to bring in this Court to slash these retirees, and

10   it also says that they had filed proofs that -- all creditors

11   had filed proofs of claim for each claim they assert against

12   the debtor by the bar date.  Our people never had any chance

13   because they were never notified of any kind.  If they were

14   ever to have gleaned from back here in Delaware that they

15   were even mentioned in May of 2004, they would have seen in

16   August that their reference to them and their top-hat

17   contracts were struck by Northwestern.  Also on page 9 of

18   their base order of reorganization of November 1, 2004,

19   Docket No. 1060234.9, it says, Notice, and it says,

20   Compliance with disclosure statement approval order, and it

21   recites that, In accordance with the disclosure statement

22   approval order the Bankruptcy Code and the Bankruptcy Rules

23   as described in the affidavit of service sworn by Chris

24   Shepper (phonetical) on June 14th, 2004, the debtor has

25   timely (a) mailed, sub-(1) notice of the date, time, and

1  place of the confirmation hearing; (2) notice of the deadline

2  and proceedings for filing objections to confirmation of the

3  plan.  And then it goes on to talk about setting out ballots

4  and all of that.  The long story short, Your Honor, these

5  individuals that I represent had absolutely no notice even

6  though that is also on page 97 of the reorganization plan

7  where the Court has adopted Northwestern's representation

8  that all notices were properly sent.  There is no

9  jurisdiction in this Court whatsoever because these gentlemen

10  were denied any opportunity, because they got no notice, to

11  participate in this exercise here in Delaware.  They were

12  denied all of their due process rights to object, and they

13  are absolutely, that is Northwestern, absolutely banned from

14  going forward in this fashion to try to deprive these

15  gentlemen of their pensions.  Because of that, not only does

16  this Court have no jurisdiction to act further on these

17  emergency hearings when the totality of the circumstances are

18  looked at, when we told them we would not serve the complaint

19  in state court until this Court has ruled and yet my co-

20  counsel, Mr. Sullivan, as I yield to him in a moment, he had

21  discussions with the Northwestern lawyers about this very

22  date and these very matters.  What I believe ought to be done

23  without dispatch and would ask the Court to rule immediately

24  that because of these circumstances, because of these

25  documents no jurisdiction in this Court whatsoever, not only

1  to dismiss these emergency proceedings and not only to reject

2  their request for sanctions and attorney fees and costs but

3  to sui sponte have this Court impose a sanction against

4  Northwest and allow us our costs, our attorney fees, as well

5  as an additional finding of sanctions for what I think is an

6  abuse of process in this Court. We had acted in all good

7  faith trying to deal with these matters for these retirees

8  only to have received these pleadings and then investigate

9  and find under these circumstances that not only were these

10  people once mentioned only by reference to their contracts

11  but they were crossed out in an amended filing on August of

12  2004. We ask the Court to grant our relief immediately and

13  with that I would yield back to co-counsel Bill Sullivan to

14  speak of these other matters, Your Honor.

15          THE COURT:   Thank you.

16          MR. EDWARDS:   Thank you.

17          MR. SULLIVAN:   Your Honor, Bill Sullivan on behalf

18  of Lester Ammondson. The only thing I have to add is

19  reference to discussions I had with respect to scheduling a

20  hearing on the motion to terminate. As Your Honor has heard,

21  our response to the motion to terminate indicated first and

22  foremost that we objected to the jurisdiction of this Court

23  because of the way that the plan had been handled and that

24  our clients had been omitted from the plan process. With

25  respect to that motion, after the state court action was

1    initiated and held in abeyance, I contacted counsel to say

2    when can we schedule the motion to terminate for a hearing so

3    that we can get this matter reviewed by Your Honor in a

4    fashion to determine whether in fact you had jurisdiction or

5    not.  I was advised simply that this May 3rd hearing was

6    going to be for non-contested matters, but that perhaps we

7    could seek another hearing from your court.  I even suggested

8    that we be available in Montana, given Mr. Edwards' residence

9    is there and the fact that all our clients are there.  So,

10   given that contact we were certainly taken aback when we got

11   a pleading that indicated that there should be an emergency

12   hearing requiring us to appear here on May 3rd.  We certainly

13   would have preferred to have your Court review this

14   voluntarily and would have been glad to accommodate the Court

15   either on May 3rd or at any other time, but there was

16   certainly no requirement whatsoever that an injunction

17   hearing be initiated.

18              MS. DENNISTON:  Your Honor, if I --

19              THE COURT:  Counsel for Northwest.

20              MS. DENNISTON:  -- can respond on behalf of

21   Northwestern.  First and foremost the counsel here today that

22   have been involved in these pleadings were unaware of this

23   conversation.  Had they called Mr. Knapp, me, Mr. Harper, or

24   Ms. Chavant Nungoon (phonetical) who worked on these papers,

25   we certainly wouldn't have proceeded, but obviously there's

1   been a horrible miss-communication because we were unaware of

2   that request.  Secondly though, returning to the substance of

3   the matter before the Court, is there jurisdiction or isn't

4   there, and what does it mean in terms of the notice?  First

5   and foremost, consistent with the evidence before the Court

6   and Exhibit 1 and Exhibit 2, the debtor has been of two minds

7   as to what should or shouldn't happen with these so-called

8   Montana top-hat agreements.  It's the debtor's position now

9   that it was in the debtor's economic interest to terminate

10  those contracts as evidenced by the motion filed in January,

11  and that is the same analysis that I briefed the Court on

12  earlier that the debtor reserved those rights, the debtor

13  does not believe these are executory contracts because no

14  services are being provided, and that the debtor seeks to

15  terminate them as the debtor pursuant to the plan provisions

16  that we've already briefed the Court on.  As to the notice

17  and whether or not these retirees have been impacted by the

18  way notice was given, after the debtor made the decision

19  consistent with the debtor's plan which permitted it to

20  terminate those plans on a post-effective date basis or as

21  the debtor believed and as the debtor drafted the plan and it

22  was approved by the Court, the debtor filed that motion in

23  January.  It filed it on the timing as described to the Court

24  earlier so that it would be filed as if there were claims

25  pending for each of those individuals and the debtor was

1   objecting to those claims, and what the debtor --

2           THE COURT:  I'm a little bit confused, counsel.

3   What claims were pending that were filed by anyone of the

4   retirees that you name in this complaint?

5           MS. DENNISTON:  The debtor acknowledges that none

6   of the retirees received a notice and none of the retirees

7   had claims filed.  When the debtor filed the motion to

8   terminate it treated those as if there were claims pending

9   for those contracts, and indeed, consistent with the

10  responses filed, we received an objection and the

11  counterclaim.

12          THE COURT:  Well, sure you have, you brought them

13  in here.  What are they going to do?  Just say, Okay.

14          MS. DENNISTON:  No, nobody expected them to say,

15  Okay, Your Honor, but the debtor did not intend and in fact

16  did not deprive them of any of their substantive rights.

17  Those contracts are not executory.  The debtor believes that

18  under the plan language it has the right to terminate them on

19  a post-effective date basis, and that is what the debtor has

20  sought to do by nature of the motion that's before the Court.

21  Under the terms of the plan, the confirmation order, the

22  debtor believes that this Court has jurisdiction because the

23  debtor did reserve those rights, and --

24          THE COURT:  Where did you reserve the right?

25          MS. DENNISTON:  To terminate the retirement plans,

1    that would be the section that we addressed in the context

2    with Mr. Hylland's motion.  It's section --

3              THE COURT:  8.6?

4              MS. DENNISTON:  Yes, Your Honor.

5              THE COURT:  Well, how about 10.7?

6              MS. DENNISTON:  Just a second, Your Honor.

7              THE COURT:  Are any of these plans covered by

8    ERISA?

9              MS. DENNISTON:  No, Your Honor, these are all non-

10   qualified plans.

11             THE COURT:  And does 10.7 in your opinion just

12   address ERISA pension plans?

13             MS. DENNISTON:  That's correct, Your Honor.

14             THE COURT:  And 8.6 says that payment of any

15   retiree benefits as such benefits may have been modified

16   during the Chapter 11 case -- which they weren't -- shall be

17   continued solely to the extent and for the duration of the

18   period that the debtor is contractually or legally obligated

19   to provide such benefits subject to any rights of the debtor

20   under applicable law.  Was that state law?

21             MS. DENNISTON:  That would depend on the various

22   contracts, Your Honor, and I will be candid with the Court

23   that the contracts are governed by all kinds of different --

24   in fact, there were two sets of these contracts.

25             THE COURT:  Well, as I understand your motion to

1  terminate these benefits, everyone of these are an individual

2  agreement.

3           MS. DENNISTON:  That's correct.

4           THE COURT:  And they were executed by Montana Power

5  Company, and then they were specifically assumed under the

6  APA by Northwestern.

7           MS. DENNISTON:  To the extent that they were

8  identified on the APA schedule, they were assumed.

9           THE COURT:  Well, and not only were they assumed,

10 but they were being paid.

11          MS. DENNISTON:  That's correct, Your Honor.

12          THE COURT:  I went through your motion, there are

13 over three hundred and some thousand dollars that you paid on

14 these benefits since the petition date.

15          MS. DENNISTON:  That's correct.

16          THE COURT:  And 8.6 continues on that you've

17 maintained two pension plans for its employees, that's the

18 ERISA plan; okay?

19          MS. DENNISTON:  Yes.

20          THE COURT:  And there's no mention in 8.6 of top-

21 hat plans or any other plans.  It just specifically notes

22 that some of these plans were unfunded or may be subject to

23 the Pension Benefit Guarantee Corporation; right?  The way I

24 read that 8.6 is that you're subject to the applicable law.

25 If you want to terminate these plans, you've got to do it

1    under state statute in another court.

2         MS. DENNISTON:  We believe that state law would

3    govern the terms of the termination, but the debtor's reading

4    when it prepared the plan was that it would be able to

5    terminate on a post-effective date basis in the Bankruptcy

6    Court.  There's no dispute, Your Honor, that if the contract

7    is governed by Montana law that Montana law would apply to

8    that termination.

9         THE COURT:  What other law would apply?

10        MS. DENNISTON:  I suppose it -- For example, Your

11   Honor, we do have contracts that are governed by South Dakota

12   law, but I'm not disputing that the state law --

13        THE COURT:  Just for these gentlemen, just for

14   these retirees.

15        MS. DENNISTON:  That's correct.  I believe that

16   they are all governed by Montana law.

17        THE COURT:  And you'd agreed, wouldn't you, that

18   the plan has vested all of the property back into the debtor,

19   the reorganized debtor?

20        MS. DENNISTON:  I would agree that the -- yes,

21   based on the notice of substantial consummation that's been

22   filed.

23        THE COURT:  And do you have any qualms with the

24   tests that the Third Circuit laid out in Resource

25   International about post-confirmation jurisdiction of the

1   Court relative to -- There has to a close nexus.  They

2   abandoned the _Packard_ test in a related to jurisdiction and

3   there has to be something that absolutely is stated in the

4   plan, the way I read it, because of the facts of that case

5   and if it's not there, then you're left with remedies outside

6   of the jurisdiction of the Bankruptcy Court.  You can't use

7   this umbrella for everything at all times, and the reason

8   that that comes into existence is basically the cases are

9   pretty clear under 1141 that there just -- the estate stops

10  unless it's specifically reserved.  Now, under _Resource_

11  _International_, that was a case where they had a liquidating

12  trust, and the trust brought a malpractice case against

13  PriceWaterhouse for contending that during the administration

14  of the estate PriceWaterhouse didn't perform quite well, and

15  the question is, they brought the complaint, the trustee

16  brought the complaint in Bankruptcy Court, and it went up on

17  appeal to the Ninth Circuit and the Ninth Circuit said, This

18  hasn't got anything to do with the implementation or the

19  consummation of the plan.  There's no close nexus between

20  this litigation and what is in the terms of the plan.  And

21  they held that there was no jurisdiction in the court and

22  they sent the liquidating trustee walking to some other

23  court.  Just recently in this year, in the _Pegasus_ case,

24  which I mentioned earlier, which adopted this _Resource_ test,

25  you had a situation where the plan confirmed specifically

1  provided that a certain organization in Montana named in the
2  plan was to provide the reclamation work at the Lortman Lang
3  (phonetical), and the allegation in the complaint was that
4  the Department of Environmental Quality upset that plan
5  provision by firing these people and going on with somebody
6  else, and therefore, the implementation of the plan was
7  severely limited, and the Ninth Circuit said, in that case,
8  there was a close nexus relative to the confirmation of the
9  plan which was specifically mentioned as a duty of the
10 company that was fired.  And they dismissed it on sovereign
11 immunity grounds but it seems to me that here you've got a
12 situation where these people were never brought before the
13 Court.  They were never put in the plan.  The plan doesn't
14 cover any of these benefits.  You continue to make the
15 payments, and then there was a unilateral termination, and I
16 just think that that leaves you in the Montana court.

17         MS. DENNISTON:  Your Honor, if I can be heard
18 briefly.

19         THE COURT:  Sure.

20         MS. DENNISTON:  The debtor reads the plan obviously
21 very different.  The debtor believes that based on the record
22 made at confirmation and paragraph 8.6, that the debtor
23 reserve the right to amend or terminate these benefits on or
24 after the effective date, and the retention of jurisdiction
25 provisions as --

1    UNIDENTIFIED SPEAKER (TELEPHONIC):  Okay, come in

2    --

3    THE COURT:  Go ahead.

4    MS. DENNISTON:  -- 13.1(J)(i) specifically reserves

5    the jurisdiction of this Court -- excuse me, Your Honor, it's

6    paren (J) close paren, to hear and determine any matters or

7    disputes respecting the debtor under §s 1113 or 1114 which

8    deal with the termination of retiree benefits.  The debtor

9    was -- and the debtor has argued that they don't apply but

10   that they are retiree benefits, and the reason for that has

11   been throughout the process the debtor was trying to

12   determine what was the most appropriate thing to do with

13   these non-qualified plans.  So, the debtor thinks that it did

14   retain the jurisdiction of the Court by specifically

15   reserving the right to amend or terminate the benefits, these

16   top-hat contracts prior to or after the effective date.  The

17   debtor doesn't dispute that Montana law applies.  What the

18   debtor does dispute is that because these deal with claims in

19   the nature of what rights arise if the contracts are

20   terminated that it is closely tied to the adjudication of the

21   claims against the estate, and that under the way this plan

22   was prepared, that it contemplated a post-effective date

23   termination.  And so, we believe that it's got a close nexus

24   to the adjudication of the claims, and that this Court still

25   has jurisdiction over the top-hat contracts.

1    THE COURT:  Well, just as a matter of
2    interpretation of 8.6, it says that including without
3    limitation the debtor's right to amend or terminate such
4    benefits prior to or after the effective date.

5    MS. DENNISTON:  That is correct.

6    THE COURT:  It doesn't tell anybody where you have
7    to take that action.

8    MS. DENNISTON:  I would concede the point, Your
9    Honor.  That was not the debtor's intention as reflected by
10   the retention of jurisdiction section.

11   THE COURT:  The plan binds everybody.  It binds the
12   retirees.  It binds all the creditors who are known, or
13   unknown.  But, it disturbs me that none of these people ever
14   got notice.  They had no right to bout.  Had no right to come
15   forward and say, Are we in this plan?  They were just passed
16   right on through.  It's kind of like the situation in Chapter
17   7 where you've got an outstanding mortgage and nothing's done
18   during the 7, and the law is very clear that that passes
19   right through unaffected.  I see a similarity there.  And
20   when they were first mentioned and then amended out and not
21   scheduled, not a part of any Schedule F -- only one of them
22   were included as I understand it in Schedule G under
23   executory contracts.  And if they were executory contracts --
24   I think that's an open question, because as I read your memo
25   in the motion there was a quid pro quo of them getting this

1   extra benefit -- cooperation, keep your mouth shut about some
2   confidential matters, and things like that.  That may be
3   enough to bring it into an executory position, and if it is,
4   then nothing that was done by this company during the
5   reorganization to reject them, and so, you're bound by their
6   assumption because if you didn't reject it, you didn't create
7   the cure amount, and therefore, you didn't create -- put
8   these creditors, if they were creditors, into Class 9 in
9   order for them to be able to determine whether or not they
10  can take the stock in lieu of cash.  They never had that
11  opportunity.  Now, I don't see how you can back them into the
12  Class 9 now after the fight that went through about the
13  Magten dispute.  I don't know how that's going to effect --
14  Class 7 comes in here and says, Wait a minute, you're
15  deleting what we're going to get eventually because you're --
16  We never gave them anything.  That was no part of the gift.
17  So I just think that you've got a long way to go to -- I
18  would be afraid that if I said I'm going to hold onto this
19  thing and decide it and it went upstairs, it would go
20  upstairs, I don't think the Third Circuit would have any
21  question that this is not, number one, due process; number
22  two, it has no effect on the implementation or the
23  consummation of the plan; and number three, the debtor's out
24  there now being vested.  They're on their own.  They're a
25  reorganized company and whatever their obligations are after

1  the consummation of this plan, they have to deal with it
2  somewhere else.

3         MS. DENNISTON:  Thank you, Your Honor.

4         THE COURT:  Mr. Edwards?

5         MR. EDWARDS:  Your Honor, based on what
6  Northwestern's counselor said there, I believe the record
7  needs to be further augmented.  She said that this
8  termination is in the best interest of the company.  Now, I
9  have marked as Exhibit 3 and would seek permission to bring
10  it before the Court and get a copy to counsel here -- Your
11  Honor, this is the 10(k) from the Montana Power Company in
12  1999.  What it does is speak the truth.  The Montana Public
13  Service Commission allows us to include in rates exactly
14  these pensions.  I seek permission for Exhibit 4 which is the
15  1998 Annual Report to Shareholders of the Montana Power
16  Company and on the second page of Exhibit 4, the retirement
17  plans, again they note that the PFC of the Montana Public
18  Service Commission allows the company to include in rates all
19  utility costs on the actual basic provided under these
20  retirement plans.  As we sit today and as we note in that
21  August filing, which I believe was Exhibit 2, we can see
22  within the context of that that there was an agreement
23  reached between Northwestern back in July of 2004, Your
24  Honor, and there is contemplated a rate hearing held on or
25  before September the 1st of 2006.  But as we sit now, and I

1    think that's why the top-hats were struck out in that exhibit

2    in August of 2004, because they reached that agreement.

3    These pension plans of these gentlemen are being paid for,

4    ironically enough, by them.  They have their pension plans

5    slashed but every month when they faithfully write their

6    check to Northwestern, they're being charged for their own

7    retirement plans that they ain't getting.  Now, that's not

8    right, and that is an additional factor that I think shows

9    that this Court has no jurisdiction.  It is not in the best

10   interest of the company.  It is only in a gravy instance of

11   this company.  They're getting -- the rate payers in Montana

12   are paying for these retirement plans that have been slashed.

13           THE COURT:  I don't know that.

14           MR. EDWARDS:  These contracts were --

15           THE COURT:  Let me just tell you why.  There was

16   extensive negotiations which occurred during this

17   reorganization with the Public Service Commission and this

18   debtor relative to the rate of return and how long it was

19   going to continue, and my recollection of the evidence that I

20   took last month was that this rate of return was fixed at

21   somewhere around 8 percent or something of that nature, and

22   it was then going to be reevaluated by the Public Service

23   Commission in 2006.  I don't know if that agreement that was

24   made with the PFC that was the bottom line for the funding of

25   this for the reorganization ever considered any of these

1  matters.  I don't know that.  I don't think that you can say
2  that it may have carried through.  After all, Montana is
3  still deregulated.  What jurisdiction there may be over this
4  company down the line relative to rate bases is still an open
5  question.

6         MR. EDWARDS:  The point, however, that I want to
7  make --

8         THE COURT:  You're saying that this carried through
9  and the point is that the Montana Power Company did put this
10 into the rate base.  It was acknowledged by the PSC and --

11        MR. EDWARDS:  And that was purchased by
12 Northwestern.

13        THE COURT:  -- and that was bought by Northwestern.

14        MR. EDWARDS:  And that is my point, Your Honor.

15        THE COURT:  Right.

16        MR. EDWARDS:  And I would ask that the Court with
17 all due speed --

18        THE COURT:  I don't think --

19        MR. EDWARDS:  -- grant our motion.

20        THE COURT:  Yeah.  I don't think that this issue is
21 refined enough relative to this rate base issue in light of
22 what happened during the reorganization.

23        MR. EDWARDS:  And I guess the --

24        THE COURT:  I don't think that really affects the
25 jurisdiction issue anyway.

1     MR. EDWARDS:  Right, because we are here on the

2   jurisdictional issue, and we ground our motion on the

3   jurisdictional but when that argument was made I felt

4   compelled to point out what they bought was Montana Power

5   contracts that the PSC had approved the rate payers to pay

6   for.

7     THE COURT:  But I've got to be somewhat careful

8   that I don't write something into this jurisdiction order

9   that another court down line in the state court says it's

10   already been decided.

11     MR. EDWARDS:  Yeah.  We are here on --

12     THE COURT:  When the issue hasn't been framed.

13     MR. EDWARDS:  Yeah.  We are here on the basis of

14   jurisdiction.  There's no jurisdiction, no due process, and

15   that is the basis, and we ask the Court to rule that there is

16   no jurisdiction based on that as quick as possible.

17     THE COURT:  All right.

18     MR. EDWARDS:  Thank you.

19     THE COURT:  Counsel.

20     MS. DENNISTON:  Your Honor, based on that argument,

21   I would object to the admission of the proffered exhibits 3

22   and 4.

23     THE COURT:  I'm going to sustain that because I

24   really don't think that goes to a jurisdictional matter.  I

25   think that goes to matters that can be properly raised

1   somewhere else about who's paying the benefits, if it's

2   important.  Mr. Sullivan, do you have anything further?

3           MR. SULLIVAN:  Your Honor, I was only rising to

4   comment on whether you wanted a form of order.

5           THE COURT:  I might have to rule first.

6           MR. SULLIVAN:  I thought you had ruled, but I --

7   maybe if you're taking it under advisement --

8           THE COURT:  No, I give a lot of indications and

9   then I go back in there and I think I was wrong, and I might

10  change my mind, but I don't think I will on this one, but

11  I've got an order -- I'll have an order prepared and

12  hopefully I can get it out before I leave here Thursday.

13          MR. SULLIVAN:  Thank you, Your Honor.

14          THE COURT:  All right, that concludes the hearing

15  on -- and that order will probably cover Mr. Hylland's --

16          MR. DEMMY:  I was just rising to see if the same

17  title would apply to other matters that Your Honor took under

18  advisement.  I was arguing the Hylland SISP matter.

19          THE COURT:  Yeah.

20          MR. DEMMY:  Thank you, Your Honor.

21          THE COURT:  Now, we'll take up the fees matters.

22  Mr. Smith, are you still there?

23          MR. SMITH (TELEPHONIC):  Yes, Your Honor, I'm here.

24          THE COURT:  Which one do you want to start with

25  first?

1    MR. AUSTIN:  Your Honor, Paul Hastings can go

2  first.

3    THE COURT:  We'll start with your application?

4    MR. AUSTIN:  Yes, Your Honor.

5    THE COURT:  I've had an opportunity to read the 72-

6  page auditor report which included the responses and other

7  details.

8    MR. AUSTIN:  Your Honor -- For the record, I'm

9  Jesse Austin, counsel to Northwestern but at this point I'm

10  appearing on behalf of my law firm Paul Hastings Janofsky &

11  Walker with respect to presenting for approval what is

12  officially titled the Fifth Quarterly and Final Fee

13  Application for Services Rendered and Expenses Incurred in

14  Northwestern's Chapter 11 Proceeding in Our Capacity as

15  General Lead Bankruptcy Counsel for Northwestern.  I have a

16  relatively short presentation, Your Honor, if you'd like me

17  to proceed with that.

18    THE COURT:  Go ahead.

19    MR. AUSTIN:  All right.  Your Honor, this is the

20  last of the major professional fee applications to be

21  presented for final approval in Northwestern's Chapter 11

22  case.  Heretofore, this Court has approved final fee

23  applications presented by the debtor's local bankruptcy

24  counsel, Greenberg Traurig, various special counsel to the

25  debtor for example the Browning, Kaleczye firm and the

1   Creditor Committee's primary local and special counsel

2   respectively Paul Weiss, The Bayard Firm, and energy

3   regulatory counsel out of Washington, D.C.   The application

4   covers a period from September 14th, 2003 through November 1,

5   2004.   The total fees cover, as adjusted, and I will speak to

6   the adjustment in just one minutes, seek approval for final

7   amount in the dollar amount of $13,574,871.45 and seeks

8   approval for expenses covered, as adjusted, in the amount of

9   $881,851.31.   When I speak by the adjustments, what I'm

10  referring to, Your Honor, is that except for one of the

11  adjustments suggested by Mr. Smith as the fee examiner, Paul

12  Hastings finds acceptable with the comments, the one

13  adjustment, and we're willing to make all the adjustments

14  that the fee examiner has proposed.   The one adjustment that

15  we do dispute, and I'll address in a second, is the

16  adjustment of the fee examiner essentially seeking about a

17  $75,000, what I call a case adjustment fee to the total fees

18  and expenses.   Pursuant to the administrative order entered

19  by Judge Case in this Chapter 11 case in October, at this

20  point a hundred percent of the expenses have been paid, but

21  only approximately 80 percent of the fees so that if the

22  application as adjusted is approved, Northwestern would be

23  able to pay to Paul Hastings the holdback amount which is

24  approximately $2 million, and that amount has been

25  outstanding to our law firm since on or about November 1.

1   This application, Your Honor, as all prior applications from

2   our perspective and as I've stated in support of affidavits

3   for the application complies with the provisions of the

4   Bankruptcy Code, the Rules of Bankruptcy Procedure, the Local

5   Rules of Delaware, and the U.S. Trustee Guidelines.  Other

6   than objections from Magten, there have been no objections or

7   comments filed that I'm aware of with respect to the

8   application regarding compliance issues.  Other than

9   objections from Magten, there have been no serious objections

10   submitted as to the reasonableness or necessity of the fees

11   for services rendered and expenses incurred.  Ms. Steingart

12   this morning used a number of adjectives relative to actions

13   taken by the debtor with respect to its client.  Frankly, we

14   find at this stage in this proceeding that this is just one

15   more example of Magten's litigation scatter-gun shooting in

16   an effort to further derail the progress of the debtor's case

17   and the closing of this case and to try and penalize my law

18   firm as the one who has been front and center in moving this

19   case through this Bankruptcy Court on what we certainly

20   believe to be an efficient and expeditious manner.  Subject,

21   as I noted, Your Honor, to the adjustments suggested by the

22   fee examiner, Paul Hastings submits that the application

23   should be approved.  We recognize that irrespective of the no

24   value being able to be distributed to the equity holders

25   because of the valuation and absolute priority rules do not

72

1  allow for such, that Paul Hastings led a very successful and
2  timely reorganization for Northwestern. As the evidence
3  showed in connection with the confirmation hearing, there was
4  significant effort extended pre-Chapter 11 both by the
5  debtor's principals, its financial advisors, and Paul
6  Hastings in an attempt to preserve some value for equity.
7  Unfortunately, that simply was not to be. Once the decision
8  was made to file Chapter 11, Paul Hastings led the company's
9  efforts to expeditiously and economically enter and exit
10  Chapter 11 with the reorganization structure that would
11  return the company to an investment grade credit rate. Those
12  goals were achieved in record time for regulated utility. If
13  you compare this Northwestern's case, for example, to Public
14  Service of New Hampshire, Columbia Gas, Pacific Gas and
15  Electric, Your Honor, this case got in and out in
16  approximately a thirteen-month period. We believe the
17  success of the efforts are evidenced by Northwestern's recent
18  pay-down of senior debt by approximately $25 million, the
19  company's recently establishment of an annual cash paying
20  dividend of its stock at 80 cents a share, and the fact that
21  Northwestern's common stock has consistently been trading at
22  $28 per share over the last few months, which is a 40 percent
23  premium over what was otherwise forecasted plan value of such
24  stock at $20 a share. Your Honor, I can go through a number
25  of things that we believe highlights what was accomplished in

1   this case. I think first and foremost one of the most
2   critical points that was accomplished was on the very first
3   day which was to insure payment to critical vendors such as
4   energy and gas suppliers that assured that Northwestern had
5   energy and gas to supply to its consumers, specifically
6   customers in Montana. Separately, on the first day, we were
7   able to obtain court approval from payment of all employee
8   wages that fell within the gap period between the last pay
9   period and the Chapter 11 filing, and lastly, we obtained
10  approval on that day of interim financing in the form of $100
11  million DIP loan. Following that up in October, we obtained
12  further approval of critical energy supplies to assure no
13  interruption of energy to consumers and then obtain final
14  approval of the DIP such that within the first 60 days the
15  company had available liquidity to operate its business. It
16  had sustainable energy supplies to its customers, and based
17  on its liquidity position was able to pay a hundred percent
18  of its Montana property taxes which was not an insignificant
19  dollar. Thereafter, during the mid-point of the case, the
20  company was able to maintain and keep current all of its pre-
21  petition senior secured debts. So that left one less
22  creditor class with whom the company had to deal with. We
23  were able to negotiate an interest reduction on the $390
24  million CSFB loan that saved the company almost $8 million in
25  interest carrying costs. The company continued to build

1   liquidity and frankly, during the course of the bankruptcy

2   proceeding never had to draw on the DIP loan.  Beginning in

3   December we effectively entered into or completed

4   negotiations with the Creditors Committee to develop the

5   outline of the reorganization plan which was going to provide

6   effectively for the conversion of all the senior debt and

7   subordinated unsecured debt to equity, not knowing at least

8   at that time, how much was going to be the equity split

9   between the senior unsecured bondholders and the subordinated

10  bondholders.  We couldn't have developed that until we then

11  finalized -- the company then finalized the five-year

12  business plan to support a reorganization plan, all of which

13  was presented to the Committee in early February 2004.

14  During this period, we worked with the company and helped

15  bring before this Court a negotiated settlement in

16  environmental liabilities with respect to the Milltown Dam,

17  which effectively reduced a filed claim of $150 million from

18  ARCO and other environmental protection agencies to

19  approximate $10 million relative to the debtor's estate.  In

20  February 2004, we along with principals of the debtor,

21  negotiated a settlement of the securities class action

22  litigation which resulted in resolution of that litigation

23  but with no cash payment or any other payment coming from

24  Northwestern.  Following the negotiations with the Committee,

25  the debtor was able to timely file a disclosure statement and

1  plan by March 14th, which was within only one extension of

2  the exclusivity period.  And in May 17th, we obtained

3  approval of the disclosure statement and began the

4  solicitation process.  During what I would define to be the

5  confirmation process, the debtor and we, as lead, finalized a

6  resolution of issues with the Montana Public Service

7  Commission and the Montana Consumer Council, which resulted

8  in inclusions of those provisions and stipulation into the

9  reorganization plan and the central focus of those

10  negotiations resulted in two things:  One, it stabilized the

11  rates through 2006 that would otherwise be charged from

12  Montana consumers and also resolved an involved financial

13  investigation initiated by the Montana Consumer Council

14  before the Montana Public Service Commission.  And as this

15  Court has tried to struggle with jurisdictional issues today,

16  I can assure you that it also resolved significant

17  jurisdictional issues between who was getting ready to tell

18  whom as to whether that financial investigation could or

19  could not go forward as between a debate between Judge Case

20  and the Montana Public Service Commission.  Separately, we

21  worked with management to negotiate a settlement of a

22  McGreevey class action litigation, which is now hopefully

23  trying to proceed to final approval before Judge Hadden

24  (phonetical) in Montana, assuming we also obtain approval

25  ultimately before this Court upon finalization of settlement

1   documents.  We also -- During the confirmation process was
2   able to work with the Committee in negotiating a settlement
3   with Harbert Stress Investment Management and Wilmington
4   Trust, the indenture trustee for the Toppers whereby the
5   Class 7 was able to support the plan, the senior unsecured
6   notes, and the Class AA which were the Toppers voted to
7   support the plan.  This settlement led to a modification and
8   re-solicitation on the votes on the plan, but one significant
9   point, Your Honor, is that as a result of those negotiations
10  there was increased distributions out to both the Toppers and
11  to the Quips although as controlled by Magten the class of
12  the Quips effectively did not accept that increased
13  distribution.  We began confirmation hearings in August, and
14  frankly, but for the re-solicitation of the votes on the
15  modified plan, we may have been able to have gone effective
16  in September which would then have basically been able to
17  exit Chapter 11 in twelve months.  The confirmation hearing
18  was concluded in early October over Magten and Law
19  Debenture's objections, I might add.  The reorganization plan
20  was overwhelmingly supported by all impaired classes of
21  creditors except for Magten and other similarly situated
22  Quips holders in Class 8-B.  The plan confirmed on October
23  19, which two highlights of that, Your Honor, is that there
24  was no interruption in service to consumers and there was no
25  forced layoffs of employees.  All the jobs effectively were

1   preserved through this Chapter 11 process.  And the final

2   highlight, I would submit, Your Honor, is that on the

3   effective date and in connection with going effective the

4   debtor was able to refinance and pay off and then rent two

5   loan agreements, but it paid off its $390 million CSFB

6   facility and the $100 million DIP loan with the company

7   emerging with a little over $800 million in senior secured

8   debt with extended maturities in excess of five years at

9   average interest rates approximately 2 percent lower than

10  pre-Chapter 11.  And it also has liquidity of a combination

11  of cash and available credit lines in excess of $100 million.

12  The point of this, Your Honor, is that all in all, we

13  certainly believe that this was a successful Chapter 11

14  proceeding, and that Paul Hastings' services rendered and

15  expenses incurred on behalf of the debtor were reasonable and

16  should be approved as stated in the application.  The

17  comments and objections to the application have been

18  submitted by only two parties in interest.  First, the fee

19  examiner and secondly Magten Asset Management Corporation.

20  Notably, neither the U.S. Trustee or the Official Committee

21  of Unsecured Creditors have any comment or objections to the

22  applications as presented.  With respect to the fee examiner,

23  Your Honor, the fee examiner with respect to this

24  application requested total adjustments of approximately

25  $45,790.30.  As I previously noted, Paul Hastings accepts

1    those adjustments. The fee examiner has also requested a

2    case adjustment of approximately $75,694 which effectively

3    represents a write-off of time for those attorneys that we

4    called upon on a very limited specialized basis that may have

5    billed less then I believe 10 hours in the case. As I noted,

6    we agreed to make all of the designated adjustments except

7    for this final case adjustment. We think here, Your Honor,

8    that we oppose such adjustment. There's no legal basis to

9    support such request. We submit that we were very efficient

10   in use of personnel on the reorganization and a blanket case

11   adjustment is unnecessary. I note, for example, I was just

12   quickly reviewing the Exhibit 6, I believe, that's filed to

13   our response to the Magten objection, and just with -- We

14   expended approximately 40,000 legal hours in work on this

15   case. I know personally, I worked approximately 2,600 hours

16   on it. I note that during the course of the case I traveled

17   on behalf of Northwestern over 200,000 air miles to deal with

18   the far ranging prospects of this case. Ms. Denniston billed

19   over 2,600 hours, 2,700 hours. When I looked at the core

20   bankruptcy team as it related to 40,000 hours, the core

21   bankruptcy team which was made up of approximately only six

22   people put in approximately 13 to 14 percent of the total

23   time expended. We think under the circumstances, Your Honor,

24   we went to different people to ask specific questions and in

25   this particular instance a blanket case adjustment is not

necessary or otherwise required, and we believe that and ask

that this portion of the fee examiner's objections be

overruled.  I'll go ahead and address Magten's objections,

Your Honor, as we summarize them.  Magten's objections are

based on mischaracterizations and misstatements, and we argue

that its objections should be overruled.  First, Magten asked

this Court to delay ruling on the application until Magten's

appeal to the order denying its motion to disqualify is

decided.  Frankly, Your Honor, there's no basis at law for

this, and they don't cite any cases in support.  Essentially

what Magten is asking is for a stay pending appeal when it's

never previously sought such a stay as to its appeal of the

order denying Magten's disqualification motion.  With no stay

in place, and on that point, Your Honor, Magten did not come

before this Court and did not go before the District Court

seeking any stay of that order.  So with no stay in place,

this Court should deny this portion of Magten's objections

and allow the application and payment of the whole back

amounts to be made.  The second and probably more important,

Your Honor, is that Magten mischaracterizes and mistakes Paul

Hastings' role as counsel to Northwestern.  Magten wants to

argue it appears that because Paul Hastings said that it was

stepping down as to counsel on matters related to, quote,

"the Magten adversary proceeding", close quote, that we

should not have done anything else that in any way

1  congenially involve a question about the going flat or a

2  fraudulent conveyance.  This is what Magten specifically

3  misreads because in our affidavits and in the top documents

4  we submitted, Your Honor, the Magten adversary proceeding was

5  a specifically defined piece of litigation.  It was at

6  Adversary Proceeding No. 04-53324-CGC and is what is

7  generally referred to as a going-flat transaction.  At no

8  point -- and Magten was clearly aware of this -- at no point

9  did Paul Hastings ever say that it was stepping down as

10  general and lead bankruptcy counsel for Northwestern.  Magten

11  was well aware of this and raised no objections to Paul

12  Hastings continuing to provide services and incur expenses as

13  lead bankruptcy counsel would.  We, for example, obviously

14  led the fight in the confirmation process, getting the

15  disclosure statement approved, and addressing other

16  creditors' claims.  Magten was well aware that Paul Hastings

17  was lead counsel with respect to the confirmation process and

18  issues and was also aware that we were counsel dealing with

19  claims of other parties in interest, such as the McGreevey

20  claimants and Comanche Park.  It would be totally

21  inappropriate for Magten now to come in and raise objections

22  to the services performed and expenses incurred by Paul

23  Hastings.  We submit that if it had a problem with the role

24  we were continuing to play as lead and general bankruptcy

25  counsel to Northwestern, the time to do that was at the time

1  these services were being provided not now.  We recognize

2  that this is an interim application, but at that point, Your

3  Honor, the test we believe should only judge whether the fees

4  we rendered were reasonable not whether we should have done

5  them at all.  If Magten complains about us doing them at all,

6  they should have raised those objections when the interim

7  applications were filed, and those applications were

8  submitted on a monthly basis and clearly identified what we

9  were doing in this bankruptcy case.  The fact that Magten has

10  overplayed its issues on appeal of the confirmation order

11  should not penalize Paul Hastings for successfully and

12  reasonably fulfilling its role as lead bankruptcy counsel to

13  Northwestern.  As a result, Your Honor, we ask that this

14  application be granted, that the objections filed by Magten

15  be overruled, and that the request for a case adjustment

16  submitted by the fee examiner also be overruled.  Your Honor,

17  to the extent you have questions concerning our application,

18  I am available to address them.

19       THE COURT:  Now, Mr. Smith, let's have your comment

20  relative to the reduction of 75,694.

21       MR. SMITH (TELEPHONIC):  Thank you, Your Honor.  I

22  would disagree that there is not authority in the law for

23  such a reduction, Your Honor.  We included the case of <u>Jasava</u>

24  (phonetical) a bankruptcy case in the Third Circuit, and I'd

25  like to quote from footnote 9 in that case.