1      THE COURT:  Go ahead.

2      MR. SMITH (TELEPHONIC):  It says, quote, "Request

3  for compensation for services of professionals whose time is

4  de minimis raise their red flag in our review other than

5  professionals with exceptional expertise.  The fleeting

6  involvement of bankruptcy attorneys in a case often results

7  from a staffing inefficiency.  Given the itinerate attorney's

8  lack of knowledge of the case, the attorney's time may be

9  less productive than attorneys regularly assigned to the

10  case.  When this occurs we would expect an appropriate

11  deduction be made to the time charged."  End quote, Your

12  Honor.  Now I also want to point out a few things, Your

13  Honor, regarding the time of the -- for lack of a better word

14  well call them itinerate attorneys.  Yes, we just went

15  through a response to Exhibit 6, and as of the time of those

16  with less than ten hours, I think the point was asserted that

17  these were people with special expertise outside the

18  bankruptcy arena.  If I'm misquoting, I'd like to be

19  corrected on that.  But in viewing the response to Exhibit 6,

20  we do see on the first page of that, of course, Mr. Austin's

21  time there and we're having no dispute with the 2,587 hours

22  that he put in and it shows that he's a partner and the

23  department is corporate bankruptcy.  On the very next page,

24  though, of response to Exhibit 6, there's two attorneys,

25  Thomas P. Brennan (phonetical), also in the Corporate

Bankruptcy Department.  He bills one hour to the case at an

hourly rate of $540 an hour.  Also on that same page, the

second page of the response to Exhibit 6, the attorney

Catherine A. Trackler (phonetical), she's also in the

Corporate Bankruptcy Department, and she billed 3.3 hours and

that was for a total of $1,633.50.  Your Honor, I think the

point made in Jasava is that back to when the Bankruptcy Code

was enacted in 1979, there was legislative history to the

fact that bankruptcy to entice all these professionals to

practice bankruptcy law and bankruptcy attorneys should be

paid the same inside bankruptcy as the attorneys outside

bankruptcy.  But I think there's also a -- basically there's

a -- accordingly the billing practices should be the same,

and outside bankruptcy there are often billing reductions and

discretionary reductions that are taken by attorneys for

private clients.  Many times, such reductions are for

attorneys who bill just small matters on this case.  In our

fee audit experience, many law firms make this reduction

voluntarily.  Paul Hastings has not made such a reduction.

Again, we think that there is good authority for such a

reduction.  We think such a reduction is appropriate in this

case, and that's why we made that recommendation.

        THE COURT:  All right, thank you, Mr. Smith, I'll

take those comments under advisement.  Can we have counsel

for Magten to approach the podium and you may address your

1    objections to the fees.

2        MR. AMEANI:  Good morning, Your Honor.  Dijon
3    Ameani, Schorch, Ameani, and Monvease (all phonetical) for
4    Magten Asset Management.  I'm here, Your Honor, to present
5    Magten's objection to Paul Hastings final fee application.
6    We have basically two principal objections.  The first, as we
7    discussed with Your Honor in our call on Friday, was that we
8    believe that this application should be deferred pending the
9    determination by the District Court of Magten's appeal
10   relating to Paul Hastings' disqualification and whether they
11   should have been disqualified in this matter.  The second
12   objection goes to the representation that Paul Hastings made
13   to this Court previously to Judge Case in connection with
14   that disqualification motion, and as they went forward, how
15   their actions conflicted with that representation, in
16   particular in remaining involved in matters that they told
17   the Court that they would no longer be involved in.  Before I
18   get to those two things, I wanted to address a couple of
19   things that Mr. Austin said, and that first one was the
20   scatter-gun approach that he likes to quote about Magten's
21   approach.  Nothing could be further from the truth about
22   Magten's approach to this case.  It's been a very focused
23   approach, Your Honor.  It is focused on one transaction in
24   particular and that is what people refer to as the going-flat
25   transaction.  We refer to it as a fraudulent transfer

1  transaction, but it involves, as Your Honor probably is fully
2  aware by this point, the transfer of significant assets from
3  Clark Fork to Northwestern just prior to the filing of this
4  bankruptcy and which I think no one disputes any longer that
5  that transfer was for anything but adequate consideration,
6  that in that transfer Northwestern benefitted to the tune of
7  hundreds of millions of dollars more than it relinquished in
8  return.  All of Magten's actions in this bankruptcy have been
9  focused on trying to get the right result for the creditors
10 of Clark Fork who were disenfranchised by that transfer, and
11 it was in the process of doing that that Paul Hastings'
12 conflicts arose.  It was in the process of focusing on that
13 aspect of the case that it became clear, although not crystal
14 clear until Mr. Austin submitted an affidavit, I believe, in
15 July 2004, that Paul Hastings had been involved in that
16 transaction and had been involved in that transaction for
17 both parties, both for Clark Fork and for Northwestern.  And
18 a little bit of the history since -- and you'll indulge me
19 for a moment, Your Honor, if you will -- a little bit of the
20 history since Judge Case was involved previously on how that
21 came about, how that discovery of that came about.  It was
22 during the course of negotiations in trying to determine how
23 things would be divided in this bankruptcy that there were
24 indications that Paul Hastings may have been on both sides of
25 that transaction, although that wasn't clear from the

1 records. Despite having put in several affidavits to the
2 Court, Paul Hastings had never disclosed that it had been
3 involved in both sides of that transaction. In March of
4 2004, my firm, on behalf of Magten, began making demands upon
5 Paul Hastings and asking them point blank, Were you involved
6 in both sides of the transaction? We'd like to know that.
7 And they avoided responding to that and forced us to
8 initially file a 328(c) statement with the Court, and
9 subsequently a disqualification motion following which, even
10 in response to that in affidavits, they did not disclose the
11 dual role that they played in that transaction. They only
12 finally disclosed it in response to an order from Judge Case
13 that they -- or direction, is probably closer to what it was,
14 a direction that they should file an affidavit disclosing
15 what their role was in that transaction, which they did in
16 July of 2004. It's noteworthy that in Judge Case's opinion
17 on the disqualification even though he denied our motion, he
18 did note that Paul Hastings should have made that disclosure
19 at the time, and that it was improper for them not to have
20 done so. He absolved them only on a basis of whether they
21 had an intention to withhold that information and only on the
22 basis of a last minute in-court declaration by the U.S.
23 Trustee's Office that they had in fact been advised of that
24 fact at the beginning of the bankruptcy and had chosen, I
25 guess, to keep it to themselves. On that basis he found that

1    it was not intentional, their nondisclosure.  He then held

2    that effectively Magten didn't have the standing to challenge

3    the conflict because Magten was not a creditor of Clark Fork.

4    And also found that the two parties to the transaction has

5    consented to that transaction, which it turned out

6    subsequently was a misstatement on the part of Paul Hastings

7    as well.  Clark Fork could never have consented to the dual

8    role of Paul Hastings in that transaction, at least there's

9    no record that they had done so.  But based on that finding,

10   Judge Case held that Magten should not be disqualified.

11   Nevertheless, in response to that motion, Paul Hastings

12   stated that in order to avoid any potential or appearance of

13   any conflict of interest it would withdraw from all -- it was

14   withdrawing or it had withdrawn from all matters related to

15   the Magten adversary proceeding which is addressed to that

16   very transaction, what is called -- referred to generally as

17   the going-flat transaction.  We believe that this final fee

18   application should be deferred pending the outcome of the

19   appeal from the disqualification order.  We believe that we

20   have substantial grounds for that appeal, and if that appeal

21   were to be granted, then the tenure of how the Court would

22   deal with the fee application would be different.  We also

23   believe that in light of the representation that they made,

24   that Paul Hastings made, this fee application should be taken

25   -- a much closer look should be taken of this fee application

1   and Paul Hastings should be directed to go back and review

2   its own files to determine to what degree it continued to

3   work on matters related to the adversary proceeding.  And in

4   that respect, I think, Your Honor has a lot of experience

5   because if you look at what Paul Hastings has done since the

6   disqualification motion, since they represented that they

7   were getting out, they proposed a plan.  They confirmed a

8   plan, and in the process of that plan proposal and

9   confirmation, they took issue again with the going-flat

10  transaction and Magten's objections to the going-flat

11  transactions, and those have been the subject of further

12  proceedings before Your Honor, which Your Honor is fully

13  aware of.  They subsequently settled the case with Magten,

14  and they entered into the settlement with Magten and again,

15  the settlement was directed principally to the Magten

16  adversary proceeding and all matters related to it.  They

17  then repudiated that settlement.  All right?  They then

18  suggested to us that we go to mediation, not the mediation

19  that's currently scheduled or that was directed by the Court

20  under the Court's rules with respect to any particular

21  appeal, but they actually suggested that we go to a mediator

22  whom they selected.  A $10,000 a day, we call him a holistic

23  mediator, out in Hawaii, Your Honor.  They came to us.  They

24  suggested we go to a mediation with them and try to further

25  resolve this matter with them.  They subsequently, just prior

1  to the time that that mediation was to begin, stated that

2  they would not attend the mediation.  They were no longer

3  interested in any attempts at mediation.  Everything they've

4  done since the time that they represented that they would no

5  longer be involved in the adversary proceeding or matters

6  related to it, go to the heart of that particular proceeding.

7  They've never withdrawn despite having told the Court that

8  they were withdrawing from that proceeding.  They've never

9  withdrawn from that proceeding.  We have no record of anyone

10  else, any other outside counsel having actually appeared or

11  done anything in that proceeding.  All matters related to

12  that fraudulent conveyance matter have been dealt through

13  with Paul Hastings since the inception of this case, and it

14  goes back to the -- at the heart of our problem with this,

15  and why it's the -- it remains part of Magten's overall

16  focus, the heart of our problem with this is the fact that

17  Paul Hastings having been on both sides of the transaction,

18  the fraudulent transfer transaction, Paul Hastings in fact

19  did have a conflict there and that conflict has in fact

20  pervaded everything they've done in this case.  It truly

21  calls into question whether they dealt with all the creditors

22  of this case equitably, which we understand the standard to

23  be.  And as a consequence of that, until the disqualification

24  motion is decided, they should not have their final fees

25  ruled upon.  With respect to the particular matters that they

1   said that they withdrew from they shouldn't get any fees

2   from that either.  We've laid out for Your Honor about

3   $308,000, I believe, in expenses that we were able to glean

4   from their fee application was either related to the Magten

5   -- all was related to the Magten adversary proceeding, and

6   we've laid out for Your Honor what those were.  But in the

7   process of taking discovery in this case, it also became

8   apparent that Paul Hastings, admittedly so, did not keep its

9   time records in such a manner that it was actually separating

10  the time that it was spending on matters related to the

11  Magten adversary proceeding, and so we've asked Your Honor to

12  direct them to go back and do so, so that we can get a

13  clearer picture of how much in fact was devoted to that.  At

14  this point, Your Honor, in terms of the conflict, the other

15  point that I wanted to make was, it would appear rather clear

16  that although when we first made the disqualification motion

17  we stood alone in claiming that Paul Hastings had a conflict.

18  Your Honor has now also seen that in the context of the 9019

19  motion, other parties came forward and set forth what they

20  believe was Paul Hastings' conflict as well.  The Plan

21  Committee, the Creditors Committee, the Ad Hoc, Class 7

22  Committee, both of them filed objections to the 9019, and one

23  of the principal objections they filed in the 9019 hearing

24  for the settlement was the fact that they felt that Paul

25  Hastings had such a conflict.  So, I think at this point, our

1    point simply is that there's a fairly -- There's no question
2    that there was a fraudulent transfer.  There's no question
3    that Paul Hastings was on both sides of the transfer.
4    There's a fairly substantial argument that as a result of
5    that conflict, they should have been disqualified from being
6    the debtor's counsel, and they certainly should have been
7    disqualified from dealing with that particular matter.  They
8    represented to the Court that they were not going to deal
9    with that matter, with the fraudulent transfer, at least with
10   respect to Magten's objection to it.  They continued to do
11   so.  They put in a fee application that has some $300,000 of
12   time that can be clearly identified in that respect, but
13   they've admitted that they didn't keep their time in such a
14   manner that other time that might have been spent on it is
15   not also buried in other areas, and as a consequence, the fee
16   application should be deferred for the time being until the
17   disqualification is decided and absent that, if Your Honor
18   wants to deal with the fee application, the $300,000 should
19   not be granted to them, and they should be directed to go
20   back and determine from their own time records other time
21   that was spent on that matter.  Thank you, Your Honor.
22            THE COURT:  Thank you.
23            MS. PHILLIPS:  Good afternoon, Your Honor.
24   Margaret Phillips of Paul Weiss Rifkind Wharton & Garrison on
25   behalf of the Plan Committee.  I want to sort of clarify for

1    the record something Mr. -- Magten's counsel just stated that

2    one of the Plan Committee's principal objection to the

3    settlement motion that was denied was the fact that Paul

4    Hastings had a conflict.   That was not the case.   The

5    principal objection was the fact that the settlement

6    expressly violated the terms of the plan, and I also wanted

7    to express the Plan Committee's support of Paul Hastings' fee

8    application.   This has been a difficult and complex Chapter

9    11 case, as I'm sure Your Honor is aware at this point, and

10   the debtor's plan of reorganization was successfully

11   confirmed because of the tireless efforts of Paul Hastings

12   and the other professionals that were involved in this case.

13        THE COURT:   Thank you.   Do you want to respond, Mr.

14   Austin?

15        MR. AUSTIN:   First off, to clarify the record, Your

16   Honor, Northwestern and certainly Paul Hastings takes issue

17   that (a) there was a fraudulent transfer, a transfer of the

18   assets from Clark Fork to Northwestern, and (b) that Paul

19   Hastings itself has a conflict.   Essentially all I've heard

20   Mr. Ameani do is to reargue his disqualification motion.

21   That matter had been resolved in favor of Paul Hastings.

22   There's been no stay of that.   The history that he tried to

23   bring up is effectively not relevant.   You know, the Court,

24   Judge Case after full deliberations and hearing denied the

25   motion to disqualify and in its rulings did not put any

1  restrictions on Paul Hastings as to the role it could play

2  and the services it rendered as general lead bankruptcy

3  counsel to Northwestern.  The issues which Mr. Ameani claims

4  that Paul Hastings effectively shouldn't have been involved

5  in was development and reorganization plan that was

6  overwhelmingly supported by Northwestern's approximately, I

7  guess, 98 percent of its creditor body, and effectively

8  responding to objections raised by Law Debenture and Magten,

9  which, I guess, Mr. Ameani's suggesting that we're supposed

10  to depress to know exactly what Magten's going to raise

11  before it raises it and should be prepared to have some else

12  to deal with the situation.  That simply is not how this

13  bankruptcy case was run, and it was not how Magten -- It was

14  not -- Magten was aware of anything different.  As to the

15  Magten adversary proceeding, the Greenberg Traurig firm as of

16  that point was counsel of record and it was clear as we

17  stated we stepped back and took no more action in that case.

18  And the last point, Your Honor, we do take issue with how our

19  time was kept.  We clearly delineated our time.  We kept it

20  in accordance with the rules.  We had more multiple sub-files

21  for which we recorded time and the time that related to the

22  Magten litigation, the going-flat litigation, as we called

23  it, it was what we called Magten 41, and other than one item

24  which we did make an adjustment for, Your Honor, all that

25  time was recorded prior to the point that we advised the

1    Court we were stepping down as counsel to Northwestern with

2    respect to that actual pending adversary case.  In this

3    particular instance, Your Honor, Judge Case effectively said

4    through confirmation of the plan, that the plan was fair and

5    equitable, and that the creditors -- to all creditors, and

6    indeed, the creditors noted this by voting overwhelmingly to

7    support this.  Subsequent history that Mr. Ameani's trying to

8    bring up also is not relevant, and we ask the Court to deny

9    Magten's objections and approve the application.  One last

10   point, is just an observation, on the one hand Mr. Ameani was

11   arguing last week that this application should come on.  But

12   seemingly today, he's having kind of a different perspective

13   in that you should effectively defer ruling on it pending the

14   outcome of the appeal for which there was no stay.  We also

15   want to make a correction, Your Honor, when last week we

16   suggested that possibly the Court should defer ruling until

17   there's a completion of the District Court ordered mediation.

18   We have reviewed the matters that are going to be addressed

19   before the mediator, and we retract that statement, Your

20   Honor.  We do not think there's a need for this Court to

21   delay ruling on the application pending the outcome of the

22   mediation.  Those issues before the mediator would not, we

23   believe, effect the ultimate result by this Court hopefully

24   granting the application and making payment if for some

25   reason down the road, there's an adverse ruling to Paul

1   Hastings either as to the disqualification motion or what

2   have you.  We believe at that point an appropriate remedy

3   could be fashioned because we are officers of this Court.

4   This case is still pending before this Court.  It has not yet

5   been closed, and if this matter is ever remanded back and

6   we're forced to order disgorgement in any way, we certainly

7   are available and before this Court to face those

8   consequences.  Thank you.

9        THE COURT:  Thank you.  I'll take this matter under

10   advisement.  Do we have the Graves' application?  Counsel.

11        MR. ABBOTT:  Good morning, Your Honor.  Just

12   barely.  Maybe it's still morning for a minute or so.  Your

13   Honor, my name is Derek Abbott of Morris, Nichols, Arsht &

14   Tunnell.  I'm here on the related matters of the revised

15   final fee application of the Graves Law Office and the

16   alternative nunc pro tunc application for the debtors to

17   retain ELM Consulting.  Your Honor, I'm here in both those

18   capacities.  By way of preview, Your Honor, very briefly, I

19   think it's important to note at the outset that we have come

20   to peace with Mr. Smith who I think is on the phone and will

21   acknowledge that with the exception of a couple of issues.

22   The two issues that I think the Court's interested in hearing

23   about and Mr. Smith is obviously reserving judgment on are

24   the issue of the propriety of Graves Law Office paying fees

25   to ELM Consulting as an expense.  That said, Your Honor,

1  we've discussed with Mr. Smith his comments both to the fees

2  and expenses relating to Graves Law Office, and other than

3  the propriety of the structure, the fees and expenses of ELM

4  Consulting, Your Honor, and to be brief, what we're left

5  with, Your Honor, is a revised final fee application

6  reflecting the comments of the fee auditor for fees in the

7  amount of $185,435 for Graves Law Offices and expenses --

8  and, Your Honor, I'll put those in two buckets to make it

9  clear.  Expenses not related to the fees of ELM Consulting in

10  the amount of $60,737.11 and then a balance after a number of

11  deductions for expenses of Graves Law Office for ELM fees in

12  the amount of $841,793.11.  Your Honor, the deductions per

13  Mr. Smith's comments to the ELM matter were approximately

14  $22,000 related to an expense surcharge noted by the Court at

15  one of the prior hearings.  Your Honor, an adjustment of

16  eight thousand some odd dollars related to the

17  appropriateness of the billing for non-working travel time.

18  $148.87 adjustment, Your Honor, for a meal that wasn't

19  sufficiently described.  A $5 charge for an alcoholic

20  beverage, Your Honor.  And a $16,492 communications charge.

21  All of those items, Your Honor, were reduced to get us to

22  that final aggregate number of both ELM related expenses and

23  other case expenses of $902,000 -- excuse me, $902,530.22.

24  Your Honor, what I would like to do is spend a little time

25  describing the background.  I've got two witnesses that I

1    think together hopefully should be in the twenty to thirty

2    minute range, depending on the Court's questions.  I do note

3    there are no objections to either of these applications, and

4    perhaps the easiest thing to do, Your Honor, would be to

5    commence with the testimony, but I'm at the Court's pleasure

6    on that.

7            THE COURT:  Go ahead, proceed as you wish.

8            MR. ABBOTT:  I'd like to call, Your Honor, Lee

9    Graves to the stand.

10           THE COURT:  All right.

11                        LEE GRAVES

12   being duly sworn according to law, testifies as follows:

13                     DIRECT EXAMINATION

14   BY MR. ABBOTT:

15   Q.   Mr. Graves, would you please tell the Court who you are

16   and what you do.

17   A.   My name is Lee Graves.  I am principal in Graves Law

18   Offices as well as principal of ELM.

19   Q.   Can you explain what Graves Law Offices is and then

20   follow up with an explanation briefly of what ELM Consulting

21   is?

22   A.   Yes.  Primarily Graves Law Offices is an environmental

23   law practice in which we focus on environmental remediation,

24   natural resource damages, and overall environmental

25   compliance issues.  Our firm is a very small firm.  We only

1  have three attorneys of which I'm the principal again.  ELM

2  Consulting is a environmental consulting firm of only twenty

3  people.  Approximately, they're made up of environmental

4  engineers, design engineers, geologists, ecotoxicologists,

5  human health toxicologists, and are primarily individuals

6  with I would say on the average of over fifteen years'

7  experience with those folks.

8  Q.   When did you first become associated with Northwestern

9  Corporation or its affiliates?

10  A.   I would say approximately three years ago, just prior to

11  the acquisition of Montana Power by Northwestern.

12  Q.   Can you explain in rough terms what the Graves Law

13  Offices do for Northwestern and its affiliates?

14  A.   Primarily we handle all their environmental matters

15  which range from the management of several manufactured gas

16  sites in three states, Nebraska, South Dakota, and Montana.

17  Of those nine, there's three, I would say, active sites in

18  Helena, Montana.  Aberdeen and Mitchell, which have been part

19  of a voluntary program with enforcement oversight by the

20  agencies.  Graves Law Offices has been working on those sites

21  in conjunction with the consultants.  We have been doing

22  pilot studies, characterizations, sampling to determine what

23  risk to human health in the environment are at those sites.

24  Coordinating that matter with Northwestern as well as with

25  the state and federal agencies. There's other sites in

1    Nebraska which we're beginning conversations with state

2    agencies on as well.  We've also provided support services

3    for Northwestern through the bankruptcy as to quantification

4    of environmental liabilities that support the plan.  We've

5    been doing enforcement compliance and auditing for the

6    company in its general operation.  We have been supporting

7    quantification of liabilities as it relates to the reserve

8    numbers for SEC reporting requirements, Sorbey & Oxie

9    (phonetical) requirements.  And also been managing the

10   Milltown Dam matter in negotiations near Mesula (phonetical),

11   Montana.

12   Q.    In the course of your representation of Northwestern as

13   affiliates, does the Graves Law Office use consultants?

14   A.    Yes, we do.

15   Q.    Can you describe the use of those consultants very

16   generally for the Court, please.

17   A.    Generally, we hire experts in that environmental matters

18   generally are very technically driven as to environmental

19   risks, fate and transport of constituents, clean-up levels,

20   quantification of contamination in the environment, how to

21   clean it up, how to approach it, and with that takes a number

22   of different disciplines to draw conclusions and give -- Just

23   to give an opinion as to the issues.  Graves Law Offices

24   retains consultants and different firms including the ELM

25   Consulting to manage those expertise under an umbrella of

1  attorney/client privilege in anticipation of litigation.  And

2  those experts all are directed by counsel and that allows the

3  opportunity to manage the strategy and hopefully end resolve

4  of the liability for the corporation.

5  Q.   This structure that you've described where Graves Law

6  Office retains the consultants directly in order to protect

7  attorney/client privilege and work product protections, is

8  that structure unique to your firm's engagement with

9  Northwestern or is that what you do with all your clients?

10  A.   Depending upon the matter.  The majority of our matter

11  is anticipation of litigation.  So we will retain experts

12  directly, and I know ELM Consulting has been retained by law

13  firms directly if Graves Law is not the law firm involved.

14  So the general state of the industry is very litigation

15  driven in terms of environmental matters, and so, the

16  majority of the experts working with legal counsel are of a

17  privilege nature.

18  Q.   And just so the Court's got this information, Mr.

19  Graves, how long have you been involved in the environmental

20  litigation and legal arena?

21  A.   Probably about -- I guess career stretching from more of

22  a finance attorney and contract attorney in Washington in the

23  '80s, Exxon-Valvese (phonetical) ran aground, I went back

24  into the federal government as an attorney to work on the

25  Exxon-Valvese matter and take over major litigation for

1    federal and state agencies in California, Montrose Chemical

2    litigation which was the preeminent natural resource damage

3    case in the country and, I think, still is today.

4    Q.   Is it fair to say that you're relatively experienced in

5    the environmental litigation world?

6    A.   I think the basis of the natural resource damage and

7    remediation experience -- our practice is a small practice

8    but we're probably preeminent in the field.   There's probably

9    no better group of experience in the country than we have

10   internally between technical folks and myself on the legal

11   matter.

12   Q.   Focusing again quickly on the differences between what

13   Graves Law Offices does and what ELM Consultants do for

14   Graves Law Offices, I want to ask you a series of questions

15   regarding ELM Consulting's role, not Graves Law Office but

16   ELM Consulting's role.   Would you say that ELM Consulting had

17   the responsibility to control, manage, administer, invest,

18   purchase, or sell assets significant to this debtor and its

19   reorganization proceedings?

20   A.   No.

21   Q.   Was ELM Consulting itself involved in the negotiation of

22   a plan of reorganization?

23   A.   No.

24   Q.   Is the service the ELM provides directly related to the

25   principal work carried out by the debtor or the routine

1   maintenance of its operation?

2   A.    No.

3   Q.    Did anyone at ELM Consulting have the discretion or

4   autonomy to exercise professional judgment in the

5   administration of the Northwestern debtor's estates?

6   A.    No.

7   Q.    Were professionals -- Excuse me, were ELM Consultants

8   heavily involved in the administration of these cases?

9   A.    I'm sorry, which cases?

10  Q.    I'm sorry, the Northwestern bankruptcy cases.

11  A.    No.

12  Q.    And finally, you talk a little bit about some of the

13  qualifications for the consultants at ELM, but did they

14  possess some special skill or knowledge that would leave one

15  to believe that they are professionals in the ordinary

16  meaning of the word?

17  A.    As it relates to their discipline, yes.

18  Q.    Thank you.  Back to your involvement with this estate or

19  these debtors and both pre-petition and during the case, do

20  you understand that on or about the first day or week of the

21  case these debtors sought court approval to use both Graves

22  Law Office and ELM Consulting as ordinary course

23  professionals in these matters?

24  A.    Oh, absolutely.

25  Q.    And sometime later was there a different sort of

1    retention sought for Graves Law Office?

2    A.    I believe -- I hope I get the character right, it's

3    special counsel and that was I think due primarily to the

4    amount of monies going through shifted that from ordinary to

5    special.  I believe that's the nomenclature for its shift.

6              MR. ABBOTT:  Your Honor, may I approach the witness

7    with a document?

8              THE COURT:  Yes.

9              MR. ABBOTT:  And the bench as well, Your Honor, in

10   case you haven't got the Graves retention application in your

11   binder.

12             THE COURT:  I've got it.

13             MR. ABBOTT:  Thank you, Your Honor.

14   BY MR. ABBOTT:

15   Q.    Mr. Graves, I've handed you a document that on its face

16   is marked Docket No. 591 dated December 22nd, 2003.  Have you

17   seen this document before?

18   A.    Yes.

19   Q.    And is this the application that the debtors filed to

20   retain Graves as special counsel?

21   A.    Yes, it is.

22   Q.    Does this document disclose the structure of the

23   relationship between Graves Law Office and Elm Consulting?

24   A.    Yes, it does as does our original engagement letter

25   prior to bankruptcy.  I believe it's page 3, item 6.

1   Q.    That's the discussion in the application.   Is not that

2   engagement letter -- I stand corrected.   I believe the copy

3   that I handed you does not have all the attachments and I

4   apologize, but to the best of your belief was the engagement

5   letter between the debtors and Graves Law Offices attached to

6   that application?

7   A.    Yes, it was, the original application.   I don't see it

8   on this copy though.

9          THE COURT:   Are you talking about Mr. Graves'

10  affidavit?

11         THE WITNESS:   No, it was the original engagement

12  letter of Graves Law Offices with Northwestern prior to

13  bankruptcy.

14         THE COURT:   Oh.

15         MR. ABBOTT:   Your Honor, I had understood that was

16  attached and disclosed as redacted to protect certain

17  confidential information.   I've got a copy here I could hand

18  up if it's not attached to the Court's copy.

19         THE COURT:   I've got a copy of the docket file and

20  I don't see that attached.   Is it marked as an exhibit or a

21  schedule?

22         MR. ABBOTT:   Your Honor, I believe it was, although

23  I don't -- It was filed under seal, Your Honor.   Footnote 3

24  on page 3 of the application reflects that it was filed under

25  seal because it did have some privileged information in it.

1  The copy I've got that is attached to my copy has been

2  redacted, I believe.  Your Honor, very briefly, my point in

3  referencing this was to point to the disclosures made in

4  there that were not redacted regarding the structure of the

5  arrangement between ELM Consulting and Graves Law Offices.

6  Again, I'm happy to hand that up to the Court if it was not

7  included in the file as having been filed under seal, but I

8  could just as easily, perhaps, get Mr. Graves to testify to

9  that disclosure.

10        THE COURT:  I don't have anything from the docket

11  sheets which are included in the applications and that has

12  anything to do with the scope and services pre-petition, but

13  what has attached here is a retention letter, Exhibit B, and

14  then there is in the application the recitation relative to a

15  connection between Graves and ELM and how Graves will in turn

16  employ an environmental consulting firm to perform

17  environmental work including field sampling, laboratory

18  testing remediation and one of those firms is ELM, E-L-M.

19        MR. ABBOTT:  Your Honor, I believe Exhibit B was

20  the document to which I was referring.  It's an engagement

21  letter, Your Honor, dated December 14, 2001.  If I may

22  approach, I could hand the Court my copy.

23        THE COURT:  That's not in the exhibit I have, but I

24  have seen that exhibit in a prior hearing.

25  BY MR. ABBOTT:

1    Q.    Mr. Graves, did that engagement letter attached as

2    Exhibit B describe the structure of GLO's retention of ELM

3    Consulting and also disclose the nature of your majority

4    ownership interest in each of those entities?

5    A.    Yes, and it was also representative of the discussions

6    with Northwestern management in that one of the other

7    managers of ELM was with me when we initially met with and

8    introduced how to manage environmental liabilities, the

9    combined approach using ELM for privilege and legal and the

10   consulting for the technical support.

11   Q.    And that structure and arrangement was the arrangement

12   and structure that existed when you were first retained in

13   2001 --

14   A.    Correct.

15   Q.    -- and throughout the duration of the bankruptcy case

16   and in fact today, post-confirmation in effect today; is that

17   true?

18   A.    The relationship and how the environmental sites are

19   being managed hasn't changed since the first engagement in

20   2001.

21   Q.    Thank you.

22         MR. ABBOTT:    Your Honor, that's all I have for Mr.

23   Graves.

24         THE COURT:    All right.

25         MR. ABBOTT:    I would pass the witness to the Court

1    or interested parties if there's further inquiry.

2            THE COURT:   I have no questions.   Thank you very

3    much.

4            THE WITNESS:   Thank you, sir.

5            MR. ABBOTT:   Your Honor, I would next call Mike

6    Young.

7                    MICHAEL J. YOUNG

8    being duly sworn according to law, testifies as follows:

9                    DIRECT EXAMINATION

10   BY MR. ABBOTT:

11   Q.   Mr. Young, will you please tell the Court who you are

12   and what you do.

13   A.   Yes.   My name is Michael J. Young.   I'm a senior

14   corporate counsel at Northwestern Corporation, and my

15   principal responsibilities are to work doing the commercial

16   work of the utility and in that context I handle basically

17   all of the environmental work for the utility.

18   Q.   And how long have you been with the company?

19   A.   I've been with Northwestern since January 1st of 2001.

20   Q.   And in connection with your responsibilities with the

21   company, are you aware of Graves Law Office and ELM

22   Consulting?

23   A.   Yes, I am.

24   Q.   Since when?

25   A.   I was first introduced to Graves Law Offices and ELM

1    Consulting approximately this time during the year 2002,

2    shortly after we had closed on the Montana Power acquisition.

3    So it might have been the May/June time period of 2002.

4    Q.    Are you aware of the structure of their engagement

5    whereby Northwestern retained Graves and Graves retained

6    consultants?

7    A.    Very much, yes.

8    Q.    Do you understand why they do that?

9    A.    Yes, I've -- In my previous employments both with

10   Northwestern with NRG Energy in Minneapolis and also with

11   Cargale (phonetical) Inc., I was involved pretty

12   significantly with environmental work, and at both those

13   companies, similar to the way Northwestern has it structured,

14   we would typically engage a consulting firm directly through

15   the use of outside counsel.

16   Q.    And why was that?

17   A.    The principal reason was to solidify the privilege

18   because a lot of the work was done in anticipation of

19   litigation.

20   Q.    And is this structure an arrangement one that

21   Northwestern employs with counsel other than Graves from time

22   to time?

23   A.    Yes, I have some recollection on that and certain

24   matters Northwestern has engaged other consultants through

25   the use of lawyers particularly when there's anticipated

1   litigation.

2   Q.   Is it your understanding that this structure, in terms

3   of the retention, has always been in place with Graves Law

4   Office as far as you're aware?

5   A.   Yes, as far as I'm aware, and in fact, I did work on the

6   engagement letter, so I was very familiar with the structure.

7   Q.   Would you describe briefly in your own words what Graves

8   Law Offices does for Northwestern?

9   A.   Well, it's kind of a unique relationship because you

10  kind of get a double bang for your buck.  I mean, you get Lee

11  Graves who's an extremely experienced environmental lawyer

12  who had significant experience in negotiating settlements and

13  consent decrees with regulatory agencies, which is something

14  that Northwestern was involved with very deeply once it

15  acquired Montana Power with respect to the Milltown Dam

16  situation.  And then of course we saw coming down the

17  pipeline potential other problems and issues involving

18  manufactured gas plant sites in our states in which we

19  operate, and on top of that, he was affiliated with a very,

20  very strong consulting firm that had a high level of

21  competency, was extremely well respected in the industry.

22  So, we felt that we were making a very efficient engagement

23  by getting access to two very valuable resources.

24  Q.   And you were sitting here in the courtroom when Mr.

25  Graves testified about what he did for the company; is that correct?

1  A.    That's correct.

2  Q.    Was his testimony consistent with your understanding of

3  their role?

4  A.    Yes.

5  Q.    How critical to the operations of Northwestern are the

6  services that Graves Law Offices provides?

7  A.    In my opinion, very substantial.  When Northwestern

8  acquired Montana Power Company, it was the last part of a

9  major divestiture involving the unwinding or the unbundling

10  of a vertically integrated utility out in Montana, and when

11  the generation assets were sold to PPL, a significant number

12  of environmental human resources went with that transaction.

13  So, Northwestern, when I came on board and was assigned the

14  responsibility to deal with the environmental issues, it was

15  pretty clear to me that internally we did not have the human

16  resource power to manage these situations going forward

17  efficiently and effectively because we didn't have the

18  manpower, the people-power to do it.  So, a decision was made

19  by senior management to go the route of using outside

20  consultants to manage the environmental affairs, working with

21  an in-house lawyer.

22  Q.    And I realize I'm getting into a sensitive area here, so

23  I want you to be limited of course to publicly disclosed

24  information, but is there a disclosed general order of

25  magnitude that you can describe either the alleged or

PENGAD • 1-800-631-6989

FORM FED-25

1   potential liability involved in the environmental matters

2   that Graves Law Office is involved in on Northwestern's

3   behalf?

4   A.   Sure.  Currently in our public filings, most recently

5   our 10(k), we list out an environmental reserve amount of I

6   believe approximately $43 million.  So that is the company's

7   assessment at this point of what it believes it is going to

8   be responsible for going forward with its environmental

9   matters, and in addition, obviously in this bankruptcy there

10  was a very public situation involving the Milltown Dam super-

11  fund site in which I believe claims were filed in the

12  neighborhood of $150 million against the company and the

13  estate for potential responsibility at the Milltown Dam and

14  through the efforts of Graves Law and the Paul Hastings firm

15  and ELM Consulting we were able to structure a very, very

16  favorable settlement to the benefit of the estate of roughly

17  $11 million.

18  Q.   Now, I realize that a lot of people contributed to the

19  confirmation and effectiveness of the plan of reorganization,

20  but in your mind could the company have done it without the

21  sort of assistance that Graves Law Office provided the

22  debtors?

23  A.   No, I think it would have taken significantly longer to

24  get this company through the bankruptcy process, in my

25  opinion, because we would have had to go out and hire the

1   necessary resources to go out and assess the environmental

2   situation, do an inventory of potential environmental

3   liabilities, and then do a quantification of those

4   liabilities, and Graves Law and ELM were extremely familiar

5   with all the company's environmental situations in all three

6   of its states and were able to work effectively and

7   efficiently with the Paul Hastings firm to develop a plan for

8   dealing with the environmental liabilities and to implement

9   or structure that plan within the filing documents.

10  Q.    Thank you, Mr. Young.

11          MR. ABBOTT:   I have no further questions, Your

12  Honor, and I would pass the witness.

13          THE COURT:   Thank you, Mr. Young.   Does that

14  conclude your testimony?

15          MR. ABBOTT:   That concludes the testimony, live

16  testimony, Your Honor.   I do wish to ask the Court to take

17  judicial notice of some of the entries on the docket and the

18  record in the bankruptcy case generally, and I'd be prepared

19  to address that in the beginning of my argument, if I might,

20  Your Honor.

21          THE COURT:   Go ahead.

22          MR. ABBOTT:   Your Honor -- Your Honor, this company

23  filed its petition on September 14th, 2003.   As Mr. Graves

24  testified, it sought the ability to use ordinary course

25  professionals in the ordinary course of its business.   On

1  September 17th, that was docket item 38, Your Honor.  Listed
2  on the exhibit there were both Graves Law Office and ELM
3  Consulting.  That motion, Your Honor, was approved at docket
4  item 200 on October 10th and contained what are fairly
5  customary monthly and aggregate caps for those professionals.
6  Your Honor, because it looked like the caps would likely be
7  exceeded with respect to these professionals, on December
8  22nd, 2003 at docket item 622, the debtors filed their
9  retention application of Graves Law Offices, and I would ask
10 the Court to take judicial notice of that.  Mr. Graves
11 identified it, and I note, Your Honor, that that application
12 disclosed the structure of the engagement, described in the
13 scope of their services under paragraph (9), Your Honor, that
14 Graves would retain and direct environmental consultants and
15 contractors and the management of environmental liabilities
16 and remediation of sites.  That's 9(c), Your Honor.  When
17 discussing the compensation and expenses at paragraph (11),
18 Your Honor, that that application stated that in addition to
19 the hourly rate set forth above, Graves customarily charges
20 its clients for all costs and expenses incurred including
21 environmental consulting services, telephone and tele-copier,
22 toll and other charges and a number of other fairly
23 traditional charges.  Your Honor, that's paragraph (11) on
24 page 4 of the application.  Your Honor, on January 14th,
25 2004, Judge Case then presiding over this proceeding entered

the order as far as we can tell without any objection, Your

Honor.   That's docket item number 696.   On page 2 of that

order, it states that the debtor's authorized pursuant to

327(a) and Bankruptcy Rule 2104 to retain and employ Graves

as special counsel in this Chapter 11 case, upon the terms

and conditions set forth in the application and the Graves

affidavit effective as of the petition date.   Your Honor,

that's the background of how Graves got into the case and

their efforts to -- or the debtors' efforts to have them

approved to provide services to the debtors.   Throughout the

course of the case, Graves submitted interim and quarterly

fee applications.   The Court in some previous hearings and

certainly Mr. Smith had noted some problems with those

applications that I think we have now corrected and resolved

in connection with our discussions with Mr. Smith and the

reductions that both the Court has imposed and Graves and ELM

have agreed.   The Court in some earlier hearings raised the

question of whether it was appropriate for Graves Law Office

to be able to pay its consultants directly, and I want to try

to respond to those, Your Honor.   As a result of those

comments, also on the docket at number 2622, which is still

pending is that nunc pro tunc retention application.   It was

supplemented on February 7th, Your Honor, with a request that

in the event that that application needed to be ruled on,

that ELM would request some modest relief to which I don't

1    think the fee auditor had an objection regarding its billing
2    practices and the customary sort of billing practices used
3    for environmental consultants of ELM's kind.  In addition,
4    based on some of their earlier comments at hearings, Graves
5    submitted a revised final fee application at docket item
6    2959.  That is the document, Your Honor, to which Mr. Smith
7    has noted some deficiencies and as to which recommendations
8    or deficiencies we agreed to concede.  Your Honor, I really
9    have three points that I'd like to make in legal argument.
10   The first is that we believe given the historical record in
11   this case, the disclosure of the engagements and the
12   retention order granted earlier in the case that there is a
13   law of the case argument that would suggest to us that ELM
14   need not be separately retained.  Additionally, and perhaps
15   alternatively, Your Honor, there is a case law extant in this
16   circuit that suggests that environmental consultants are not
17   professionals within the context of 327, they need to be
18   retained by the Court.  And my final point, Your Honor, and I
19   want to go through each of those a little more carefully, but
20   my final point, Your Honor, would be alternatively, if the
21   Court is more comfortable with such a nunc pro tunc
22   application, that on the, I think, relatively well settled
23   nunc pro tunc application law in this circuit, nunc pro tunc
24   retention in this case would be warranted.  And I'd like to
25   start with the idea of the law of the case, the two Third

1    Circuit cases I'd like to talk about first are <u>Hamilton v.</u>

2    <u>Leevy</u> (phonetical), which is 322 F.3d 776, and <u>Africa v. City</u>

3    <u>of Philadelphia</u>, which appears at 158 F.3d 711.  Together,

4    Your Honor, those cases suggest the following about law of

5    the case:  The doctrine of law of the case is intended to

6    limit the re-litigation of an issue once it's been decided

7    either explicitly or by necessary implication.  The intent of

8    that doctrine is to promote finality, consistency, and

9    judicial economy.  There's an exception for certain matters

10   including new evidence.  It's clear, Your Honor, from those

11   cases that the application of the law, the case doctrine,

12   does not restrict this Court's power but informs the exercise

13   of the Court's discretion.  The law, however, suggests that

14   the discretion to refrain from applying the doctrine should

15   only be used in extraordinary circumstances which I submit

16   are not present in this case.  Those circumstances are things

17   like new evidence, supervening new law, or that the earlier

18   decision was clearly erroneous and would create manifest

19   injustice.  Respectfully, Your Honor, we submit that there

20   are no such extraordinary circumstances to warrant a

21   departure from the law of the case doctrine in this case and

22   the previously approved retention application that adopted

23   the structure set forth in the application and the letter

24   agreement.  Your Honor, as an aside to that, I note that

25   § 328 of the Code would otherwise allow the Court to change

1  the terms and condition of compensation after the conclusion
2  of services only if the terms and conditions proved to have
3  been improvident in light of circumstances not capable of
4  being anticipated at the time of the fixing of such terms and
5  conditions, and, Your Honor, here where they've been
6  disclosed in advance, we don't think we're in that bailiwick.
7  Your Honor, we do know from Mr. Graves' testimony that it's
8  frequent in his practice that this structure is used.  We
9  know that the ELM services were specifically contemplated by
10 the retention application in an order, and we think the law
11 of the case ought to govern, Your Honor.  The second prong of
12 my argument as I described is the reference to the line of
13 cases, the most, I think, well known of which is a case
14 called In Re:  Napoleon in this circuit.  It's at 233 BR 910.
15 That case cites another case In Re:  Sealing Associates
16 Limited, which is 128 BR 721.  They stand for the proposition
17 that environmental experts or consultants need not be
18 retained specifically under 327 as they're not necessarily a
19 professional as contemplated by § 327 of the Code.  The other
20 case that I would cite in that regard, Your Honor, is a 2001
21 case from Puerto Rico at 259 BR 484.  Again there the Court
22 found an environmental wet lands expert was not a
23 professional as contemplated by 327.  These cases are not
24 riding on a clean slate, Your Honor.  There is some
25 jurisprudence in this jurisdiction regarding those factors,

1  and as I'm sure you heard Mr. Graves run through a series of

2  questions that were designed to get at those factors, Your

3  Honor, and those factors are laid out I think most recently

4  in the AC&S case in this district, which appears at 297 BR

5  395.   That's a 2003 case that highlights the six factors that

6  Judge Farnan in the earlier First Merchants case established.

7  Those factors are whether the person to be employed controls,

8  manages, administers, invests, purchases, or sells assets

9  significant to the reorganization.  Whether that person would

10  be involved in negotiating the plan of the reorganization.

11  Whether that person's employment directly related to the type

12  of work carried out by the debtor or to the routine

13  maintenance of the debtor's operations.  Whether the person

14  to be employed is given discretion or autonomy to exercise

15  professional judgment in the administration of the estate,

16  and finally whether those persons are possessed of some

17  special skill or knowledge that would leave one to believe

18  they are professional within the ordinary meaning of that

19  term.   Your Honor, pursuant to Mr. Graves' testimony and I

20  think consistent with Mr. Young's testimony, the ELM

21  Consulting folks are certainly professionals within the

22  ordinary sense of the meaning, but that's the only one of

23  those six factors, Your Honor, that suggests that they are

24  professionals that would need to be retained.  We understand

25  from the earlier transcripts and record in the case that Your

1    Honor has a concern about that, and for that reason, Graves

2    did file a nunc pro tunc application to be employed and

3    retained in the case.  That alternative relief, Your Honor,

4    we would ask the Court to approve if in fact it is not

5    inclined to grant the application for fees including the ELM

6    expenses that's presently before Your Honor as amended,

7    pursuant to discussions with Mr. Smith.  Your Honor, there

8    are a couple of cases in this circuit that talk about the

9    propriety of nunc pro tunc application.  The two leading

10   cases are In Re: Arkansas at 798 F2d 645, and the most recent

11   case that I could find at the Third Circuit level that

12   addresses this issue and in fact clarifies to some extent the

13   Arkansas case was the In Re:  FS Air Lease II, Inc., case at

14   844 F2d 99.  The FS Air Lease added a couple of questions to

15   the standard from Arkansas and they were (1) sort of at the

16   global level, could this applicant have been retained

17   initially, and (2) are circumstances extraordinary so as to

18   warrant approval on a nunc pro tunc basis.  The cases talk

19   about the reasons and the importance of prompt application by

20   a debtor for the retention of its professionals, and I think

21   those reasons have been met in this case where the debtor did

22   in fact seek approval of both GLO and ELM as ordinary course

23   and ultimately for Graves Law Offices as 327(e) counsel, but

24   the factors that the Court says are to be considered are

25   largely inapplicable in this case.  The first is, did the

1  applicant or someone else have the responsibility for
2  applying?  Well, Your Honor, in this case whether it was the
3  applicant or someone else, and I would submit that it was
4  perhaps a shared responsibility between debtor's bankruptcy
5  counsel and Graves, but they met their burden.  They did, in
6  fact, make the application.  It was granted without approval.
7  The second factor, Your Honor, is was the applicant under any
8  time pressure to begin work before approval.  Again, not a
9  factor that's particularly applicable to the facts of this
10  case.  Graves was working both before, during, and after the
11  bankruptcy case.  I think they were involved in important
12  negotiations all through it, but given the fact that within
13  three days of the filing of the case, there was an effort to
14  get Court approval for the retention.  I don't think that
15  factor is particularly applicable.  The third factor, again,
16  not applicable, was their delay after learning that the
17  approval was not granted.  Well, in fact, Your Honor,
18  approval was granted earlier in the case, so that factor, I
19  think, at least is met here.  The fourth factor is whether
20  compensation to this party would prejudice innocent third
21  parties, and nobody has suggested that, that I'm aware of,
22  Your Honor, and we don't think that's the case.  The last
23  factor's a catchall and it asks the Court to consider other
24  relevant factors.  Here I think there are some other relevant
25  factors, and they are principally the facts that we've heard

1   in testimony and I've discussed a little bit, the fact that

2   there was a multi-part effort to retain Graves Law Offices

3   and in acknowledgement in that retention of ELM Consulting's

4   role.   There was an effort to retain ELM Consulting as an

5   ordinary course professional, and then in the alternative in

6   the recent nunc pro tunc application to retain ELM

7   Consulting.   And the other factor, I think that's important

8   to consider, is that the purpose of the structure that was

9   developed and used by Graves Law Offices and other

10  environmental and other litigation firms was to retain the

11  expert directly in order to protect the company's important

12  confidential information, privileged information, and work

13  product protections.   I think, Your Honor, that on those

14  facts, and I hope the Court would view those facts to be the

15  extraordinary circumstances that would warrant nunc pro tunc

16  relief in this matter if the Court believes it needs to get

17  to that application before granting the Graves Law Office fee

18  application, including the ELM fees.   That said, Your Honor,

19  I'd be happy to try to respond to the Court's questions.   I

20  note that this engagement structure is one that did not

21  bother the U.S. Trustee.   I've been authorized to explain to

22  the Court that that was their position, and I would ask the

23  Court now to grant --

24            THE COURT:   Maybe you should go to the U.S. Trustee

25  and get him to sign the order.

1    MR. ABBOTT:  I understand, Your Honor.

2    THE COURT:  No, I don't have any problem.  Let me

3  clear up one thing with Mr. Smith here.  Mr. Smith --

4    MR. SMITH (TELEPHONIC):  Yes, Your Honor.

5    THE COURT:  -- what are your final numbers -- Are

6  you still there, Warren?

7    MR. SMITH (TELEPHONIC):  Yes, I am, Your Honor.

8    THE COURT:  What are your final numbers on this

9  revised fee application that was just filed in March?

10    MR. SMITH (TELEPHONIC):  Okay, Your Honor, if I

11  could come back to that question, if you don't mind? -- in a

12  roundabout way.  And that is, I'd like to clear up one

13  matter, and that is we did review the fee and expenses of

14  Graves.  We only reviewed the expenses of ELM.  We did not

15  review the fee detail or the fees of ELM because in our mind

16  the fee detail was inadequate for us to apply our regular

17  standard of review, and so we understand that the application

18  to employ ELM provides for them providing fee detail at a

19  lesser standard of review, and we're familiar with that, and

20  we can do that, but at this time, as of this time, we have

21  not reviewed the fees of ELM.  And, Your Honor, we did talk

22  to Mr. Abbott yesterday, and apparently they have agreed to

23  our reductions for Graves and those reductions included

24  travel time of $843.75, a reduction for conflicts of $337.50,

25  and accounting billing issue of $112 and $30.50 in reduction

1  for alcoholic beverages.

2       THE COURT:  So that comes out to what as far as the

3  expenses?

4       MR. SMITH (TELEPHONIC):  Your Honor, I've not added

5  those up.  I could just -- hang on, Your Honor.  Your Honor,

6  since ELM was listed in the Graves application as an expense,

7  I've not totaled up the other reductions because those are

8  fee and expense reductions.  Your Honor, if I could address

9  the agreement we had regarding reductions on ELM?

10       THE COURT:  Yes.

11       MR. SMITH (TELEPHONIC):  Again, we had only

12  reviewed the expenses of ELM not the fees.  There were

13  basically five issues on the ELM expenses.  One was the

14  communications fee.  That was in the amount of $16,492.25.

15  It was our understanding that that was basically a fee that

16  was based on a percentage of the time billed, and it's our

17  understanding that they've agreed to waive that fee.  We

18  asked a question, Your Honor, regarding travel time that was

19  imbedded in the ELM time records.  It was unclear to us what

20  that travel time was, and we've not gotten a response to that

21  question.  It's our understanding they will agree to reduce

22  that travel time by fifty percent, but again, we don't have

23  -- we are not able to quantify that number at this time.  And

24  also, Your Honor, the expenses were charged a 10 percent

25  surcharge.

1     THE COURT:  Yeah.

2     MR. SMITH (TELEPHONIC):  And they've agreed to

3  reduce that but we have not yet quantified that as well.  So

4  there are several items on the ELM expense side that have yet

5  been quantified.

6     MR. ABBOTT:  Your Honor, I can provide what I

7  believe are those numbers.

8     THE COURT:  Why don't you dictate them into the

9  record for me here.

10    MR. ABBOTT:  I'd be happy to, Your Honor.  The 10

11  percent expense surcharge that would be waived is $21,997.74.

12  The non-working travel adjustment is $8,047.50.  Mr. Smith

13  was correct about the communication charge of $16,492.  In

14  addition we've agreed to eliminate a $148.87 meal charge, and

15  a charge of $5 that apparently purchased beer.

16    MR. SMITH (TELEPHONIC):  Yes, Your Honor, that's

17  our understanding.

18    THE COURT:  Okay.  What is that total?

19    MR. ABBOTT:  For that, I'm going to have to borrow

20  --

21    THE COURT:  What I'm trying to get at is what's the

22  final figure you want to put in an order if I approve these

23  fees and expenses.  I'm not going to sit here and guess at it

24  --

25    MR. ABBOTT:  Your Honor, I've got that math done.

PENGAD • 1-800-631-6989

FORM FED 25

1    The total amount of fees would be $902,530.22, consisting of

2    as amended ELM expense and fees of $841,793.11 and non-ELM

3    Graves Law Office expenses of $60,737.11.

4              THE COURT:  What was the last number, 60 what?

5              MR. ABBOTT:  Sixty thousand seven hundred thirty-

6    seven dollars and eleven cents.

7              THE COURT:  And that totals the 902,530.22?

8              MR. ABBOTT:  Yes, sir.  And the fee component of

9    Graves after the reductions that we've agreed to and

10   discussed with Mr. Smith is $185,435.

11             THE COURT:  Okay.  Have you got that, Mr. Smith?

12             MR. SMITH (TELEPHONIC):  Yes, Your Honor.

13             THE COURT:  All right.  I'll take it under

14   advisement, we'll get out an order.

15             MR. ABBOTT:  I appreciate it, Your Honor.

16             THE COURT:  Right.  Let's take -- Have we got Law

17   Debenture; is that it?  How long is that going to take?  Can

18   we take a break?  How are you girls doing?  I've just been

19   ordered to take a break.

20             UNIDENTIFIED SPEAKER:  I think that would be a good

21   idea.

22             THE COURT:  Let me just say one thing.  We did an

23   order this morning on that arbitration case with Northwestern

24   and --

25             UNIDENTIFIED SPEAKER:  National Union.

THE COURT:  National Union Insurance Company, and the Court has appointed a former justice of the Montana Supreme Court, Jim Ragnier (phonetical) to be the umpire, and the order specifies that he will be given $450 per hour to split between the parties and then reasonable expenses.  And that concludes so that the arbitration now can proceed.

MR. ABBOTT:  Your Honor, if I might be excused from reappearing, I apologize.

THE COURT:  Yes.  How about 1:15.

MR. SMITH (TELEPHONIC):  Your Honor, if I could be excused we were not requested --

THE COURT:  Yeah, thanks, Warren.

MR. SMITH (TELEPHONIC):  Thank you very much, Your Honor.

(Whereupon at 12:56 p.m. a recess was taken in the hearing in this matter.)

(Whereupon at 1:16 p.m. the hearing in this matter reconvened and the following proceedings were had:)

THE CLERK:  Please rise.

THE COURT:  You may be seated.  Well, let's see. We've got some more money to look over here.  It's Law Debenture Trust Company of New York, request for fees of $958,075.87 and expenses of $21,994.49, unpaid annual administration fees of $45,000, total request $1,025,070.30. Now, you may proceed, counsel.

1    MR. SNELLINGS:  Thank you, Your Honor.  John

2    Snellings for Law Debenture Trust Company of New York as

3    indenture trustee to the Quips.  My notes say here, Good

4    morning, Your Honor.  I guess I'll have to modify that and

5    say --

6         THE COURT:  Well, it's still morning in Montana.

7         MR. SNELLINGS:  There you go.  We're here today on

8    Law Debenture's request for payment of fees and expenses that

9    was filed pursuant to a plan of reorganization back on

10   December 1st.  This is for fees and expenses pre-effective

11   date and does not cover those expenses and fees that we've

12   incurred since then.  It's a little outstanding here today.

13   Just eight weeks ago we were standing here presenting a

14   settlement agreement, a settlement agreement that included

15   payment of all of our fees, both pre- and post-effective date

16   in full.  Debtor admitted that that settlement was in the

17   best interest of the estate, and I would also remind the

18   Court that when the debtor reneged on the agreement it wasn't

19   due to the fact that our fees were excessive, but that's

20   water under the bridge pursuant to an appeal.  Now, we're

21   back to square one.  In reviewing the debtor's objection,

22   there seemed to be two major themes.  One is that there's not

23   enough information for them to make a determination regarding

24   our fees, and two, the issue of substantial contribution to

25   the reorganization effort.  There have been with regard to

1  inadequate information this dispute that's before you today
2  is not about inadequate information.   There have been over
3  220 interim and final fee applications filed in this case.
4  There have been in excess of $47 million in fees paid.   We
5  have provided sufficient information pursuant to the local
6  rules.   We have provided supplemental information, additional
7  information so that they could, the debtor could do a
8  reasonable and measured review of our fees and of our
9  expenses.   We have never obtained any such an analysis from
10 the debtor.   So this is not about inadequate information.   It
11 is not about substantial contribution either, Your Honor.   No
12 indenture trustee has been held to that standard in this
13 case, whether it be Wilmington or HSPC, they've been held to
14 a very lax standard.   This objection is about leverage.   The
15 debtor's angry, continues to be angry that Law Debenture and
16 Magten continue to prosecute the fraudulent conveyance
17 action.   Their objection seeks to use leverage -- our fees as
18 leverage so that they might push us to settle this matter
19 because the debtor equates substantial contribution to
20 reaching an agreement with the debtor as a prerequisite of
21 payment of any of our fees.   That is not now nor it should
22 ever be the standard to measure an indenture trustee's
23 actions within a case.   It puts an indenture trustee like Law
24 Debenture, a fiduciary to all of its holders, in an
25 impossible position where it is to serve the holders, but it

1 must submit to the demands of the debtor to settle. Debtor's

2 objection is contrary to the plan. It's contrary to

3 representations it's made to this Court between counsel and

4 to the public in general. It is contrary to how it's treated

5 every other indenture trustee in this case, and it's contrary

6 to the order confirming their plan. The plan provided quite

7 clearly in § 1518 that the debtor shall pay on the effective

8 date all the fees and expenses of an indenture trustee in

9 cash and in full. That's a typical provision in a Chapter 11

10 case in which there are indenture trustees and that type of

11 indebtedness involved. Basically, the holders get two

12 bundles of consideration for the plan, a distribution

13 directly to them and a payment of fees of their indenture

14 trustee so that it does not have to invoke the charging lien

15 and, therefore, reduce the recovery to those holders. That

16 was the consideration that this debtor offered to and

17 solicited votes from the Quips and the Toppers and the senior

18 notes, and this Court should hold them to that promise. The

19 fairness of the plan was built into the concept that the

20 Toppers and the Quips were going to be treated the same, that

21 their distribution would be a percentage recovery that was

22 equal. That was critical to Judge Case's finding in the

23 confirmation that they would be treated alike. Now, with

24 respect to that, the debtor at confirmation and also in the

25 confirmation order said that both the 8-A and 8-B parties

1  would be treated alike, that their distribution would be the

2  same.  However, by objecting to our fees and causing us to

3  rely on the charging lien, they have significantly reduced

4  the recovery of the Quips to far less than any recovery the

5  Toppers will receive.

6  THE COURT:  Is that because you'll have to go to

7  the Quip holders and recover under your charging lien?

8  MR. SNELLINGS:  Yes, Your Honor.  And for anything

9  that you do not allow here under this particular order.  So,

10  with respect to when we filed our request pursuant to the

11  plan, just before going effective, of what our fees were, the

12  response to the debtor was that they had never any intention

13  to paying our fees.  Once if you look at the correspondence

14  between debtor's counsel and my office, you will see that we

15  challenged that and said, Gee, that's not what  you said

16  during the confirmation process.  That is not what you said

17  in the plan, and it would have been good to disclose the fact

18  that you were never going to agree to our fees, challenge

19  them, and, therefore, reduce the ultimate recovery to the

20  Quips.  At that time, the attitude of the debtor changed and

21  said, No, we will comply with the plan, but you're still

22  going to have to file a fee application and go through that

23  process.  They also made representations to counsel, Your

24  Honor.  During the period just prior to going effective we

25  had the issue of determining an amount and estimating the

1  amount for the adversary proceeding in the Class 9 claims

2  dispute reserve.  We had numerous discussions about trying to

3  set that amount and at that time, we had discussions with

4  counsel from the debtor regarding our fees because that was

5  just prior to going effective, and we were preparing to make

6  our presentation to the fees as required under the plan.  And

7  as stated in the affidavits that we put forward to the Court,

8  is that we had conversations that the debtor did intend to

9  pay our fees and that we would not be nickeled and dimed.

10 However, once we actually made the application on November

11 1st, that changed and required us to invoke the charging

12 lien.  Also prior to going effective on November 1, the

13 debtor on its own website published a notice to all indenture

14 trustees, including Law Debenture, that is open to the public

15 and any Quips holders, any Toppers holder in which they

16 stated that on the effective date all of the fees and

17 expenses of all indenture trustees including law debenture

18 would be paid.  But contrary to that public representation,

19 it's never been paid.  This is completely inconsistent with

20 how they've treated all of the other indenture trustees in

21 the case.  Take for instance, Wilmington and its major holder

22 Harbert.  They struck a deal prior to confirmation and it's

23 in the plan that they were paid on the effective date $2.25

24 million in cash for their fees.  Wilmington also invoked

25 their charging lien and received another amount of stock

1   worth in the amount of around 55,000 shares which at current

2   prices is over another million dollars.  So they have

3   collected, Wilmington and Harbert, in excess of $3 million to

4   cover their fees.  Unlike Wilmington and Harbert, our fee

5   application is solely for the fees and expenses associated

6   with Law Debenture's role in this case.  We are not seeking

7   any fees of Magten's.  You can sort of parallel, Harbert was

8   the Topper's largest holder; Magten is ours.  Both have taken

9   very aggressive positions throughout this case.  However,

10  unlike Wilmington and Harbert, we're not seeking the payment

11  of any of Magten's fees here with this application.  It's

12  solely Law Debenture's.  But they struck their deal and

13  that's what they were paid.  There was absolutely no review

14  of Wilmington and Harbert's fees and expenses by the debtor

15  in the testimony provided to you when we took a 30(b)(6)

16  deposition of a representative from the debtor regarding

17  their fees and expenses and all fees and expenses of

18  indenture trustees.  The testimony was that the amount was

19  struck during the negotiations between Harbert and the

20  Committee but there was absolutely no oversight, no review of

21  any of the fees and expenses of the indenture trustee.

22  Second, there's HSBC.  They're the indenture trustee to the

23  senior note holders.  Your Honor, they've been paid over

24  $700,000 in fees and  expenses.  There again, there was no

25  oversight.  The representative of the debtor did indicate

1  that he had seen the invoices, but that he did not give them
2  anything but a quick review, and that they paid all of those
3  expenses of HSBC and their counsel, Pryor Cashman, a hundred
4  cents on the dollar, and this review can best be seen by
5  looking at Pryor Cashman's first invoice in which there is a
6  double entry for work done on the very first day of them
7  being hired. I asked the debtor, Did you pay for that double
8  entry? And they said, Most likely, yes, since we paid for
9  everything. Finally, Your Honor, there was our predecessor
10 indenture trustee, Bank of New York. They were the indenture
11 trustee for the Quips prior to our successor. They had
12 submitted fees and expenses of $54,000 not only during the
13 time of their position on the Committee but also pre-petition
14 fees and expenses. The debtor paid those expenses on the
15 effective date without any review, without any oversight.
16 Yet, now they're trying to hold us to a standard of
17 substantial contribution when here was a predecessor trustee
18 who was only on the case for a short time and was paid not
19 only their post-petition fees and expenses but also their
20 pre-petition. With regard to that, with regard to the
21 representations made, with the findings of the Court in the
22 confirmation order, and with the acts of the debtor we
23 believe that they're judicially estopped from now just doing
24 a blanket objection to our fees and requiring us to come
25 forward to the Court with this fee application. I think also

1  in their objection they minimize what we have done in this
2  case.  All that Law Debenture's done is attempted in good
3  faith to fulfill their fiduciary obligations to their
4  holders.  They have performed customary acts of indenture
5  trustees in Chapter 11s that are customarily paid by the
6  debtor.  We are the class representative.  We represent
7  hundreds of holders of Quips, and we perform that service
8  diligently and for the benefit of the debtor who does not
9  have to deal with these thousands of creditors and debt
10  holders.  We served on the Creditors Committee, a normal and
11  customary act.  We filed a proof of claim so that the debtor
12  could only have to deal with one proof of claim rather than
13  thousands.  We worked with regard to plan confirmation.  Now,
14  the plan isn't to our liking, yet it is better now as
15  confirmed than it was when we started.  The first plan had a
16  death trap provision, that if a class did not vote for the
17  plan the entire class got nothing.  We fought that.  It was
18  taken out.  We also believe that while they do not recognize
19  it to the full extent that we would want it, that the plan
20  now recognizes the fact of the litigation and the legitimacy
21  of that litigation and it continues as part of the plan.  We
22  also worked with the debtor with regard to solicitation and
23  the issues that were going to arise with regard to splitting
24  the class.  Now, with regard to Option 1 and Option 2.  While
25  they did not take our warnings and did not put in

1  solicitation practices to resolve the identity problems we've

2  worked with them since to help resolve that.  So we've

3  continued to work with the debtor on the litigation.  And

4  then we have the litigation itself, Your Honor.  We're in the

5  litigation for good.  The way the plan is devised so no Quips

6  holders have to be plaintiffs in this litigation so long as

7  we're a part of the litigation.  Section 12 of the

8  confirmation order is quite explicit.  While in other classes

9  the indenture is canceled and is not in full force and

10 effect, with regard to those who took Option 2, we are still

11 obligated to be representing them as a class and continue to

12 do so.  The litigation was an integral part of the plan

13 because it's the sole recovery of a substantial number of the

14 Quips who chose that, and it was the dividing of that choice

15 between Option 1 and Option 2 that Judge Case would allow

16 confirmation of the plan.  So, with regard to those who took

17 Option 2, the Quips notes and all the related documents

18 remain in full force and effect, and we continue to fulfill

19 that role as the indenture trustee, and that is worked into

20 the confirmation order.  And we will continue to fulfill

21 those responsibilities.  There are a number of methods that

22 we think we can be paid here.  We believe the clearest one is

23 the plan itself, and 518 that all indenture trustees are paid

24 their fees and expenses at or on the effective date in full

25 and in cash.  Now it states that if the debtor and the

1   indenture trustee do not agree, then it has to come before
2   the Court.   However, I believe and as we stated in our reply
3   that that type of objection should have the specificity with
4   regard to what items they truly reject, that a blanket
5   rejection without any specificity is one done in bad faith
6   and is arbitrary and is very difficult as counsel for an
7   indenture trustee to respond to.   To date, if you parse
8   together all their correspondence and pleadings, the debtor
9   has admitted or at least suggested that they're in agreement
10  with four of our categories and that they don't have a real
11  objection to it.   But yet, they hide behind the fact that
12  they will need a order to pay that.   They don't need an
13  order, Your Honor.   The order's in the confirmation.   If they
14  agree with our fees, they pay it, yet they haven't paid it.
15  They have strung this out to such an extent that we are still
16  accruing significant fees and expenses.   They raise an issue
17  with regard to our local counsel.   Our local counsel
18  submitted fifteen pages of invoices, a very small amount
19  given all the fee applications that have been filed here.
20  There's nothing unusual with regard to what our local counsel
21  did.   There's absolutely no grounds to object to their fees.
22  Everyone knows that here local counsel is Delaware's cottage
23  industry, and everyone knows what they perform and the
24  activities that they do, and there's absolutely no reason to
25  ask for more information about what they've done in this

1    case.  That's quite apparent.  With regard to the fees of Law

2    Debenture, the two officers that have been responsible for

3    this case, they ask for further information.  Yet, the detail

4    that is given, both in our application, is significant and

5    far greater than any information that they received from HSBC

6    and certainly far greater than anything they've received from

7    Wilmington since Wilmington never turned in a fee app.  And

8    yet they ask for more.  Your Honor, it's time to relieve us

9    of the burden of this leverage, to level the playing ground,

10   and allowing us to move forward in the litigation and any

11   settlement without using our fees as a ping-pong and without

12   using our fees as leverage to gain settlement.

13              THE COURT:  Is it your position that, and as I read

14   the fee request, they continue all the way through October

15   basically to the plan confirmation; correct?

16              MR. SNELLINGS:  Correct.

17              THE COURT:  And so from that point on when the

18   appeal was filed by Law Debenture and Magten trying to upset

19   the plan, you make no charges for those services.

20              MR. SNELLINGS:  Well, I'd have to check exactly

21   when we stopped.  I think that under the plan it was up to

22   the effective date, which was November 1.

23              THE COURT:  I want to separate something right

24   here.  It seems to me that what you do for your -- basically

25   your clients, the Quip holders, as I understand this thing,

1    the way it started out this 1996 debenture was originated to

2    raise some financing money for environmental matters and then

3    City Bank was the trustee, City Bank of New York, and was the

4    indenture trustee and you succeeded to their interest post-

5    petition.

6            MR. SNELLINGS:  That's correct.  Because Bank of

7    New York had a conflict.

8            THE COURT:  And during that pre-petition period

9    then City Bank would receive the funds from the old Montana

10   Power Company and then they make the distribution to the Quip

11   holders for the principal and interest that were paid, and

12   then they received an annual fee; right?

13           MR. SNELLINGS:  That's correct.

14           THE COURT:  Okay.  Now, did that debenture trustee

15   or your company as the successor trustee ever attempt to

16   protect those Quip bondholders when it learned back in '99

17   that the cash cow was going to be dismembered and that the

18   financial integrity of these Quip bonds were in jeopardy?

19           MR. SNELLINGS:  Well, Your Honor, I think you go to

20   some of the very essence of the fraudulent conveyance and the

21   fact that we believe that the entire going-flat transaction

22   was part of a fraudulent scheme that began --

23           THE COURT:  No, I'm talking about, counsel, much

24   more than that.  I'm talking about the dismemberment of a

25   generation facilities, which came first --

1    MR. SNELLINGS:  Uh-huh.

2    THE COURT:  -- the selling of all the generation

3    facilities to PP&L and then the dismemberment of the gas

4    supply company, and then came the transmission sale, each one

5    of these separate, and what I can't understand is how the

6    Quips bondholders were protected, weren't trying to be

7    protected at the beginning of this corporate scheme.

8    MR. SNELLINGS:  That I have no knowledge of.

9    THE COURT:  But you're a successor in interest.

10    MR. SNELLINGS:  That's correct.

11    THE COURT:  See, what bothers me about this whole

12    thing is these Quip holders and the indenture trustee is they

13    didn't step in any time when this thing was on the drawing

14    boards to be split out and all this cash was going to go into

15    this telecommunications network and put a lot of money in the

16    ground.  No one stepped forward on behalf of these Quip

17    bondholders to try to stop that.

18    MR. SNELLINGS:  You know, again, I'm not privy of

19    the history there pre-petition.  All I know is that once Law

20    Debenture, you know, became the successor, we did review the

21    going-flat transaction and had certainly tried to step in and

22    protect the rights of the Quip holders with regard to that

23    transaction.

24    THE COURT:  I'm probably holding you to the wrong

25    standard but it's just -- There's no question that the Quip

1    notes were unsecured.

2              MR. SNELLINGS:  Uh-huh.

3              THE COURT:  What they were relying upon was the

4    financial integrity of the Montana Power Company, which had a

5    history of performance for Montana.

6              MR. SNELLINGS:  That's correct, and --

7              THE COURT:  And that all changed when the company

8    decided to go into a dismemberment plan, and they did, and

9    nobody stepped forward on behalf of the Quip holders and

10   said, Hold it.  Nobody sought legal action at that time and

11   says, We relied upon the financial integrity of this company,

12   of the going concern, all the generations through

13   transmission.

14             MR. SNELLINGS:  Your Honor, I appreciate that

15   history.  All I can do is talk about when we got involved --

16             THE COURT:  Now, let's get involved with you.  You

17   say none of these fees are with regard to the Magten going-

18   flat transaction.

19             MR. SNELLINGS:  No, I'm not --

20             THE COURT:  Because that's not the way I read the

21   application.

22             MR. SNELLINGS:  No, we're not making any

23   application for any of Magten's fees that they've incurred in

24   this case.  For example the fees of Fried Frank or any other

25   counsel that they might.

1        THE COURT:  But your company parroted the Magten

2   and asserted the Magten objections to the plan and asserted

3   the fraud throughout the confirmation process; correct?

4        MR. SNELLINGS:  We -- Yes, but there are certain

5   things that we've never joined them.  We continued to

6   exercise independent judgment.  For example, we've never

7   challenged the MOU, and that's one appeal.  We did not join

8   in the Paul Hastings conflict motion.  We did not join there.

9   We do not join in the appeal of the confirmation order, Your

10  Honor.  That's just Magten.  So there were definite times

11  throughout that we did not join with them, and they went off

12  on their own way.

13       THE COURT:  So the only thing that you've got going

14  now adverse to the reorganized debtor is the Magten/Law

15  Debenture lawsuit trying to upset the Clark Fork transfer.

16       MR. SNELLINGS:  That's correct and also the more

17  recent one that was filed about Friday a week ago in which

18  we're seeking to revoke the confirmation order for their

19  failure to adequately fund their Class 9 reserves.

20       THE COURT:  Then this provision in the plan

21  relative to a dual test for your company's award of the fee,

22  503 --

23       MR. SNELLINGS:  Uh-huh.

24       THE COURT:  -- substantial contribution, and

25  something else; right?

1    MR. SNELLINGS: Well, Your Honor, I think the way

2 the plan reads is that it's subject to 503 and the debenture,

3 and the language in the debenture states at 907 that we are

4 -- that the debtor's obligated to pay our reasonable fees and

5 not only is it a reasonable fees but it's also an

6 administrative expense.

7    THE COURT: Well, doesn't that interpretation write

8 out, blank write out 503 language?

9    MR. SNELLINGS: Write it out?

10    THE COURT: You just argued that you don't have to

11 even get into this substantial contribution bogey-man

12 argument because it's irrelevant.

13    MR. SNELLINGS: Well, I think it is by the fact

14 that they have not in any way applied that same standard to

15 any other indenture trustee, that they're only using that

16 standard and rejecting our fees outright as a punishment for

17 our actions in this case in which we were trying to protect

18 the interest of the Quips.

19    THE COURT: Maybe they were satisfied with the

20 cooperation they received from those other indenture trustees

21 and they felt that it wasn't necessary to invoke 503(b).

22    MR. SNELLINGS: Well, Your Honor, they have said

23 that, that the issue with regard to the Toppers was that they

24 settled and they now get $2.5 million in cash without any

25 oversight. The problem there is that, Your Honor, with

1 regard to that settlement we were never invited to that
2 table.  We were never invited, you know, when they negotiated
3 with the Toppers they didn't invite the Quips to see if we
4 could come to some global settlement.  Instead, they
5 completed tried to isolate us.  There have been other
6 parties, Your Honor, throughout this case that have brought
7 up the fraudulent conveyance action.  The McGreevey's class
8 action that was mentioned earlier and the Comanche creditor
9 as well as Atlantic Richfield.  Creditors of Clark Fork and
10 Black Foot have been bringing up the fraudulent conveyance
11 action on a number of occasions, and in each case, even when
12 some of those have indicated an interest in joining our
13 action, the debtor has worked very, very diligently to settle
14 those cases and get those people not to join our action, and
15 consequently -- but that's not the standard that I believe
16 that, you know, we should be held to.  We have provided a
17 service to our Quips.  The indenture is clear that the debtor
18 is obligated, and you can either put it under an
19 administrative claim or you can look at the indenture as an
20 executory contract that has been assumed and continues to be
21 in effect today even.  It was in effect with the debtor in
22 possession.  It's in effect with this reorganized debtor, and
23 as an executory contract, they're obligated to pay for the
24 services that we have been providing.  So there's a number of
25 ways in which we should be paid.  This one in which they

1    promised under the plan to pay indenture trustees so that our

2    holders would not be significantly deluded by the charging

3    lien is the one that has brought us here today, and we

4    believe, based on their representations, based on the

5    confirmation order, and based on their public representations

6    that they're obligated to pay those fees, pay them in full,

7    and not apply this standard that they're only using more as a

8    club rather than anything else.

9         THE COURT:  My other question was regard to the

10   invoice that I have seen in here relative to the annual

11   administration fee of 45,000 is also included the

12   transactional or extraordinary fee of 129,000.

13        MR. SNELLINGS:  That's the hourly fees of the two

14   officers of Law Debenture that's been focused on this case,

15   and that's broken out, Your Honor, in pretty explicit detail

16   and in time records in our application.

17        THE COURT:  I agree that the time records are

18   there, but what is the basis, the legal basis for those

19   people to be paid through the reorganization?

20        MR. SNELLINGS:  It is pursuant to the indenture,

21   they're allowed to charge an hourly fee, just like --

22        THE COURT:  Reasonable expense?

23        MR. SNELLINGS:  -- HSBC did and HSBC's fees were in

24   excess of $400 an hour and Law Debenture's officials are, I

25   believe, 325.

THE COURT: Okay, anything further?

MR. SNELLINGS: No, Your Honor.

THE COURT: All right. Mr. Austin.

MR. AUSTIN: For the record, Your Honor, I'm Jesse Austin from Paul Hastings on behalf of Northwestern. I want to make a couple of summary points and try to address a couple of the questions. First off, I think the Court's analysis or perspective is correct that whatever else may be in the Quips indenture, 503(b) under the Bankruptcy Code ultimately controls whether or not the debtor, in this case Northwestern, actually has to pay cash with respect to the indenture trustee's fees and costs incurred by Law Debenture. What they're here asking you for today is to require Northwestern to pay approximately a million dollars in cash to them -- to it for the fees and expenses incurred in so-called fulfilling its duties as indenture trustee which Mr. Snellings readily admitted was primarily to benefit the individual Quips holders. We're not here arguing and in fact that they don't have a claim. We're here arguing whether or not with respect to whatever claim is there, whether Northwestern has to pay it in cash. We submit in this particular instance, 503(b) controls, it specifically provides for in the plan. To the extent ultimately, this Court, for example, would say, Okay, you made a application for a $1,100,000 effectively, I'm going to grant you a

1    hundred thousand.  That other million dollars of the claim

2    doesn't go away.  It becomes part of the indenture -- Law

3    Debenture's claim as the indenture trustee on behalf of the

4    Quips, and if they ultimately prevail in the litigation would

5    become part of that prevailing litigation claim.  It doesn't

6    go away.  It becomes a Class 9 claim ultimately paid from

7    distributions and Class 9 reserve.  So I want it to be clear.

8    It's not that the claim is going to go away.  The real

9    question is whether or not Northwestern has to bear the brunt

10   of a cash payment.  Here, Your Honor, the one thing I believe

11   we do agree with is that § 518 of the plan controls.  But

12   unfortunately Mr. Snellings only reads the first clause of

13   that first sentence of § 518 which says, On the effective

14   date the reorganized debtor will pay the indenture trustee's

15   fees and expenses in full and in cash.  What Mr. Snellings

16   does not go on to read is, In a amount to be agreed upon

17   among the debtor and each of the indenture trustees.  Each of

18   the indenture trustee means HSBC, Bank of New York,

19   Wilmington Trust, as well as Law Debenture.  In the event

20   that the trustee and the debtor can't agree, then the issue

21   comes before this Court to apply § 503, and 503 is very clear

22   that for an indenture trustee, which admittedly in this

23   particular instance, represents an unsecured claimant to

24   receive a cash payment on account of its fees, it has the

25   burden of establishing a substantial contribution.  And the

1    law in this case, which is controlled by the decision of

2    Lebraun (phonetical) vs. Mecom (phonetical) Financial at 27

3    F3d 937, clearly points out that a substantial contribution

4    shows that the efforts of the applicant, in this case Law

5    Debenture, resulted in a actual and demonstrable benefit to

6    the debtor's estate and the debtor's creditors.  Otherwise,

7    the creditors presume to be acting on it or its

8    representative's behalf.  And the Lebraun court further

9    stated that 503(b) is to encourage activities that will

10   benefit the estate as a whole and the substantial

11   contribution should be applied in a manner that excludes

12   reimbursement in connection with activities of creditors and

13   other interested parties which were designed primarily to

14   serve their own interest in which accordingly would have been

15   undertaken absent an expectation of reimbursement from the

16   estate.  Controlling law as well as 503(b) says here, Your

17   Honor, that the burden's on Law Debenture, and we submit that

18   it has not shown and cannot show that the fees and costs of

19   which it seeks payments were from efforts for Law Debenture

20   and its counsel provided an actual and demonstrative benefit

21   to Northwestern and its estate and its creditors.  Indeed, if

22   the Court reviews not only the application itself, but if it

23   reviews many pleadings that have been filed in this case, it

24   is very clear that Law Debenture acted almost exclusively to

25   protect the interests of the Quips holders and especially

1  Magten and not other creditors of Northwestern's estate.  Law
2  Debenture essentially became the official mouthpiece for
3  Magten and other distress funds for the Quips.  Magten held
4  in excess of 25 percent of the Quips, and under the terms of
5  the indenture could direct Law Debenture to take actions in
6  the bankruptcy case, and for the most part, while Mr.
7  Snellings in part begs to differ, Law Debenture appears to
8  follow Magten's lead rather than the interest of those Quips
9  holders which actually voted for the debtor's plan.  Law
10 Debenture objected to the confirmation.  Law Debenture filed
11 the adversary case.  It never engaged in negotiations to
12 result in a consensual plan.  It did not send out any type of
13 consent solicitation letter urging the Quips holders to vote
14 in favor of the plan.  There's nothing that Law Debenture
15 really did here as a practical matter which in any way
16 benefitted and enhanced this company getting the plan
17 confirmed, and in fact, all along the way, while we obviously
18 opposed what they were doing, they were throwing up
19 roadblocks and objections to the confirmation process.  When
20 you boil it down, Law Debenture's arguments essentially jell
21 around one point.  Northwestern paid the other trustees, it
22 should pay us too.  But as this Court itself recognized in
23 its comments, Northwestern clearly sees the other indenture
24 trustees significantly different than Law Debenture.
25 Throughout the Chapter 11 case, as we noted, Law Debenture

1  was fighting the process, and indeed, once it filed the

2  adversary case, it got booted off the Creditors Committee.

3  So, certainly after May 14th, anything Law Debenture was

4  doing May 14th, 2004 can't be said it on the benefit of the

5  estate but solely for the benefit of the Quips holders in

6  trying to block confirmation.  In contrast, HSBC, as a

7  trustee for the senior unsecured notes, worked throughout the

8  case as a member of the Creditors Committee to develop a

9  consensual plan.  And it had to defend itself against attacks

10  raised by Law Debenture as well as preliminarily Harbert and

11  Magten concerning -- Harbert and Wilmington Trust concerning

12  whether or not the claims of the Class 7 senior unsecured

13  notes were in fact a valid claim under some argument that the

14  Public Utility Holding Company Act may have voided those

15  securities.  Throughout there were negotiations and

16  discussion with HSBC, and the Creditors Committee would

17  ultimately reach an agreement to pay the claim presented by

18  HSBC because HSBC from the debtor's perspective, from the

19  perspective of the Creditors Committee did indeed make a

20  contribution, and to the extent that they were helpful, and

21  they were, they supported confirmation.  They urged their

22  holders upon call to support and vote for the plan.  From

23  that standpoint HSBC is clearly different, and I might add,

24  Your Honor, in contrast and I'll come to it in detail in a

25  second, the payment to HSBC was for -- and it represented

1 approximately almost $800 million of senior unsecured claims,

2 it's claim was for $745,000 roughly and that was for the

3 period from September 15th all the way through the

4 confirmation.  What you have to do is compare the claim of

5 Law Debenture, which is over a million dollars, representing

6 $65-plus million of claims, if you want to get some level of

7 comparison.  Additionally, the same can be said as far as the

8 assistance of Wilmington Trust, the trustee for the Toppers.

9 Yes, Wilmington Trust did engage in litigation with the

10 debtor in trying to oppose confirmation of the plan.  Yes, it

11 had Harbert beside it when that litigation was going on, but

12 that was at the time that we had a plan that distributed only

13 2 percent of the company's new equity to the Toppers and the

14 Quips to be shared pro rata.  As a result of the litigation,

15 as a result of negotiations within which Wilmington Trust

16 entered into with the debtor and with the Creditors

17 Committee, a modification to the plan was made that increased

18 the distribution to the Toppers and the Quips on a pro rata

19 basis from 2 percent to 8 percent with additional warrants

20 that could be exercised for an additional 5 percent of the

21 company.  So as a result of direct efforts by Wilmington

22 Trust and Harbert, there was a benefit to the debtor's estate

23 because these other creditors, which the Quips could have

24 taken, all they had to do was vote for the plan because they

25 went along for the ride, if you will.  Wilmington Trust made

1    from our perspective a substantial contribution, but it's not

2    completely substantial because we didn't pay all of the fees.

3    As a result of the negotiations, we only paid $2.25 million,

4    and we want to make it clear, based on that payment, that

5    every creditor thought that was okay.  It was actually

6    imbedded in § 5.18 that those payments were being made to

7    Wilmington Trust on account of its position and Harbert on

8    the settlement.  And, as Mr. Snellings stated, Wilmington

9    Trust didn't get paid a hundred percent because it did indeed

10   exercise its charging lien that reduced the distribution to

11   the Toppers by approximately a million dollars in value.  So

12   there was another million dollars of claims that Wilmington

13   Trust, through the provisions of the plan, got paid some cash

14   because we saw that made a contribution but on the balance of

15   it had to get paid through its charging lien, which

16   effectively then reduced the distribution to the holders of

17   the Toppers' claims.  With respect to Bank of New York,

18   similarly situated, that was done as a result of some of the

19   work done at the beginning of the case.  Plus, Your Honor,

20   with respect to the pre-petition amount, my recollection I

21   can state in my place, is I believe that was for payment on

22   account of unpaid trustee fees to the Bank of New York on

23   account of its position as the indenture trustee for one of

24   the senior secured bonds.  The reason Bank of New York had to

25   resign as indenture trustee on the Quips was because Bank of

1   New York also served as indenture trustee on one of the

2   issues of the senior secured bonds and under the Trust

3   Indenture Act of 1940, it couldn't serve in both capacities.

4   It resigned as a holder, as a trustee for the Quips and

5   that's where that, I think, most of that pre-petition amount

6   came from.  The point is, Your Honor, that here we did indeed

7   treat the Toppers and the Quips alike, and irrespective of

8   the fact that Law Debenture may attempt to invoke a charging

9   lien, it's ultimately provided for under the indenture just

10  as under the indenture there's obligations for

11  indemnification from those holders of Quips that are

12  directing Law Debenture to take such action that may

13  otherwise it has taken in this case.  Here, Your Honor, we

14  don't see any basis that Law Debenture can argue that it's

15  made a substantial contribution to confirming the debtor's

16  plan.  It totally failed to carry its burden and at all

17  points to this case it has attempted to oppose confirmation

18  and closing of this estate.  As we have gone through in an

19  attempt to review Law Debenture's fee applications, we do

20  note a number of things.  First, whatever else may be before

21  the Court, there certainly should be no consideration

22  whatsoever for fees and expenses incurred by Law Debenture

23  after May 14th because clearly that's a defining moment when

24  Law Debenture was removed from the Committee as a result of

25  the fact it actually joined in filing the adversary case to

1    remove assets from the debtor's estate which would have been

2    to the detriment of all the debtor's creditors.  So whatever

3    work was incurred after May 14th clearly doesn't fall into a

4    situation where this debtor would have even thought to have

5    paid in cash but one where Law Debenture can ask this Court

6    in good conscience to pay in cash.  If you then just look at

7    this fee statement up to that point, that otherwise reduces

8    that million one down to about $400,000, and the unfortunate

9    thing, Your Honor, in reviewing the application that's

10   presented, we the debtor can't really discern how much of

11   that should or should not be allowed as to things that may

12   well have helped the debtor.  For example, doing some

13   communications with the Quips holders and how much of it is

14   just stuff that otherwise would have been incurred by Law

15   Debenture under any circumstance.  The one thing I can tell

16   you that we've been able to discern was there's approximately

17   $67,000 incurred for participation on the Creditors Committee

18   and related matters.  To that point, I can advise the Court

19   the debtor would not object to those payments.  However,

20   you've got to then look at the rest of the claim they filed

21   in this context.  For example, a review and analysis of

22   general bankruptcy matters, they identify approximately

23   $88,000.  And there they specifically assert that these

24   tactics are attempted to facilitate efficient, quote,

25   "preservation and administration of the rights and claims

1    under the indenture." Well, if that's what they incurred,

2    they have a Class 9 claim, but it's not one that we should

3    pay the cash for under 503(b) at this point. They have

4    another $32,000 incurred for preparation of proofs of claim

5    although that section only includes approximately 2.1 hours

6    of time. Again, that's something that may be reimbursable

7    under the indenture, but not a 503(b) type reimbursement.

8    The same for certain communications with Quips holders in the

9    amount of $65,000 of which when you look at some detail, they

10   put in time related from June 15th to September 3rd, 2004,

11   related to the adversary proceeding including 5.5 hours

12   related to research and the trustee's duties to prior

13   bondholders in the fraudulent conveyance claim. And then

14   separately, Your Honor, they have included in that $114,511

15   of bankruptcy litigation fees and expenses related primarily

16   to the adversary proceeding and also another $452,000 roughly

17   for plan and disclosure statement matters, clearly places

18   where Northwestern cannot see that it gained any benefit for

19   the fees and expenses incurred. One last point, Your Honor,

20   the argument that the indenture has been assumed is

21   incorrect. The plan explicitly says and the indentures are

22   extinguished in counsel, but irrespective, indentures

23   themselves have survival language with respect to ultimate

24   payment of administrative costs and other claims. These

25   payment provisions may well survive the ultimate cancellation

1   and termination of the indentures.  They certainly may well

2   survive to the extent that we have ongoing litigation and if

3   the unlikely circumstance from Northwestern's perspective

4   that Law Debenture and Magten would prevail on the underlying

5   adversary complaint, that is the basis by which they may well

6   then be able to argue -- at least Law Debenture could argue

7   since it is the Quips' representative, that it is entitled to

8   its fees and expenses as a prevailing litigant under the

9   contractual provision.  At this point, Your Honor, we ask

10  that this Court deny the request of Law Debenture to require

11  the debtor to make a cash payment on account of fees set

12  forth in the application.  We do not believe that the plan

13  allows for such payment.  The parties did not agree on the

14  amount.  The plan specifically provides that as a result,

15  there has to be an application under 503(b), and in that

16  context, Your Honor, there's been no showing in this

17  particular instance of a substantial contribution for the

18  fees and expenses requested.  Thank you.

19          THE COURT:  Does the Committee have any position?

20  Let me hear from the Committee.

21          MS. PHILLIPS:  We would support the debtor's

22  objection.  For the record, Margaret Phillips of Paul Weiss

23  Rifkind Wharton & Garrison for the Plan Committee.  The

24  language in the plan in 5.18 is very clear, and that to the

25  extent there's a dispute between an indenture trustee and the

1   debtor that the mechanism provided is that they file an

2   application in front of this Court subject to 503(b), and in

3   looking at their application, it just doesn't seem to satisfy

4   that standard which is a pretty stringent standard.  Thank

5   you.

6            THE COURT:  All right.

7            MR. SNELLINGS:  Your Honor, just to make sure that

8   we're all reading the same passage, I believe that 518 says

9   503 and not 503(b) as well as the indenture, and with regard

10  to, you know, administrative expenses, the indenture again

11  requires that the debtor be obligated to pay us all of our

12  reasonable fees and expenses as well as giving us an

13  administrative expense, but 518 does not make a reference to

14  503(b).  Again, with regard to the plain language of the

15  plan, it also states that if the parties cannot reach an

16  agreement.  Here we have again the debtor indicating certain

17  portions of the fee request being reasonable and such, yet

18  opposing the entire thing in toto.  I don't believe that

19  that's what's demanded of the plan and that those amounts

20  that they have admitted are reasonable and if they don't have

21  an objection, they should be required to pay.  And, with

22  regard to the remaining portion of the claim, while it gives

23  some comfort to the fact that it continues to be a Class 9

24  claim, with regard to that I guess it goes back to the

25  issuance of the fact that whether or not it has been properly

1  reserved under the disputed reserve amounts, and whether it

2  will be there to pay that claim should we prevail in the

3  litigation, and given the representations to the Court in

4  prior hearings, one has to wonder how much the debtor will be

5  able to rely on their dispute reserve in the future.  But, we

6  believe that our application is consistent with our duties

7  and responsibilities as an indenture trustee in this case and

8  consistent with what we are to be doing in the sense that we

9  are a fiduciary representing the Quips.  With regard to our

10 comparison to HSBC, let's be serious about that.  They were a

11 member of the Committee.  They had all the privileges of

12 Committee's counsel and such, and I would assume, since

13 they've gotten paid almost a hundred cents on the dollar,

14 that I am surprised that the Committee and the debtor paid

15 them $700,000 when in fact the senior notes had very little

16 risk in this bankruptcy, and yet, they have incurred that

17 type of fees when they were sitting on the Committee and

18 pretty much as was described going along with the bankruptcy.

19 With regard to Wilmington, we know that, again, out of that

20 $2.25 million, 1.9 was paid directly to Wilmington, 300,000

21 to Harbert, and we assume, although it's never been disclosed

22 that the additional stock also went to cover Harbert's fees

23 and expenses.  They were aggressive in this case, and just to

24 point that they had settled when we haven't even though we

25 have tried desperately, and this Court is well aware of us

1    attempting to bring a settlement of our litigation and all

2    the other resulting litigation before this Court that most of

3    those fees went to be paying Harbert's costs, we're not

4    seeking Magten's costs here which goes to the reasonableness

5    of what we're seeking here, and therefore, we believe that

6    our fee request should be allowed pursuant to the plan.

7            THE COURT:  What about the argument that's made

8    that under any circumstances you shouldn't be paid any fees

9    after May 14th when you were relieved from the Committee and

10   took an adversary position?

11           MR. SNELLINGS:  Well, Your Honor, you know, this is

12   an adversarial environment.  We're in a Chapter 11 in which

13   people are constantly trying to make positions and such.  The

14   Committee spent, what, $50,000 researching whether or not

15   there was a fraudulent conveyance before Magten was even on

16   the Committee.  This was a very serious issue, and to say

17   that once we have raised an objection or filed a complaint

18   that we have somehow forfeited all of our rights under the

19   indenture or under 503 or whatever standard, would be a

20   hammer that is contrary to the duties and responsibilities of

21   trust indentures and also it is, you know, contrary to the

22   fact that we are a representative fiduciary.  We have no

23   stake in this.  We do not hold Quips, but we do represent

24   Quip holders, and we are at all times acting in good faith.

25   That complaint has survived a motion to dismiss and once it's

1    properly teed up we'll move forward, and again, I remind the

2    Court that only eight weeks ago this debtor was willing to

3    pay us quite handsomely to settle that dispute and many

4    others, and we were willing to settle with that.

5            THE COURT:  We don't have an agreement today.

6            MR. SNELLINGS:  No, and remarkably while everybody

7    said how much they wanted to settle it, my phone hasn't been

8    ringing, so --

9            THE COURT:  It's too bad we can't get somebody to

10   take it off track or get it back on track.

11           MR. SNELLINGS:  Yes.

12           THE COURT:  Well, thank you very much.

13           MR. SNELLINGS:  Thank you.

14           MS. STEINGART:  Your Honor, may I?  There was a

15   point raised that I had not seen in the papers before that I

16   did want an opportunity to respond to since now we are --

17           THE COURT:  What are you talking about?  What

18   motion or what objection --

19           MS. STEINGART:  I'm talking about Law Debenture.

20   Since there has been talk now that it should be a Class 9

21   claim and being a Class 9 claimant and having a substantial

22   Class 9 claim by virtue of the plan, all of -- I wanted to

23   point out the technical fact that all of Law Debenture's

24   fees, Your Honor, are post-petition.  What Class 9 is for is

25   pre-petition, unsecured claims.  So, the idea that somehow

1    Law Debenture's fees should be lobbed into Class 9 is

2    completely contrary to what the Class 9 claims were set aside

3    for, which is disputed, pre-petition, unsecured claims, and

4    before we went further with that, I thought it might be

5    helpful for the Court to be aware of that issue.

6            THE COURT:  Mr. Austin, what -- Maybe you can

7    clarify your position with regard to not being -- you don't

8    want to pay any cash and does that mean that you want to pay

9    them in stock?

10           MR. AUSTIN:  To the extent they ultimately had a

11   claim that derived from the litigation, Your Honor, then it

12   would be a Class 9 claim.  I disagree with Ms. Steingart's

13   characterization that that is cost incurred on behalf of an

14   indenture that was entered into pre-petition and they're now

15   litigating that's what they were doing, so like any other

16   litigant that may have a contractual provision so that to the

17   extent they have a Class 9 claim, yes, they get paid in

18   stock.  That's where it would come from, but the real issue

19   we're here today for, Your Honor, is the fact that the

20   administrative claim, the question is do they get paid?  Do

21   we have to pay that claim in cash?  The answer is, we

22   believe, not this particular one in the amounts they've asked

23   for.  Thank you.

24           MS. DARWIN:  Your Honor --

25           MR. AUSTIN:  Your Honor, I object.  Mr. Snellings

1    has already spoken on behalf of the indenture trustee, and

2    Ms. Darwin's with his firm.  I think we only should have one

3    party to speak in connection.

4         MS. DARWIN:  Your Honor, if I may, Amanda Darwin

5    with Nixon Peabody.  I did actually want to agree with Mr.

6    Austin on this point.

7         MR. AUSTIN:  I withdraw my objection.

8         MS. DARWIN:  You will see that we have specifically

9    reserved our right to pursue an allowed unsecured claim for

10   that portion of the fees and expenses that aren't paid in

11   cash.  We have filed two proofs of claims, as a matter of

12   fact, one on behalf of the Quip holders for principal and

13   interest due under the Quips, and that is the proof of claim

14   that has all the focus in terms of the adversary proceeding.

15   We have also filed a second proof of claim, which is our

16   standard practice for the fees and expenses of the indenture

17   trustee, and to the extent that those are not paid under

18   whatever theory, whether it be pursuant to the plan or

19   whether it be a substantial contribution in cash by the

20   debtor on the effective date, there is solid case law which

21   is undisputed that those fees and expenses post-petition are

22   an unsecured claim and payable by the debtor as an unsecured

23   claim.  Thank you.

24        THE COURT:  All right.  Well, I'll take -- Is that

25   it?  Everybody's got their briefs in, now they've got all

1  their arguments in -- just be a matter now to get a simple

2  order out.

3          UNIDENTIFIED SPEAKER:  Simple?

4          THE COURT:  Up or down.  All right.  I don't think

5  there's anything further; is there?

6          MS. DENNISTON:  There's nothing further on the

7  agenda today, Your Honor.

8          THE COURT:  Okay, then, we'll be adjourned.

9          ALL:  Thank you, Your Honor.

10          (Whereupon at 2:20 p.m. the hearing in this matter

11  was concluded for this date.)

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19  United States Courts, certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter.

22

23  *Elaine M. Ryan*                              5-09-05
    Elaine M. Ryan

24  2801 Faulkland Road
    Wilmington, DE 19808

25  (302) 683-0221